# In The Matter Of:

*ECIMOS, LLC v.*

*Carrier Corporation*

---

*Joshua A. Siegel*

*January 11, 2018*

---



LISABLAKEREPORTING

*Original File JoshuaSiegel final 011118.txt*

*Min-U-Script® with Word Index*

1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
2                      WESTERN DIVISION
_____
3                               )
ECIMOS, LLC,                    )
4                               )
        Plaintiff,              )
5                               )
                                )
6   vs.                         )              Case No:
                                )     2:15-cv-02726-JPM-cgc
7                               )
CARRIER CORPORATION,            )
8                               )
        Defendant.              )
9   _____)

10

11          THE DEPOSITION OF JOSHUA A. SIEGEL

12                  January 11, 2018

13

14

15

16

17

18

19

20

21

22

23              Lisa J. Blake, LCR, RPR
                      LCR #483

24
                LisaBlakeReporting.com
25                 901.485.9048

2

1          The deposition of JOSHUA A. SIEGEL, taken

2   on behalf of the Plaintiff, pursuant to Notice, on

3   January 11, 2018, beginning at approximately

4   9:10 a.m. in the law offices of Farris Bobango

5   Branan, PLC, 999 S. Shady Grove Road, Suite 500,

6   Memphis, Tennessee  38120.

7          This deposition is taken in accordance

8   with the terms and provisions of the Federal Rules

9   of Civil Procedure.

10          All forms and formalities are waived, and

11   objections as to relevancy, materiality and

12   competency are reserved, to be presented at or

13   before the hearing.  Objections as to the form of

14   the question must be made at the time of the taking

15   of the deposition.  The signature of the witness is

16   waived.

17

18

19

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2

    For the Plaintiff:
3
          MR. RALPH T. GIBSON
4         Attorney at Law
          Bateman Gibson
5         22 N. Front Street
          Suite 650
6         Memphis, Tennessee  38103

7
    For the Defendant:
8
          MR. GARRETT M. ESTEP
9         MR. ROBERT A. MCLEAN
          Attorneys at Law
10        Farris Bobango Branan, PLC
          999 S. Shady Grove Road
11        Suite 500
          Memphis, Tennessee  38120
12

13  Reported by:

14        MS. LISA J. BLAKE, LCR, RPR
          LisaBlakeReporting
15        8993 Acorn Landing
          Germantown, Tennessee  38139
16

17  Also present:

18        MR. STEPHEN OLITA
          MR. JEFF CARR
19        MR. JAMES CHENAULT
          MR. J.C. STEWART
20        MR. DOUG FEMEC

21

22

23

24

25

4

1                              INDEX

2    WITNESS:                                    PAGE NO:

3         JOSHUA A. SIEGEL

4
     Direct-Examination------------------------     5
5         by Mr. Gibson

6
     EXHIBITS
7
     No.                   Description          Page No:
8
     125   Report................................     49
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     **Exhibits were marked consecutively among the
25   deponents, and are bound in separate binder.

5

1                    JOSHUA A. SIEGEL,

2    having first been duly sworn, was examined and

3    testified as follows:

4                    DIRECT-EXAMINATION

5    BY MR. ESTEP:

6    Q.        State your name, please.

7    A.        My name is Joshua Alexander Siegel.

8    Q.        And your address?

9    A.        It's 2006 Hanover Street, Silver Spring,

10   Maryland.

11   Q.        Okay.  Mr. Siegel, I've read your report

12   and your -- and I've heard your background and

13   testimony and so I -- because you've testified a

14   number of times, I assume you know all the

15   deposition rules.

16   A.        Sure.  But if you want to review anything

17   with me, that's fine, too.

18   Q.        And you've heard them all that we've --

19   A.        I've heard them all today, yes.

20   Q.        Okay.  I'm not going to go over them with

21   you.

22   A.        Okay.

23   Q.        Now, first, before we do anything, I want

24   to -- Well, let me -- let me go through just a few

25   background and we'll put your report into evidence.

6

1          Where are you employed?

2    A.         I'm currently employed at DisputeSoft.

3    It's in Potomac, Maryland.

4    Q.         What does DisputeSoft do?

5    A.         We are primarily a litigation consulting

6    firm, so we assist counsel in dealing with

7    technology issues surrounding software, large

8    project implementations.  So if there is a contract

9    to develop a new program for a large state, there's,

10   like, seven phases and the project fails around

11   phase three, a lot of times we'll be hired in order

12   to help tease apart the issues that caused the

13   project to fail.

14          In addition, another practice area we deal

15   with is intellectual properties, so patents,

16   copyrights, trade secrets as it pertain to software

17   and assisting counsel and triers of fact in getting

18   to the truth in those matters, understanding what

19   really happened and where the facts lie.

20   Q.         Okay.  Does DisputeSoft create any software

21   or --

22   A.         Generally --

23   Q.         -- database?

24   A.         -- we don't develop too much.  We have a

25   few in-house tools developed for source code

7

1  comparison, for example, because that's a common

2  thing that people want to do in these litigations

3  involving copyrights and trade secrets.

4  Q.       But that's usually comparing to existing

5  software systems; correct?

6  A.       Yes, I believe so.  It will be difficult to

7  compare to nonexisting software systems, I think,

8  so.

9  Q.       Right.

10 A.       I don't -- Okay.

11 Q.       I'm just trying to see if you've ever --

12 well, if DisputeSoft creates or develops a software

13 system from scratch for a manufacturing facility --

14 A.       Oh.

15 Q.       -- such as what we have in this case.

16 A.       Generally, we are not involved in that sort

17 of practice.  Like I said, we do have some current

18 projects that we're working on that involve our

19 internal work processes, to make our lives easier.

20 Q.       Okay.  That's for your own company, though?

21 A.       That's for the own company, we're not --

22 Q.       Nobody's hired you to do that?

23 A.       Nobody has -- Yes, that's right.

24 Q.       So in what you've just described that

25 DisputeSoft does, what part of that do you

8

1  personally get involved in?  All of it or --

2  A.         I mean, if you look at my CV, I've been

3  involved in parts of all of those things.  So my

4  particular areas of expertise involve computer

5  forensics.  So I'm an NK certified examiner, so I

6  can do digital forensic analysis.

7          I've also been involved in several

8  copyright and trade secret misappropriation matters.

9  I've also been involved in a few patent cases, Apple

10  verse HTC, had to do with their Android source code.

11          A lot of my work involves reviewing,

12  understanding and comparing source code.  That's a

13  lot of my day-to-day.  And then determining what --

14  well, what's going on.  And then if there had been

15  any evidence of copying and that sort of thing.

16  Q.         Is what's been marked as Exhibit 123 there,

17  is that a copy of your expert report in this case?

18  A.         It does appear to be, with some markup.

19  There's some notes on here.

20  Q.         I gave you the wrong one.

21  A.         Yeah.

22  Q.         Wait a minute, how did I --

23  A.         That one's marked as the exhibit, though.

24  So I'm going to say no.

25  Q.         My goodness.  Don't know what happened with

9

1   that.  I don't know how that happened.  All right.

2   A.       I didn't look at the notes.

3            MR. GIBSON:  Here we go.  I'm going to

4   change 123.

5   Q.       (BY MR. GIBSON) Does that appear to be --

6   Well, look through the whole thing.

7   A.       It appears to be my report printed

8   environmentally and double-sided.

9   Q.       Are there no -- Yeah, one came in

10  double-sided and one came -- I don't know why that

11  happened.

12  A.       It does appear to be my report.

13           MR. GIBSON:  Okay.  That's the only other

14  copy I have, Garrett.  For some reason it's

15  double-sided.  But if we want to make one that's

16  single-sided later we can do it --

17           MR. ESTEP:  Sure.

18           MR. GIBSON:  -- if that's easier for the

19  record.

20  Q.       (BY MR. GIBSON) Okay.  And you can look at

21  yours --

22  A.       I have a copy.

23  Q.       -- if you'd prefer.  We'll just leave that

24  one in the stack.

25  A.       I just didn't know if you wanted that one

1  back.

2  Q.       That's fine.

3          All right.  Now, so I went ahead and jumped

4  to the Exhibit there, 123, so we could go a little

5  bit more into your background.

6          If you'll look at page 9, which I guess is

7  about your -- page 9 of your background part of

8  the -- which I think is Attachment One.

9  A.       Oh, okay.  Okay.

10  Q.       It says Employment History.  So you've been

11  at DisputeSoft since January of 2011?

12  A.       Yeah, I started over Christmas, but

13  officially in January of 2011, I would say.

14  Q.       So what you described that DisputeSoft --

15  what its business model is is what you've been doing

16  since January of 2011 or December of 2010?

17  A.       That and systems administration.  I'm also

18  the systems administrator for the office, so that

19  involves maintaining all our databases and computers

20  and networks, infrastructure.  I wear a lot of hats.

21  Q.       Okay.  Did you create that database or was

22  it existing when you came to DisputeSoft in 2010 --

23  A.       Can you --

24  Q.       -- 2011?

25  A.       -- specify?

11

1   Q.        Did you build it?

2   A.        Did I design the database --

3   Q.        Yeah, did you design and build it?

4   A.        -- or did I create the database?  Because I

5   created the database, but I didn't design and build

6   the database.

7   Q.        Okay.  What do you mean by -- what's the

8   difference between --

9   A.        So databases --

10  Q.        -- design and build?

11            MR. ESTEP:  Try not to talk over each

12  other.

13            THE WITNESS:  Oh, sorry.

14  Q.        (BY MR. GIBSON)  Okay.  What's the

15  difference between design and build and create?

16  A.        So, in my mind, it's my understanding that

17  designing a database would be more in line with

18  picking the fields, the types that are going to go

19  into the fields, the field lengths, how the database

20  is going to structured, how it's going to interact,

21  how the keys work, whether there's indexes or not,

22  you know, the planning stage of how a database is

23  going to be laid out.

24            So I normally deal with database

25  administration, which is running queries,

12

1    understanding how the database works, restoring

2    backups, performing analysis on databases, using

3    queries, like, to get data out of ticketing systems.

4              A lot of times there's claims related to

5    too many defects in a software.  So we'll need to

6    pull out all the defects that are related to certain

7    levels of priority.  So the critical defects are

8    always the most important and how long they've been

9    open.  So we can use SQL to do that sort of thing.

10   Yeah, and I would say I think we use the SQL quite a

11   bit in our office for that.  There's several

12   systems.  I use SQL as a back-end that I administer.

13   Q.        Okay.  Okay.  So by "create," you mean

14   creating what?

15   A.        So you create an instance of a database.

16   So you can restore it from a backup, you can install

17   a new software that creates a blank database, you

18   can right click and say a new database.  It's not --

19   it's not too complicated in the SQL server

20   management Studio Tool, which is often what I'll use

21   to do database management.

22   Q.        So you're, essentially, creating a new

23   version of the same database?

24   A.        I'm not sure if that's exactly accurate.  I

25   mean, you -- I'm not sure in what context you're

1  asking me the question, I guess.  Could you clarify?

2  Q.      Well, take the MES database.  I understand

3  that after 9 months the data is archived.

4  A.      I understand that as well, yes.

5  Q.      So are you creating a new database at that

6  point?

7  A.      I wouldn't expect so, no.  I would expect

8  you would clear the data out or copy it to an

9  archive database or maybe you make a backup.  I'm

10  not sure what the archive processes are at Carrier.

11  I mean, a lot of places will make a database backup

12  and then further restore -- sorry, back that up even

13  further to tape and then put that in a vault

14  somewhere, depending on how many years of records

15  you need to keep.  Like, if you're in government,

16  for example, you might need to keep a lot of

17  records.

18  Q.      Okay.  And then if you look down at your

19  experience -- employment experience before January

20  2011 on your resume', there it says, "IT manager and

21  systems administrator at TM Associates Management,

22  Inc., from October 2005 to January 2011?"

23  A.      Uh-huh.  Yes.

24  Q.      Did you develop or design any software

25  solutions or databases in that job?

14

1    A.        Develop and design, no.

2    Q.        Okay.  Now, before October 2005 what did

3    you do?

4    A.        I was a college student.

5    Q.        Okay.  Up there at the Wesleyan University?

6    A.        Uh-huh, Wesleyan University up in

7    Connecticut.

8    Q.        Now, I've looked through here extensively,

9    Attachment One, but I may have missed it.  I may

10   have gone through it too quickly.  I don't think I

11   see even the word "LabVIEW" in Attachment One

12   anywhere.

13            Is that true?  Did I -- did I --

14   A.        That's true, yes.

15   Q.        Did I miss it?  Okay.

16            What is your LabVIEW experience besides the

17   30 minutes you spent on the airplane looking at the

18   LabVIEW manual that you talked about at the hearing?

19   A.        I don't have much experience with LabVIEW,

20   as I stated at the hearing.  I don't purport to be a

21   LabVIEW expert.  It's my understanding that counsel

22   hired Doug Femec to be an expert in LabVIEW for this

23   matter.

24            It's also further my understanding that

25   LabVIEW is not even an issue in this case, according

1    to most of the experts and testimony I've heard.

2    Q.        Okay.  But you did compare the LabVIEW

3    software, which is called the RES software that was

4    created in LabVIEW, to the Visual Basic 6 software

5    that has been called the ECI software; right?

6    A.        What I did, as detailed in my report, I

7    used the text of the VB6 source code to compare the

8    text elements of the LabVIEW source code to

9    determine if any of the names on the registration

10   for the 267 APIs were present in the RES software.

11            To do that task I did not need to

12   understand how LabVIEW worked, I just needed to

13   determine if there was evidence of copying.

14   Q.        Okay.  Did you check the aliased names?

15   A.        I don't understand what you mean by that

16   question.

17   Q.        Have you -- Well, you've been here for two

18   days, you heard what Mr. Carr and Mr. Chenault said

19   about aliased names.

20            So do you agree with how they're defining,

21   for this case at least, what the aliased names mean?

22   A.        I'm not still quite sure what you mean by

23   alias names.  But if I were to define "alias," I

24   would say that that is a reference to something

25   else, and that something else would need to still

16

1    exist for that alias to work.  So if you need to

2    have an alias, like, if you're a person going by an

3    alias and you say, "Well, yeah, just call me

4    Skeeter," if that person's name is Steve or

5    something like that, you would still need to have

6    Steve existing for that alias to work.

7    Q.        Well, Steve and Skeeter are pretty far

8    apart.  But it's slightly aliased if I say "Joshua"

9    and "Josh;" right?

10   A.        Certainly.

11   Q.        Okay.  That's -- that's kind of what was

12   done here; right?

13   A.        Not to my understanding, no.

14   Q.        Not to your understanding?  Okay.

15             Well, have you looked at the 267 names as

16   they exist now in the MES database?

17             Let me -- let me -- let me rephrase that.

18             Have you looked or found the test

19   procedures or the valid tests as they exist in the

20   MES database today?

21   A.        It's my understanding that "valid tests" is

22   a term that was used in conjunction with the ECI

23   software.

24             I have seen the test procedures that

25   Carrier has entered into the MES database, if that's

1  the question.  And that's -- I'm going to answer yes

2  to that question.

3  Q.      And I see from your report all this time

4  you've had the ECI database.

5  A.      I have had and relied upon the ECI

6  registered scripts that were provided to me by

7  counsel, which I believe came from Mr. Olita and

8  yourself, Mister -- Mr. Dixon[sic].

9  Q.      Yeah.  But my point is, have you compared

10  the test procedures or the valid tests that are now

11  in the MES database to the test procedures and the

12  valid tests that were or are in the archived last

13  version of the ECI database?

14  A.      No.  That was not part of the scope of my

15  engagement.

16  Q.      Okay.  So if my expert witnesses testify

17  that they exist in much -- either the exact same

18  form or much the same form in the MES database that

19  they -- by "they," meaning the stored procedure -- I

20  mean the test procedures and the valid tests -- as

21  they existed in the ECI database, you don't know

22  anything differently?

23  A.      I would disagree with that largely because,

24  to my understanding, that the registration is where

25  the database scripts, which covers the structure,

18

1    sequence, organization of the database.  I reviewed

2    the registration of the database script.  That does

3    not include the data that would be in the database,

4    which is the steps, the order of the test

5    procedures.  This is my understanding, again.

6            It's also my understanding that there is a

7    dispute over the ownership of the software and

8    database in this case.  So from my point of view --

9    Q.       Whoa, whoa.

10   A.       -- a lot of this was jointly developed,

11   from what I've heard and the testimony so far.

12   Q.       Now, is that affecting your opinion at all

13   that there's a dispute over whether or not ECI owns

14   the license or Carrier owned the license?

15   A.       Let me think about that for a second.

16   Q.       Okay.

17   A.       So I would say my opinions are based on the

18   fact that there was a purchase order in place prior

19   to there being any licensing agreement.

20   Q.       That's a legal issue, isn't it?

21   A.       Sure.  Yes.

22   Q.       Okay.  You hadn't been -- you hadn't been

23   hired as a lawyer in this, a legal --

24   A.       No.

25   Q.       -- expert in this case?

19

1   A.          I have not been.

2   Q.          Now, let me -- that brings me to 124.  Take

3   a look at that, if you would, and read the sentence

4   down there.  If you would read it out loud, I would

5   appreciate it.

6   A.          The sentence at the bottom?

7   Q.          Yes, at the bottom.

8   A.          Okay.  So this is a printout from Thursday,

9   August 31.

10   Q.          It's a printout, but I'm -- I'm

11   representing that that was on the ECI software at

12   least as of --

13   A.          As of what date?

14   Q.          -- 2004.

15   A.          Okay.  It says, "Warning."

16   Q.          We believe, anyway.

17   A.          Okay.  "Unauthorized reproduction or

18   distribution of this program or any portion of it

19   may result in severe civil or criminal penalties and

20   will be prosecuted to the maximum extent possible

21   under law."

22   Q.          Okay.  Now, that was -- are you aware that

23   that was on the ECI software?

24   A.          I am aware of that, yes.

25   Q.          Okay.  And sitting at the Carrier plant for

20

1  the whole time it was in use?

2  A.      That is not my understanding.

3  Q.      From the time -- I'm sorry.

4  A.      Okay.

5  Q.      From the time that they made the conversion

6  to WINDOWS XP?

7  A.      That is also still not my understanding.

8  Q.      Well, when --

9  A.      I don't know exactly when this came into

10 use.  But it is my understanding that most parties

11 agree that it was in the area of 2004 sometime.

12 Q.      Okay.  I think that -- well, so my

13 understanding -- we don't need to get into that,

14 that's --

15 A.      Sure.

16 Q.      -- that's a factual still.

17         But if I tell you that 2004 is when they

18 changed from DOS to WINDOWS XP, you don't have

19 anything differently to --

20 A.      My understanding that that actually

21 happened earlier.  But I thought it was around 2002

22 and that if this doesn't appear until 2004 there

23 would have time --

24 Q.      Somebody -- Okay.

25 A.      -- so that would have been two years where

21

1    this --

2    Q.        But whether it's 2002 or 2004, for the

3    better part of almost a decade that -- that was

4    sitting on the system out there at Carrier?

5    A.        Sure.

6    Q.        Is that fair to say?  Okay.

7              And Carrier is one of the largest assets --

8    or the eighth largest company in the country.  Does

9    that surprise you that they allowed that to stay on

10   their database if they thought they owned it?

11             MR. ESTEP:  Object to form.

12             MR. GIBSON:  Go ahead.

13   A.        It's also my understanding this wouldn't

14   have been on the database, this probably would have

15   been on the --

16   Q.        (BY MR. GIBSON) I'm sorry, I said the

17   data -- Let me rephrase the whole thing.

18   A.        Okay.

19   Q.        Would that -- I'm going to preface it by

20   talking about the eighth largest corporation in the

21   country.  United Technologies is the eighth largest

22   corporation in the country.  Carrier Corporation is

23   one of their largest in assets.

24             Does it surprise you that a company that

25   sophisticated would allow that to stay on their --

22

1  what they believe their own licensed -- I mean,

2  their own software system?

3          MR. ESTEP:  Object to form.

4  Q.       (BY MR. GIBSON) Would be on there the

5  whole --

6  A.       Actually, could I see that again?

7  Q.       Yes.

8  A.       Just to be clear.

9              (Document was passed.)

10  Q.       And then I'll rephrase the question again,

11  'cause I didn't say it very well.

12  A.       Okay.

13             (Witness reviewed a document.)

14  A.       Okay.  You said you'll rephrase?

15  Q.       Now, does it surprise you that a company as

16  sophisticated as United Technologies and its

17  subsidiary or affiliate or whatever it is, Carrier

18  Corporation, would allow that message to remain on

19  software it thought it owned for nearly a decade?

20          MR. ESTEP:  Object to form.

21  Q.       (BY MR. GIBSON) Go ahead.

22  A.       I'm not sure.  I don't know what context in

23  that screen popped up.  I've certainly heard

24  testimony that, you know, conflicts in terms of how

25  often that would have shown up to an operator.  But

23

1    if I'm an operator on the floor, not the management,

2    you know, they might not be talking to each other.

3    So I would say it might be a little unusual, but it

4    doesn't surprise me to hear that.

5    Q.        Why doesn't it surprise you?

6    A.        Well, I'm not sure the people that would be

7    concerned about intellectual property would be the

8    people that were seeing that screen, the people on

9    the floor.

10   Q.        Who needs to be concerned about

11   intellectual -- What about Mr. Stewart, should he be

12   concerned about intellectual property --

13             MR. ESTEP:  Object to form.

14   Q.        (BY MR. GIBSON) -- in his job at Carrier?

15   A.        I'm not sure how much he knows about

16   intellectual property, to be perfectly honest.  But

17   I would expect he would be concerned about it.

18   Q.        What type of employees at Carrier should be

19   concerned about that being on the software that

20   Carrier thinks it owns?

21   A.        The attorneys.

22   Q.        Okay.

23   A.        And the developers, I would say.

24   Q.        Developers.

25             And the attorneys aren't going to learn

24

1    about it unless they're also involved in IT.  The

2    attorneys aren't going to learn about it unless

3    somebody brings it to their attention.  Right?

4              MR. ESTEP:  Object to form.

5    A.        That's what I would expect.

6    Q.        (BY MR. GIBSON) Okay.  Should the IT folks

7    bring it to the lawyers attention immediately when

8    they see that on there just one time in a decade?

9              MR. ESTEP:  Object to form.

10   A.        I -- I really am not sure how things work

11   at Carrier, but I would expect that someone would

12   mention it.

13   Q.        (BY MR. GIBSON) Okay.  And after seeing

14   Exhibit 124, are you still of the opinion that

15   Carrier owned the software?

16             MR. ESTEP:  Object to form.

17   A.        After all the material I've seen, I would

18   say yes.  I mean, I've heard testimony of James

19   Rindin saying that everybody worked together to

20   develop these tests.  Again, I know there's a

21   dispute over who owns it, but it was built for

22   Carrier in Carrier's plant.

23   Q.        (BY MR. GIBSON) It was?  Who told you that?

24   A.        That's my understanding from counsel.

25   Q.        Really?

25

1   A.      Yeah.

2   Q.      Who?  These -- these lawyers right here

3  told you that?

4   A.      I don't know the material they were --

5  perhaps I misstated something.

6   Q.      Well, no, no, no, no, you're stuck with

7  what you're given.  Right?  I mean, you can't --

8  well, you're stuck with your works in your report;

9  right?

10  A.      Uh-huh.

11  Q.      Is there anything that's not part of the

12  scope -- Have you reviewed your scope of work

13  before?

14  A.      Yes.

15  Q.      Okay.  So you don't need to read it again?

16  A.      I mean, I can look at it again.

17  Q.      Is there anything else?

18         And I know you've listened to testimony for

19  two days from my experts.  Is there any anything

20  else that --

21  A.      I mean, mostly, I was just engaged to

22  determine if there was evidence of copying.  So I

23  don't want to formulate any new opinions this time

24  based on, you know, who developed what.  I'm not

25  trying to -- to step in it, as it were.

26

1    Q.        Okay.  But you've got 10 pages -- or 9 of

2    your 10 pages of your background deal with cases and

3    copying and --

4    A.        Uh-huh.

5    Q.        -- this --

6    A.        This type of case.

7    Q.        This type of case?

8    A.        Yes.

9    Q.        And so if you saw -- if you were hired by

10   Carrier, not told anything about this case, and they

11   sent you out there and said, "Hey, pull up the ECI

12   software that's archived over here and tell me if

13   you see anything," if this was the first screen you

14   saw when you pulled it up, would -- would that mean

15   anything to you?

16   A.        If I were --

17   Q.        When I say "this," Exhibit 124.

18   A.        So this is a hypothetical now?

19   Q.        Yeah.

20   A.        So in the hypothetical situation where we

21   were -- Sorry, if you want --

22   Q.        We'll ask you.  Is this the first time

23   you've ever seen this?

24   A.        I've seen that maybe once before.

25   Q.        Okay.  But only as an exhibit --

27

1   A.        As an exhibit.

2   Q.        -- in the case?

3             You didn't pull up the software, the ECI

4   software, and see this?

5   A.        I was present for the inspection that was

6   ordered by the Court in May -- was it 2016?  2015?

7   I'm not exactly sure on the date.  But I don't

8   remember seeing that screen specifically, but it may

9   have been there.  I haven't reviewed the videos or

10  anything like that.

11  Q.        Okay.  Now at that point we're -- we've

12  changed over to the RES software; right?

13  A.        Correct.

14  Q.        Okay.

15  A.        So I wouldn't have seen that screen pop up.

16  Q.        By the way, you do know the rules already,

17  but if you need to take a break --

18  A.        I'm good for now.  If you guys need a

19  break, though, we can do that.

20  Q.        Anybody that's important -- Everybody's

21  important.  But anybody that's important to this

22  deposition, which are the lawyers and you, everybody

23  else can take a break as they need to.

24  A.        Once this coffee runs through me, I'll

25  need a break, so.

28

1   Q.        And the court reporter.  And Lisa.

2             All right.  Now, so if the first thing you

3   did was pull up the ECI software -- This is a

4   hypothetical again --

5   A.        Uh-huh.

6   Q.        -- and you saw Exhibit 124, would you

7   investigate to see what -- what in the world is that

8   doing on the software that Carrier claims it owns?

9   A.        If I were engaged, almost always litigation

10  has already begun.  So I would say we need to figure

11  out how this software was created, who created it,

12  when this licensing language appeared to determine,

13  you know, how the software was developed and under

14  what methods it was, you know, provided to the

15  client.

16  Q.        Now, if the facts are that Mr. Olita

17  already had a completed IPCS system, the drawings

18  for the assembled hardware, the ECI software and the

19  ECI database, and he had already had that system

20  developed and then brought it to the Carrier

21  Collierville plant to implement, does that change

22  your opinion in any way?  Would that change your

23  opinion in any way?

24             MR. ESTEP:  Object to form.

25  Q.        (BY MR. GIBSON) Again, I'll call it a

29

1    hypothetical.  Even though it's true, I'll call it a

2    hypothetical since you believe the facts are

3    different.  You may have been told the facts are

4    different than that.

5    A.        At what timeframe are you talking about?

6    Q.        I'm talking about 1992.

7    A.        1992, that -- my understanding is that

8    there --

9    Q.        Or -- or --

10   A.        -- was a DOS version or, you know, a basic

11   version.

12   Q.        Back --

13   A.        I don't have any questions about whether or

14   not Mr. Olita and ECI developed the software, if

15   that's what we're trying to get to, but...

16   Q.        Okay.  So you have been told that Mr. Olita

17   developed the software in the database?

18   A.        For 1992 --

19   Q.        DOS -- back in the DOS days.

20   A.        -- you know, that there was some agreement,

21   which I'm not sure on the basis of the VB6 time, but

22   I -- that ECI would develop the software.  I'm not

23   sure under what state it would have been provided,

24   and that's a legal question anyway.

25   Q.        Okay.  But -- So you are aware that

30

1   Mr. Olita developed the IPCS system as a whole and

2   the specs for the assembled hardware, the ECI

3   software and the ECI database, and then implemented

4   that in the Carrier plant?

5            MR. ESTEP:  Object to form.

6   Q.       (BY MR. GIBSON) Is that your -- I'm just

7   trying to see what your understanding is.

8   A.       Sure.  My understanding is that I don't

9   believe --

10  Q.       In 1992.

11  A.       Sure.

12  Q.       In the DOS days.

13  A.       My understanding is that Carrier doesn't

14  believe it's the IPCS system that they received, but

15  Mr. Olita definitely implemented the ECI software in

16  1992.

17  Q.       And developed the plans for the hardware

18  even though Carrier purchased the actual hardware

19  itself --

20  A.       I personally don't have knowledge of --

21  Q.       -- assembled hardware?

22  A.       -- of who developed what, but my

23  understanding is that that was installed.

24  Q.       Now you saw those -- Did you see those big

25  plans at the hearing, the big books of the plans for

31

1   the hardware that we've put into evidence at the

2   hearing and preliminary injunction?

3   A.      I was only there for the first day, so I

4   may not.

5   Q.      That's why I asked that.

6   A.      Yeah.

7   Q.      But, anyway, the plans for the assembled

8   hardware are fairly extensive.

9           Would that surprise you?

10  A.      No, that would not surprise me.

11  Q.      And if those plans were designed by ECI, do

12  you know anything differently from that?

13  A.      I don't know anything differently from

14  that.

15  Q.      Now, moving forward.  When Carrier changed

16  from the ECI software, or DOS, to the ECI software

17  for WINDOWS XP --

18  A.      Uh-huh.

19  Q.      -- whenever that was, 2002 or 2004, do you

20  know whether or not Mr. Olita created the upgraded

21  software at ECI and then implemented it in the

22  Carrier plant?

23  A.      I mean, that's my understanding that --

24  that Mr. Olita and his company developed the VB6

25  source code.

32

1    Q.        Okay.  So we were back a moment ago, before

2    we got into this back-and-forth discussion about

3    whether ECI developed the software or whether

4    Mr. Rindin and some group developed the software,

5    what did you mean by that?

6    A.        My confusion is that I believe you were

7    asking about the valid tests and the data in the

8    database.  And I believe the data that went into the

9    database was developed jointly or was decided by

10   Carrier's needs as a business, dictated by how they

11   needed to test their air conditioning units,

12   developed in conjunction with ECIMOS, or ECI.

13   Q.        So the valid tests weren't developed by --

14   as far as you know, the valid tests weren't

15   developed by ECI and then implemented --

16   A.        Perhaps I --

17   Q.        -- in the Carrier plant?

18   A.        -- misspoke there.  So the valid tests I

19   believe are the single unit --

20   Q.        The 267 valid tests.

21   A.        I'm talking about the scripts --

22   Q.        The script --

23   A.        -- the actual -- the ordering of the

24   scripts and what was to be tested.

25             But it's also my understanding that Carrier

33

1    probably knew what they needed to test on the units.

2    But I don't know that for sure, so I'm going to --

3    I'm going to say I'd be guessing on that.

4    Q.        Okay.  Now, one other thing on the

5    ownership.  And you probably heard my question to

6    Mr. Carr yesterday when he and Mr. Estep were

7    talking about the foundry and the software that he

8    developed for the foundry.

9    A.        Uh-huh.

10   Q.        And Mr. Estep asked him -- Mr. Carr --

11   whether the foundry owned that software or whether

12   Mr. Carr's business owned it and simply licensed it

13   to the foundry.

14             Do you remember that?

15   A.        Uh-huh.

16   Q.        Okay.  And you remember my hypotheticals to

17   Mr. Carr that once the foundry owned the software,

18   would it have been appropriate for Mr. Carr to have

19   then taken that software and implemented it in a

20   competing foundry?

21   A.        No.

22   Q.        That would not have been; right?

23   A.        No, that would not have been appropriate.

24   Q.        Okay.  Are you aware that the IPCS system,

25   meaning, the ECI software, the ECI-developed

34

1    database, and the assembled hardware that the ECI

2    drawings are designed for, are in multiple large

3    HVAC companies that compete directly with Carrier?

4            MR. ESTEP:  Object to form.

5            Go ahead.

6    A.      I am aware that there are VB6 code bases

7    that are running from ECIMOS in several other lines,

8    yes.

9    Q.      (BY MR. GIBSON) And if you thought you

10   owned the ECI software, "you" being Carrier, and the

11   ECI hardware design and the ECI database and you're

12   Carrier, would you object to ECI or now ECIMOS

13   having those same systems running in Nortec, at

14   Johnson Controls, Rheem --

15           MR. ESTEP:  Object to form.

16   Q.      (BY MR. GIBSON) -- York or whatever they're

17   called now?

18           MR. GIBSON:  York is Johnson Controls,

19   though; right?

20   Q.      (BY MR. GIBSON) Okay, York, Johnson

21   Controls?

22   A.      So it's my understanding that the source

23   code was customized at each of those locations with

24   different executables to meet the needs of each

25   individual plant.  So the version of the code that

1   would be running at Carrier likely would not do what

2   the other companies need it to do.

3          It's my understanding that Carrier thought

4   it owned what it was running at the plant, but not

5   necessarily something that they would be able to

6   take anywhere else.

7   Q.       So if they own the expression, if you will,

8   from the copyright law of the trade secret to the

9   IPCS systems design --

10  A.       Now I'm not talking IPCS.  So I've seen the

11  IPCS --

12  Q.       I'm talking --

13  A.       -- and I don't think that's what --

14  Q.       When I say "IPCS" and then we have a little

15  back-and-forth about that, I know.  But when I say

16  "the IPCS," it's all over the place.  But when I say

17  the "IPCS system" --

18  A.       Uh-huh.

19  Q.       -- it's easier to say that, I'm talking

20  about the ECI software --

21  A.       Sure.

22  Q.       -- the ECI database, and the ECI drawings

23  for the assembled hardware --

24          MR. ESTEP:  I want to object to form.

25          Go ahead.

36

1    Q.        (BY MR. GIBSON) -- that interfaces with the

2    ECI software and the ECI database.  Okay?

3    A.        Okay.

4    Q.        All right.  Now, if those same designs --

5    Obviously we've got different models, of course.

6    A.        Right.

7    Q.        But if those same designs are being

8    implemented at Nortec, York slash Johnson Controls,

9    Rheem, a number of others, would that be infringing

10   on Carrier's ownership of the intellectual property?

11            MR. ESTEP:  Object to form.

12   A.        I think that's a legal question.  But I

13   would say that from my experience it's not

14   appropriate to use someone else's intellectual

15   property.

16            What I will say is that by the time it

17   makes it to my desk things have not been done

18   properly on one side or both sides.  So in the --

19   Q.        (BY MR. GIBSON) We'll --

20   A.        -- foundry example --

21   Q.        We'll concede that.

22   A.        -- it sounds like everything was done

23   properly and there was an appropriate agreement in

24   place.  Most of the stuff that comes to my desk

25   something was done wrong and there's a disagreement

37

1   because something was not done in the way that it

2   would normally be done.

3           So I could say that Carrier may not have

4   even considered the ownership issue until there was

5   litigation and then they went to go find out, well,

6   who actually owns this code, and then they would

7   make decisions based on that.

8   Q.      Should they have considered the

9   intellectual property before they hired Amtec?

10          MR. ESTEP:  Object to form.

11  A.      I don't know what they did consider, but I

12  certainly think they should have.

13  Q.      (BY MR. GIBSON) And back to my original

14  question regarding Exhibit 124.

15          Does it surprise you that Carrier claims it

16  owns the intellectual property we've been talking

17  about, that being the ECI software, the ECI

18  database, the ECI drawings for the assembled

19  hardware, but yet allowed the implementation in all

20  its competitors -- most of its competitors?

21  A.      No, it doesn't surprise me, because of what

22  I just said.  I said once you get litigation you

23  want to try and figure out what's actually going on,

24  what are the real facts going on.  They may have

25  believed that to be in effect up until that point.

38

1    And then once you get to a lawsuit you have to

2    figure out, well, hey, actually, according to these

3    agreements, we may actually own this software.  So

4    they may not have taken any steps to protect their

5    intellectual property before, if it is theirs.

6              Again, these are things to be decided by

7    triers of fact and not myself.  I was asked to

8    search for evidence of copying and filter out things

9    that are not usually deemed protectable expression.

10   Q.      Now, I think I've beat that dead horse.

11   A.      Okay.

12   Q.      So let's just move on.

13             THE WITNESS:  Dead and dead.

14             You want to take a break now, before we get

15   to the next one?

16             MR. GIBSON:  Is that good?  You want to?

17             THE WITNESS:  I'm fine.  But it might be

18   good for everybody else.

19             MR. GIBSON:  As long as there's not a

20   pending question you can --

21             THE WITNESS:  Yeah.

22             MR. GIBSON:  -- you have the floor on that.

23                   (Recess.)

24   Q.      (BY MR. GIBSON) All right.  Mr. Siegel, I

25   told you we were going to stop beating that dead

39

1    horse, but I want to go back and get just a couple

2    of questions and revive that dead horse for a

3    minute.

4              One question, you said it would be -- you

5    would expect that the lawyers and the developers

6    would -- might be worried about Exhibit 124.

7              And my question is, do you know the

8    lawyers that were -- do you know any lawyers, have

9    you talked to any lawyers, do you know any lawyers

10   that were involved or have you heard about any

11   lawyers at Carrier that were involved in determining

12   whether the -- there was infringement?

13             MR. ESTEP:  You're referring to in-house

14   lawyers at Carrier?

15   Q.        (BY MR. GIBSON) In-house, outside, anybody,

16   any lawyer that was asked to make a determination, a

17   legal determination as to whether or not there was

18   infringement.

19             Do you know anything about that?

20   A.        I do not know anything about that.

21   Q.        And my second question is, do you know who

22   the developers were that might be worried about it?

23             MR. ESTEP:  Object to the form.

24   A.        I would guess maybe the database

25   developers.  I know David -- I believe David Hoal

40

1    was involved on the database side.  Maybe J.C.

2    Stewart.  But I don't think he did any programming.

3              I don't really know, is the answer to that

4    question.

5    Q.       (BY MR. GIBSON) What about Amtec?

6    A.       It's my understanding that Amtec wasn't

7    involved at the time that this was -- this software

8    was installed.

9    Q.       Which software?

10   A.       The software depicted in Exhibit 124, when

11   it was -- you're talking -- Could you clarify --

12   Q.       Well, by "developers," I assume you mean

13   the developers of the RES software.  Right?

14   A.       Could you clarify the question?  I just --

15   Q.       Okay, let me go back.

16             I first mentioned the lawyers.  And you

17   don't know anything about the -- you don't think you

18   know anything about the lawyers.

19             Okay.  Then I jumped to the developers.

20   And I assume by "developers" you meant the

21   developers of the RES software and MES database.

22   Correct?

23   A.       That was not what I understood what you had

24   asked.

25             I thought you meant developers at the

41

1   Carrier facilities, because they do have some folks

2   there that seems to understand databases and manage

3   their databases.  And I assume they have some folks

4   there that understand code, but I don't know.

5           I did not take that to mean the Amtec

6   developers, so forgive me.  If you want to ask me

7   that again.

8   Q.      Okay.  So David Hoal, J.C. Stewart.

9           Have you talked to David Hoal?

10  A.      I've talked to him very briefly at the

11  preliminary injunction hearing.  I believe he was

12  there.

13  Q.      Just in the back, sitting back in the back

14  of the courtroom?

15  A.      Yes, I believe so.

16  Q.      What did you talk to David Hoal about?

17  A.      I asked him about the development of the

18  RES database, the database that would support the

19  LabVIEW software, because I had concerns about

20  whether or not it was developed independently or, as

21  is alleged in this matter, whether or not it was

22  derived from the ECI database.

23  Q.      Okay.  And what did he say?

24  A.      He said that it was developed independently

25  by Carrier.

42

1    Q.        By Carrier itself?

2    A.        By Carrier.  And it's my understanding,

3    from what I've heard the last two days, perhaps with

4    assistance from Amtec.

5    Q.        Okay.  But other than Amtec and Carrier,

6    are you aware of any other -- any third-party

7    besides Amtec that was involved in the development

8    of the MES database?

9    A.        You know, David Hoal may have listed

10   another database administrator or someone along

11   those lines, but I can't remember.  He would be

12   better to ask.

13   Q.        Boals.  Was -- was he talking about Boals,

14   the CSE, the guy from CSE?

15   A.        I'm not sure.  I'm sorry, I don't remember.

16   Q.        Okay.  I'm not sure his first name off the

17   top of my head, but he was at the -- he was at the

18   test -- testing.

19            All right.  Did you talk to Peter O'Connor?

20   A.        No, I don't believe I did.

21   Q.        How many times have you talked to J.C.

22   Stewart about this matter?

23   A.        Multiple times.  I couldn't tell you.  I

24   mean, 10, 20.

25   Q.        And in your conversations with Mr. Stewart,

43

1    do you believe Mr. Stewart had any -- any part in

2    the development or programming or migration or

3    whatever of the MES database?

4    A.        I'm not sure I understand your question.

5    Q.        Do you -- do you believe -- do you know

6    whether Mr. Stewart had any -- did any work on the

7    MES database to get it developed and built?

8    A.        I believe Mr. Stewart was involved in the

9    process regarding the development of the LabVIEW

10   software, but not necessarily from the coding

11   standpoint, more from the requirement standpoint.

12   That's my understanding.

13   Q.        And what about the MES database?

14   A.        So my understanding is that J.C. Stewart

15   would have had input into some of the data that

16   would have been going into that, such as the results

17   that might need to be captured from testing the air

18   conditioning units and, perhaps, the order of the

19   test procedures and things of that nature.  That's

20   my understanding.

21   Q.        Have you ever seen the Indemnity Agreement

22   that Carrier agreed to with Amtec?

23   A.        I'm not sure if I've seen that document.

24   Q.        Okay.  Would it surprise you to find out

25   that a big 'ole company like Carrier would agree to

44

1   completely hold Amtec harmless from and indemnify

2   them from any potential litigation that might occur

3   from the development of the RES software and MES

4   database?

5          MR. ESTEP:  Object to form.

6   A.      I think you're asking me for a legal

7   conclusion.

8   Q.      (BY MR. GIBSON) I just said would it

9   surprise you, I'm not -- whether it --

10   A.      Would it surprise me that --

11   Q.      How strong it is is, you know, a legal --

12   A.      Let me repeat.  Would it surprise me to

13   hear that Carrier was willing to indemnify Amtec?

14   Q.      Correct, for what it did in this case.

15   A.      For Amtec's development process?

16          MR. ESTEP:  Same objection.

17   Q.      (BY MR. GIBSON) Go ahead.

18   A.      No, it would not surprise me.

19   Q.      Okay.  Why?

20   A.      Because I'm not a lawyer and I'm not

21   exactly sure how that would normally be written in a

22   contract.

23   Q.      Okay.  If you were in Amtec's shoes, would

24   you have requested to be protected like that from an

25   indemnity agreement from Carrier when you heard

45

1   about what was going to be requested in this case to

2   be done?

3           MR. ESTEP:  Object to form.

4   A.      Honestly, I'm not sure on what Amtec's

5   business processes, either.  It could be it's a

6   standard form for Amtec.  I haven't seen the

7   document, I don't know.

8   Q.      (BY MR. GIBSON) Okay.  When did DisputeSoft

9   first get involved in this case, anything to do with

10  this case?

11  A.       I'm not sure if I can recall exactly.  That

12  would be a better question for Bob and Garrett over

13  here.

14          But it was definitely a few months before

15  the inspection.

16  Q.      The first inspection?

17  A.       The first inspection.  I was present at the

18  first inspection in May.

19  Q.      May of 2016?

20  A.       2016, I believe.  And it would have been

21  months before that, but I -- I -- I can't recall,

22  I'm sorry.

23  Q.      So you're thinking early 2016, maybe?

24  A.       Maybe early 2016, maybe late 2015, maybe

25  the summer of 2015.  I'm really -- I'm not sure.

46

1  Q.      Were you the first contact from

2  DisputeSoft, as far as you know?

3  A.      No, it would have gone through my boss

4  first, Jeff Parmet.

5  Q.      So somebody at Carrier called Jeff --

6  A.      Parmet, P-A-R-M-E-T.

7  Q.      Somebody would have called Jeff Parmet from

8  Carrier, you think -- you believe?

9  A.      I believe so.  Yeah, I believe Mr. McLean

10  would have called and said I have litigation

11  involving these details, you know, do you have

12  someone at the firm that would be a good fit to help

13  us understand the issues at this case.  And I was

14  recommended.

15  Q.      And are you the only person that you know

16  of at DisputeSoft that's worked on this case?

17  A.      I am the only person that has reviewed any

18  proprietary materials.

19          I did have some assistance reviewing some

20  deposition testimony just to get me some summaries,

21  because I didn't have time, I was out of state.

22  Q.      And who did that at Dispute?

23  A.      Her name is Ann Ackerman, A-C-K-E-R-M-A-N.

24  Q.      But other than helping with deposition

25  summaries, Ms. Ackerman hasn't done any other work

47

1    on this case?

2    A.        No.

3    Q.        Now, do you -- Has DisputeSoft ever done

4    any other work for Carrier Corporation?

5    A.        Not to my knowledge, no.

6    Q.        How about for the Farris Bobango firm?

7    A.        Not to my knowledge, no.

8    Q.        Now, do you know whether or not Carrier

9    enlisted the help of a third-party when it was

10   making the decision to change from the ECI software

11   to the Amtec RES software?

12   A.        I do not have any knowledge about this.

13   Q.        I said "Amtec."  I didn't mean to say

14   "Amtec."  But it's the RES software.  'Cause I know

15   Carrier owns RES software; correct?

16   A.        That is my understanding, yes.

17   Q.        Now, does DisputeSoft ever get involved --

18   Well, let me back up.

19             You discussed some or gave some opinions in

20   your report about cleanroom.  Right?

21   A.        Cleanroom design, yes.

22   Q.        Have you ever designed a cleanroom before

23   the implementation of the development of a software

24   package to prevent it from being -- infringing on a

25   different software package?

48

1    A.        I personally have never designed a

2    cleanroom, but I have provided opinions and analysis

3    regarding cleanroom design.

4              And I would like to state my definition is

5    a different definition than the cleanroom

6    development definition that was used yesterday.

7    Q.        Okay.  Now, so how many times -- so every

8    time you've been involved in making -- giving an

9    opinion about cleanroom or involved in a cleanroom

10   design in any way is after the fact, so to speak.

11             Is that -- is that fair to say?

12   A.        That is fair to say, we have not been

13   engaged prior to a litigation involving that

14   particular issue.

15   Q.        Like you said, most of the time you get

16   involved after there's a problem?

17   A.        Most of the time we get involved after

18   there's a problem.  Sometimes we do get

19   pre-litigation assessments, which can help avoid

20   litigation sometimes.  It has in the past.  But that

21   is not as common.  Normally we get calls from

22   attorneys because something is going on, not because

23   something might happen.

24   Q.        All right.  Well, since we're on cleanroom,

25   let's go ahead and look at your report.

49

1            (WHEREUPON DOCUMENT WAS MARKED as Exhibit
2    125 to the testimony of the witness.)
3    Q.        (BY MR. GIBSON) And I believe it starts on
4    page 15.
5    A.        Okay.
6    Q.        Is that right?
7    A.        Sure.
8    Q.        First of all, if there were no cleanroom
9    here, based upon your definition or some other
10   definition, but based upon your definition if there
11   were no cleanroom here, would that mean there were
12   possible infringement?
13   A.        May I provide my definition before I answer
14   that question?
15   Q.        Sure.  Sure.  Sure.  You can answer it
16   however you can.
17   A.        Sure.
18            So cleanroom design, in my opinion and in
19   my research, is different from cleanroom development
20   that was defined yesterday.
21            Cleanroom development defined yesterday,
22   the goal is to deliver a defect-free product.  That
23   is not what I was talking about in my report.  The
24   definition I'm using is more closely related to
25   copyrights and intellectual property.  And it's more

50

1   of a set of guidelines to follow, things that you

2   can do in order to potentially avoid litigation and

3   accidentally misappropriating trade secrets or other

4   intellectual property.

5           Sometimes it's called a "Chinese wall."  A

6   lot of times it's about segregating different

7   people, segregating knowledge so that you can

8   develop a product without making those mistakes.

9   Q.      All right.  Now, how do you design it?

10  A.      How do you design the cleanroom.

11          The cleanroom design --

12  Q.      In the context of preventing litigation.

13  A.      Right.  So, again, I said it's more of a

14  set of guidelines of what you would want to do.

15          One of the steps that's normally taken is

16  hiring an outside third-party consultant without

17  knowledge of the prior IP.  That's something that

18  Carrier did in this matter, which is an adherence of

19  cleanroom design.

20          Now normally you would not want to send

21  anything regarding that previous knowledge.  And I

22  will say that I believe Carrier made a mistake in

23  that in regard in EC10082.xls spreadsheet.

24          But, like I said, these -- these matters

25  don't generally come to my desk unless there's an

1    issue in the case.  And if things were done

2    perfectly I wouldn't be here.

3    Q.        Okay.  Now, let me look -- get you to take

4    a look at Exhibit 125.  And this is the report that

5    you reference in your footnote --

6    A.        Yes.

7    Q.        -- nine that carries --

8    A.        It's the entire --

9    Q.        It's on page 15 and carries over to page

10   16.  And I'm just going to say what it is, and then

11   you tell me if that's what it is.

12             It says -- your note talks about the idea

13   of cleanroom development, and, in this case, design.

14   And it says, "As a means of protection against

15   copyright infringement."  And it was introduced in

16   the NEC versus Intel case.

17             It says, the final sentence there, is, "In

18   order to ensure there would be no prior knowledge of

19   the registered work NEC hired an independent

20   engineer to develop code in order to maintain their

21   cleanroom."  And it's from the Harvard Journal of

22   Law and Technology, Volume III, Spring Issue, 1990.

23             Is that what you cited in your report?

24   A.        That is my citation, yes.

25   Q.        And is that a copy of that document that

52

1  you were citing?

2          MR. GIBSON:  Hey, I've got an extra copy

3  for you since it's --

4              (Document was passed.)

5  Q.      (BY MR. GIBSON) Does that appear to be a

6  copy of it?

7  A.      Let me check.

8          This appears to be it, yes.

9  Q.      Okay.  In the title of the 14-page law

10  review article or similar law review article there

11  is from NEC, it's titled NEC v. Intel: Breaking New

12  Ground in the Law of Copyright.

13          So Exhibit 125 is that article?

14  A.      It appears to be, yes.

15  Q.      Okay.  Now if you'll flip over to page

16  219 --

17  A.      219.

18  Q.      -- of that document.

19  A.      Okay.

20  Q.      It says -- it says, "Yet SOP cleanrooms

21  would be"... And by "SOP" he means -- they mean

22  standard operating procedure up at the top there.

23          Do you see where SOP as defined as

24  entered --

25  A.      I see it.

1  Q.      All right.  I'm going to back up and say it

2  again.

3          "Yet SOP cleanrooms would be a major burden

4  on the software industry.  Most hard felt will be

5  the recordkeeping burden.  In NEC v. Intel the

6  cleanroom documentation was 'many thousands of

7  pages' long."  And many thousands of pages is in

8  quotes.  "It included every single piece of paper

9  which Mr. Davidian saw."

10          I assume Mr. Davidian is similar Ms. Davis

11  here.  Would that be fair to say?

12          MR. ESTEP:  Object to form.

13  Q.      (BY MR. GIBSON) But go ahead.  Well, you

14  didn't answer.

15  A.      I would say so.

16  Q.      Okay.  "Plus, records of all his written

17  and electronic communications.  Such completeness

18  demands a large investment of time and resources."

19          So, first of all, do you know how much

20  Carrier spent on this alleged cleanroom that you're

21  talking about here?

22  A.      Again, I'm alleging that they followed the

23  principles of cleanroom design, not that they

24  implemented a cleanroom.  I believe that's what my

25  opinion states.

54

1  Q.      So you haven't seen many thousands of pages

2  of documents going back and forth about how they

3  maintain their cleanroom?

4  A.      My point here was simply that they were

5  following the principles of cleanroom design in

6  that, like as my citation says on page 213, that the

7  developer did not have access to the source code of

8  the other product.

9  Q.      Well, just answer my question first, and

10  then we can get --

11  A.      Sure.

12  Q.      -- to the source code.  I know -- I know

13  where you're going, but I'm trying to make sure I

14  understand what you're talking about.  And right now

15  we're going to kind of go from the broad to the

16  specific, although sometimes I'll get into what

17  actually happened here when I'm talking about what a

18  cleanroom design really is.  And then we can get

19  into whether the source code was copied or not.  I

20  mean, 'cause that's -- obviously we're going to talk

21  about that.  Okay?

22  A.      Okay.

23  Q.      All right.  Now, how much did -- so you

24  don't know how much -- you don't know how much, if

25  anything, Carrier spent on a cleanroom design?

1   A.        I have no idea on that.

2   Q.        Okay.  And you don't know -- you haven't

3   seen a single piece of paper that talks about what

4   they did to maintain a cleanroom design; is that

5   correct?

6   A.        I have not seen anything along those lines.

7   Q.        Now, if you'll look at the next paragraph

8   on that same page, it says, "The manpower burden is

9   also quite large," period.  "Cleanrooms require at

10  least three groups of people:  A specification team,

11  a design team, and a coordination team."

12            Now, I assume here that the design team is

13  what you're talking about Amtec was.  Right?

14  A.        I would think --

15            MR. ESTEP:  Object to form.

16  A.        Yeah, I would think that that was the

17  development team.  I believe the design would have

18  been done by Mr. Stewart, who had knowledge of the

19  requirements of Carrier's business.

20            But, again, this seems to be referring to

21  an SOP cleanroom, and I'm only talking about

22  elements of cleanroom design.  I'm not alleging that

23  Carrier set up a cleanroom.

24  Q.        (BY MR. GIBSON) Okay.  Well, does the fact

25  that they didn't set up a cleanroom mean that they

56

1  infringed on software?

2  A.        No.

3  Q.        Okay.  Well, isn't it software infringement

4  just by the mere fact that Paula Davis received

5  documents that were from the ECI software database?

6  A.        It's my understanding that's a legal

7  conclusion whether or not that's infringement.  But

8  evidence of copying does not necessarily mean that

9  anything was infringed.  That's the whole point of

10  the filtration step of the abstraction-filtration-

11  comparison is you filter out nonprotectable

12  elements.  And you also filter out elements that

13  would not receive protection due to either ownership

14  or third-party or open source or automatically

15  generated code, generally doesn't receive

16  protection.

17  Q.        Well, I can infringe on your software by

18  just stealing your manual on the software and

19  creating my own based on what's in the manual, if

20  it's got enough documentation in it.  Right?

21  A.        To my understanding, that wouldn't

22  necessarily be infringement on software.  You would

23  probably -- Actually, even if you didn't copy the

24  manual itself, I'm not sure if that would be

25  infringement on the manual.

57

1          But, again, I believe that's a legal

2     question, and I'm not giving any legal opinions. I

3     want to make that very clear, it's only my

4     understanding of the law.

5     Q.        Well, since you're defining cleanroom here

6     and you're talking about cleanroom here, I'm trying

7     to figure out why you brought it up if Carrier

8     didn't actually implement a cleanroom.

9     A.        I'm bringing it up because generally there

10    are elements of a cleanroom design process that help

11    protect from infringing upon IP.  And I'm saying

12    that Carrier took some of those steps in good faith

13    in order to not infringe, potentially, on this IP

14    because there's a notice on there and it's unclear

15    as to who owns the code.  So I would imagine that

16    Carrier would want to make sure that they are not

17    going to be using any of that material.

18    Q.        Which brings up another point.  I mentioned

19    Exhibit 123 having the ECI message on there that

20    it's ECI's work intellectual property and don't

21    infringe on it, basically.  I'm paraphrasing, but

22    whatever Exhibit 123 says.

23          I also mention that some very, very big

24    competitors of Carrier have the same or similar

25    system in their facilities.

58

1              That's another question.  If you thought

2     you owned the software, why are you hiring Amtec?

3     Why don't you just copy it?

4     A.       I believe, again, that there are issues,

5     because there's a litigation going on, so it's

6     unclear.

7              It's also, you know, based on that screen

8     alone, it's not clear what the terms of that license

9     are on whether or not Carrier is permitted to use

10    and modify or what -- what they're allowed to do.

11    It's just a reference to another document.  And,

12    again, that would require a legal conclusion.

13    Q.       Now the litigation ensued after Amtec was

14    hired; right?

15    A.       I believe so, yes.

16    Q.       Now, so when I'm -- if I'm understanding

17    your testimony, Carrier implemented some of what you

18    would recommend as a design of a cleanroom but did

19    not implement all of what they should have for a

20    good, proper cleanroom design.

21             Is that fair to say?

22    A.       That is fair to say.

23    Q.       Yeah.  Now, speaking of cleanroom.  You

24    said Carrier made a mistake in sending the

25    spreadsheet, the 1500 pages and all that, the

59

1   spreadsheet we talked about so much yesterday.

2          MR. ESTEP:  Object to form.  I think y'all

3   need to clarify that.

4          MR. GIBSON:  Okay.

5   Q.     (BY MR. GIBSON) You -- Am I understanding

6   your testimony correctly, you said that Carrier made

7   a mistake in sending the spreadsheet to Ms. Davis?

8          Is that right?

9   A.     That is correct.

10   Q.     Okay.  Now, did Carrier make any other

11   mistakes, to your knowledge?

12   A.     To my knowledge, that's the one that I know

13   about, so I don't know about any others at this

14   time.

15   Q.     Okay.  Have you looked at the drive that

16   was -- that Mr. Stewart gave to Mr. Fleming, who

17   ultimately gave that to Ms. Davis?  Have you looked

18   at that drive?

19   A.     I'm not sure what you're talking about.

20   Q.     Okay, you don't know anything about it.

21          Have you -- Well, we don't have a

22   transcript of Ms. Davis's testimony that was taken

23   in Huntsville.

24          You were not present in her deposition;

25   correct?

60

1   A.        I was not present at her deposition.

2   Q.        Has anybody talked to you at all about what

3   she said in that deposition, anybody talked about

4   their notes from it or any kind of -- anything

5   relating to her testimony?

6   A.        I've mostly only heard what was said in the

7   room in the past two days, I don't really know much

8   about it.

9   Q.        Okay.  Would it surprise you that in,

10  roughly, a year's time between when Amtec got

11  involved in the mockup of the RES software and -- in

12  the fall of 2014 and it was implemented in the

13  Carrier plant in the fall of 2015, so about a year,

14  would it surprise you that there are 1005 -- at

15  least 1005 emails between Ms. Davis and Mr. Stewart

16  alone?

17  A.        Would it surprise me that --

18  Q.        Yes.

19  A.        -- there are 1005 emails?  No.

20  Q.        Okay.  So almost an average of three emails

21  a day between the two of them; correct?  I mean, my

22  math, roughly?

23  A.        Yeah, I'm sure.

24  Q.        That's a lot of -- That's certainly not a

25  cleanroom; right?

1    A.        I wouldn't say that.  Mr. Stewart is

2    providing the specifications for the design of the

3    software and then the third-party should be using

4    what Mr. Stewart's dictating in order to actually

5    develop the software, again, without having seen any

6    of the prior software.  It's my understanding in

7    this case that Amtec never had access to any of

8    Visual Basic 6 source code.

9              MR. GIBSON:  I know.  I know.  Don't --

10   don't worry, we're -- we're getting there.  Settle

11   down, guys.  Settle down.

12   Q.        (BY MR. GIBSON) Now, you already know about

13   what I'm going to ask.  Everybody knows what

14   everybody's going to ask.

15             Okay.  Now, but back to page 219.  It's

16   still in front you.

17   A.        I'm still on page 219.

18   Q.        You see there -- And I'm talking about

19   proper cleanroom being implemented here.  I

20   understand what your testimony is, so I'm -- it's

21   cutting back, way back, on my cleanroom questions.

22   Okay?

23             But on page 219 it says, "Cleanrooms

24   require at least three groups of people:  A

25   specification team, a design team, and a

62

1    coordination team."

2              Just in general, not talking about this

3    case, do you pretty much agree with that statement?

4    I mean, you've cited this authoritative work.

5    A.        Yes, I agree with that statement.

6    Q.        Now, the coordination team I assume is the

7    go-between between the specification team and the

8    design team.  That's what I would figure that is.

9              Does that sound fair to say?

10   A.        Let me read this for a second.

11   Q.        Okay.

12   A.        Yes, again, my citation was to page 213

13   regarding with access to source code.

14             From context, I would expect that was what

15   it means.

16   Q.        Okay.  So my understanding would be to

17   prevent too much contact between the specification

18   team and the design team you have this coordination

19   team to make sure that intellectual property is not

20   given to the design team that shouldn't be given to

21   the design team.

22             Is that fair to say?

23   A.        I think that's fair to say.

24   Q.        So shouldn't there have been a go-between

25   between Mr. Stewart and Ms. Davis if we -- if you

1    were designing the team before Ms. Davis got

2    involved?

3    A.        According to this definition of a standard

4    cleanroom design, I would say yes.  Again, my report

5    is only an opinion that they followed some of the

6    principles of cleanroom design.

7    Q.        Okay.  All right.  Now, you mentioned one

8    of the mistakes was the email about the spreadsheet.

9             Let me ask you about another, whether this

10   other document given to Ms. Davis was a mistake.

11             (Off-the-record discussion.)

12             MR. GIBSON:  I'm just going to show this to

13   you.  And, then, since it's Exhibit 103 -- it's

14   Exhibit 103, I've written Exhibit 103 on there.

15             Can we just -- should I -- should we make

16   it a new exhibit or just say we're referring to 103?

17             MR. ESTEP:  I thought the purpose with

18   consecutive numbering was not to make new exhibits,

19   if it --

20             MR. GIBSON:  Right.

21             MR. ESTEP:  -- could be avoided.

22             MR. GIBSON:  Is that okay?

23             MR. ESTEP:  Yeah.

24             MR. GIBSON:  My -- just the way I've got

25   it?  Okay.

64

1    Q.        (BY MR. GIBSON) I'm showing you what's

2    previously been marked as Exhibit 103.  This is my

3    handwriting, but this is what we marked in

4    Ms. Davis's.

5              MR. MCLEAN:  Just a second, Ralph.  Let us

6    take a look at it.

7              MR. GIBSON:  That may be two copies.

8              MR. ESTEP:  I was going to say, it looks

9    awful thick.

10             MR. GIBSON:  Yeah.

11             MR. ESTEP:  And it is two copies.

12             MR. GIBSON:  Give me one back.

13             THE WITNESS:  Did you want this exhibit

14   back, 125?

15             (Off-the-record discussion.)

16   Q.        (BY MR. GIBSON) So let's make sure.  Can

17   you look -- does it have C030177 through the last

18   page being C030200 on it?

19   A.        Yes.

20   Q.        Okay, we're looking at the same document.

21             Now, you heard Mr. Carr's testimony on this

22   document yesterday; correct?

23   A.        I did hear his testimony.

24   Q.        Would the attachments to this document have

25   also been a mistake being sent to Ms. Davis?

65

1    A.        This is -- I mean, I've only seen this

2    document just now, I'm not sure what --

3    Q.        Take your time.

4    A.        -- you're talking about.

5    Q.        Look at it.  Take your time.

6    A.        What is the origin of this document?

7    Q.        Well, according to Mr. Carr's testimony

8    yesterday, and what the testimony will come out, it

9    came from the ECI database.

10   A.        This document?

11   Q.        Well, the appendix to this document, I'm

12   sorry.  Not the plan itself, the appendices.  There

13   are ten of them, I believe, or more.  No, eight.

14             (The witness reviewed the document).

15   Q.        Okay.  Just -- just so you'll know where it

16   came from, it's an email that came from -- it

17   came -- it was given to Ms. Davis by Mr. Stewart.

18   A.        This document --

19   Q.        Yes.

20   A.        -- was provided --

21   Q.        To Ms. Davis.

22   A.        -- to Paula Davis?

23             MR. ESTEP:  Object to form.

24   Q.        (BY MR. GIBSON)  In the -- in the beginning

25   stages of the development of the RES.

66

1            MR. ESTEP:  Same objection.

2    Q.       (BY MR. GIBSON)  I'm just -- just -- You

3    asked where it came from, I'm just telling you.

4    A.       (Witness nods head up and down.)

5    Q.       Okay.  And we discussed it in this -- the

6    103, it was first authenticated in Ms. Davis's

7    deposition.

8            MR. ESTEP:  Object to form.

9            MR. GIBSON:  But she did authenticate it, I

10   think.

11           MR. ESTEP:  I mean, we may have a

12   disagreement about that.  But --

13           MR. MCLEAN:  No.

14           MR. ESTEP:  -- until we see her

15   transcript --

16           MR. GIBSON:  Okay.

17           MR. ESTEP:  -- we'll find out.

18           MR. GIBSON:  Okay.  At least talked about

19   it in there.

20           MR. ESTEP:  It was discussed.  I agree with

21   that.

22           MR. GIBSON:  And at the bottom those are

23   Carrier Bates stamps, so it came from Carrier.

24           MR. ESTEP:  The document does have a

25   Carrier Bates stamp nomenclature.  And we agree to

67

1    that.

2              (The witness reviewed the document.)

3    A.        So I misspoke.  We did actually look at

4    this a little bit last night, and I asked J.C. where

5    this came from and where this went.  And he informed

6    me -- Sorry, I thought this was a different

7    document.  He informed me that this went to Carrier

8    management, but that he testified that he did not --

9    didn't testify -- he told me that he did not

10   actually send this to Ms. Davis.

11              Now I don't know, I assume he'll speak more

12   to that later, but that's my current understanding.

13   So my answers will be based on that understanding.

14              My apologies, I thought this was a

15   different document.

16   Q.        (BY MR. GIBSON) Oh, okay.  So you believe

17   that this was actually not given to Ms. Davis

18   notwithstanding whatever she said in her deposition?

19   A.        I haven't seen her deposition, so I don't

20   know what she said.  But it's my understanding this

21   was provided to Carrier management.  I do not know

22   if Carrier management passed that on anywhere else,

23   so.

24   Q.        Since that's what you're now aware of,

25   okay, let me just ask you just hypothetically.

68

1    We'll deal with whether Ms. Davis got it or not --

2    A.        Okay.

3    Q.        -- later.

4              Hypothetically, if she received this

5    document, would that have also been a mistake?

6    A.        I would say yes.  But mainly because some

7    of the names that would be stored in the results

8    table would be exposed.

9              Now a lot of those names I would expect to

10   see just by the needs of Carrier's business to test

11   their units.  And a lot of terms don't appear to be

12   that original, they do appear to be terms of art.

13   But I would not say that this should go to the

14   developer.

15   Q.        Okay.  And you've mentioned two mistakes.

16   I don't see either mistake in your report.

17             Is that because since you've drafted that

18   report you've learned of these mistakes?

19   A.        So of the --

20   Q.        And that's a hypothetical mistake.

21   A.        Uh-huh.

22   Q.        But assuming it's a mistake, you've

23   mentioned the one mistake and then now we've talked

24   about a potential mistake.

25             MR. ESTEP:  I'm going to object to the

69

1    form.  I'm not clear upon what the second mistake

2    is.

3              MR. GIBSON:  The -- Well, I'm going to ask

4    a hypothetical and assume that's a mistake in a

5    second.

6    Q.        (BY MR. GIBSON) But let me just ask you.

7    Were you aware of any mistakes, alleged or not

8    alleged, when you wrote your report?

9    A.        So the only mistake I was referencing was

10   in to maintaining proper cleanroom design you should

11   not be sending any information that I'm, you know,

12   aware of that might be from the other system to the

13   developer.

14   Q.        But my --

15   A.        The contents of that --

16   Q.        Go ahead.

17   A.        -- might or might not be protectable

18   expression.

19   Q.        But my question about that is I don't see

20   that anywhere in your report, so I'm assuming you

21   learned about the first mistake you mentioned after

22   you drafted your report.

23   A.        That's correct.

24   Q.        Okay.

25   A.        I -- I knew that it was used as the basis

70

1   for Mr. Chenault's analysis and my rebuttal.

2   Q.      Does it change your opinion about -- at all

3   in this case now that you've learned that that was

4   sent to Ms. Davis as a mistake?

5   A.      Which chart are we talking about?

6   Q.      That for your first mistake, the

7   spreadsheet.

8   A.      The spreadsheet?

9   Q.      Yeah.  Yes.

10  A.      That does not change my opinion.

11  Q.      Okay.  What about hypothetically with your

12  first mistake and then what I allege to be the

13  second mistake, if the second mistake was also sent

14  to Ms. Davis, would that change your opinion?

15  A.      No, I don't believe it would.

16  Q.      Okay.  Let's look at a potential third

17  mistake.

18          This is Exhibit 104, I'm going to represent

19  to you.  And it's Carrier number C030116 through

20  C030127.  Make sure I've got the same.  I'm going to

21  make sure there are no notes on there.

22              (Document was passed.)

23  Q.      All right, that is the -- it doesn't have

24  the exhibit number on there, I guess 'cause we don't

25  have it yet.  But that, I'm going to represent to

1   you, is Exhibit 104 to Ms. Davis's deposition.

2   A.      Okay.

3   Q.      I'm also going to represent to you that

4   she's the one that drafted that document or put it

5   together.

6   A.      Okay.

7   Q.      Okay?  So if you'll look at the second page

8   of that document.

9   A.      Is that C030117?

10  Q.      Yes.

11  A.      Okay.

12  Q.      In the middle of that it talks about

13  overall system design to include architecture to

14  support the existing 100 plus test sets,

15  architecture to support the existing 30 plus model

16  families with 750 plus models, and architecture to

17  support the existing 350 plus sets of test

18  procedures.

19          Do you know where the test sets, model

20  families and test procedures came from?

21  A.      I would imagine that the 30 plus model

22  families would refer to Carrier models and Carrier

23  model families of air conditioning units.

24          The -- not sure from the context what the

25  hundred plus test sets are.  But I would assume, the

72

1   context, they're sets of tests that Carrier needs to

2   run on their air conditioning units for quality

3   control.

4           And then support existing 350 sets of test

5   procedures, I would assume that's the 350 test

6   procedures that Carrier must run on its units for

7   qualify control, based on the context of this.  But

8   this is the first time I've seen this document.

9   Q.      Now, under the overall system design, are

10  you aware that there are 103 test stations at

11  Carrier?

12  A.      Thereabouts.  That sounds about right, if

13  you're talking about the work stations.

14  Q.      And you've heard all the testimony going

15  back and forth and looked at -- are you generally

16  aware that the hardware has not changed much, if at

17  all --

18          MR. ESTEP:  Object to form.

19  Q.      (BY MR. GIBSON) -- since --

20  A.      It's my understanding that there's been a

21  lot of rewiring done in the hardware in order to

22  support a different software package.  That's from

23  conversations with J.C. Stewart.

24  Q.      Okay, there was rewiring done before the

25  RES software was implemented?

73

1    A.        I believe there was some done before it was

2    implemented, I believe there was some done after it

3    was implemented.  I believe it was a constant

4    improvement process.  But, again, that's my

5    understanding from J.C., he'll correct that.

6    Q.        And I'm much more concerned about right

7    before RES software was implemented, what it's like

8    today.

9              But all of that came from J.C. Stewart,

10   correct, what you just testified to?

11   A.        That understanding came from J.C. Stewart.

12   Q.        Yeah.

13             Do you know where test procedures that were

14   mentioned there came from?

15   A.        In this proposal?

16   Q.        Yes.

17   A.        I am not sure where the test procedures

18   would come from in this -- in this proposal.

19   Q.        Okay.  You testified earlier it was your

20   understanding, you were here yesterday when -- Well,

21   first of all, back up.

22             You were here yesterday when Mr. Carr

23   testified that 21 of the 28 stored procedures were

24   drafted at least by or authored at least by -- by

25   Ms. Davis; correct?

74

1    A.         I was here for that, yes.

2    Q.         Okay.  So that was after -- that would have

3    been -- since she got in in the fall of 2014, that

4    would have been after this document was drafted.

5              Does that sound fair to say?

6    A.         I would imagine, yes.

7    Q.         So the MES database would have also been

8    implemented and the RES software implemented after

9    this document was drafted?

10   A.         I'm not sure.

11   Q.         I'm asking -- I'm sorry, I'm asking a

12   rhetorical question, let me ask it better.

13             Obviously the RES software and the MES

14   database were designed, developed and implemented

15   after this document was drafted.

16             MR. ESTEP:  Object to form.

17             But you may answer.

18   A.         I would assume so, based on the name of

19   this document.

20   Q.         (BY MR. GIBSON) Okay.  Now -- so does that

21   mean that these 350 test procedures that she's

22   talking about here came from the ECI database?

23   A.         I would not assume that, no.

24   Q.         Where could they have come from?

25   A.         I assume that Carrier needs to conduct

75

1    certain tests on their units.

2            I was provided, I would say last week, from

3    counsel with an engineering document that specifies

4    some of the tests that Carrier must run.  Now I'm

5    not an electrical engineer, so I just recognize a

6    lot of the terms that are used are similar terms of

7    art.  And it's my understanding from Carrier that

8    Carrier has certain tests they have to run, so I

9    would imagine that's where these came from.

10   Q.       Okay.  And those tests are generally tests

11   that are run by -- according to specifications

12   within the HVAC industry; correct?

13   A.       Within the HVAC industry or within

14   Carrier's particular needs for particular models.  I

15   would imagine there would be different tests for

16   different units.

17   Q.       Okay.  Well, did you hear Mr. Carr's

18   testimony that they came from the ECI database?

19   A.       I did hear his testimony, yes.

20   Q.       Okay.  And my question is, where else could

21   they have come from?

22   A.       Well, it's my understanding Mister --

23   Q.       If there's -- at this point there's no MES

24   database; correct?

25   A.       It's my understanding the MES database does

76

1   not exist as of the time of this document.

2   Q.        So --

3   A.        Well, actually --

4   Q.        -- I'm not aware of -- I'm aware of two

5   databases that we've talked about a million times in

6   this case:  The MES database and the ECI database.

7             Were you aware of a third database

8   somewhere?

9   A.        No.

10  Q.        Okay.  So Ms. Davis has to be talking about

11  the ECI database here; correct?

12  A.        Why?

13  Q.        Well, where else could they come from?

14  A.        Carrier's requirements.  These are

15  Carrier's requirements to quality assure their air

16  conditioning units.  They have to test that these

17  fans will turn on, they will operate within certain

18  voltages and temperatures.  That's my understanding.

19  Q.        Well, it says existing, they exist.

20  A.        They do.  Carrier --

21  Q.        Okay.  Well, is it -- is it a mistake --

22  A.        Some employee is going to go and test their

23  various voltages.  I saw it happening when I was at

24  the plant.

25  Q.        We're talking about the architecture to

77

1    support the existing 100 plus test sets and the 350

2    plus test procedures; right?

3    A.        Maybe I'm confused.

4    Q.        She's getting this architecture -- I mean,

5    she's getting these tests from the ECI database;

6    correct?

7              MR. ESTEP:  Object to form.

8    A.        I'm -- I'm confused by your questions.

9    Q.        (BY MR. GIBSON) If she were given these

10   specifications, would that be a mistake?  The

11   specifications for these existing sets, test sets

12   and test procedures.

13   A.        I don't believe so.

14   Q.        Okay.  Now, if you'll look at the next

15   page.

16              Now, you've mentioned -- I'm going to

17   jump -- jump to a point in your -- you can look at

18   it, if you want to, but I'm going to jump to a

19   question from your...

20              All right.  This is, basically, your

21   summary of opinions, your ninth paragraph on page 7.

22   So if you want to jump back -- back there on your

23   opinion --

24   A.        Okay.

25   Q.        -- on your opinions in your report.  And

78

1    you testified to this earlier and -- but I see right

2    there in the middle, it says, that sentence right

3    there in the middle says, "The structure" -- Right

4    in the middle of paragraph nine.  "The structure

5    sequence and organization of the RES database is

6    different from the ECI database."

7              But isn't the most important thing the

8    data?

9    A.        For a copyright infringement claim?

10   Q.        Yeah.

11   A.        The structure sequence and organization is

12   the basis for teeing up the legal arguments that

13   something is substantially similar.  That's my

14   understanding.

15   Q.        Well, you heard Mister --

16   A.        The data is not the structure sequence and

17   organization.

18   Q.        What about the stored test procedures and

19   the stored valid tests?

20   A.        It's my understanding that -- Let me back

21   up.

22              I was provided the ECI database scripts,

23   which generate the structure sequence and

24   organization.  It's an empty database shell.  It is

25   my understanding that that is what was registered

79

1  with the Copyright Office, and the way that that

2  data is organized would be protected.

3          The data that goes in the database, it's my

4  understanding that was populated by the use of the

5  software.  So -- so, no, I don't believe that data

6  would be.

7  Q.      Now, the software calls the valid test and

8  test procedures from the database; correct?

9  A.      The software -- The software is used to

10 populate that data and then it uses the data that

11 has been populated in order to run and execute.

12 Q.      But to populate that data it gets it from

13 the database?

14 A.      Right.  But at install there wouldn't be

15 any data in there.

16 Q.      But you don't know whether it's the same

17 stored procedures --

18 A.      So now --

19 Q.      -- or not?

20 A.      -- when you say -- Sorry, I'm talking over.

21 Q.      Okay, go ahead.

22 A.      When you say "stored procedure," I take

23 that to mean in the relational database sense, which

24 is a defined term of, you know, it's -- it's some

25 programming type stuff that can run a query at a

80

1    later time.

2    Q.       Uh-huh.

3    A.       Generally, in cases that I've worked on,

4    stored procedures are usually protectable

5    expression.

6            I have not seen a matter where the data

7    itself within the data was granted that protection.

8    That doesn't mean that that's not possible, but I

9    haven't seen that.

10   Q.       Okay.  Let me -- Well, let me ask this in

11   the context of Exhibit 104, that third page there.

12   A.       Presentation?

13   Q.       You've got it.  You're open to it right

14   now.

15           If I told you that the left column and the

16   middle column are the exact sequence of test

17   procedures from the ECI database, would that

18   surprise you?

19           This is a document drafted by Ms. Davis

20   right at the beginning of her work on this case --

21   on the RES software.

22   A.       That would not surprise me, no.

23   Q.       Why?

24   A.       Because I would expect Carrier to be

25   running the same tests, because they need to run the

81

1   same tests in order to quality-control their air

2   conditioning units.

3           I also would expect Carrier to work with

4   the vendor to develop those tests.

5   Q.      Where did they get the tests?  Who --

6   who -- who created the tests?

7   A.      I heard from testimony from James Rindin

8   this he worked with Mr. Olita to develop the tests,

9   the scripts, the sequence of steps for testing those

10  units together.

11  Q.      How about the 267 tests themselves?

12  A.      You mean the names?

13  Q.      Not the names, the data behind the names,

14  the -- have you -- have you compared the 267 tests

15  that were in the ECI database to the 267 tests that

16  are in the MES database, if there are 267 tests

17  still there?

18          MR. ESTEP:  Object to form.

19  A.      Yeah, I'm not even sure on that question.

20  Q.      (BY MR. GIBSON) Have you compared the

21  tests -- have you compared the valid tests from the

22  ECI database to the valid tests in the MES database?

23          MR. ESTEP:  Object to form.

24  A.      So you're talking about have I compared the

25  test sequences that are from --

82

1    Q.        (BY MR. GIBSON) Not the sequences --

2    A.        -- the scripts?

3    Q.        -- the tests themselves.

4    A.        I'm not sure what you mean, but that's not

5    something that I was asked to do.

6              I was asked to look for evidence that the

7    APIs had been copied.  And from what I could see,

8    the names of the APIs were not present.  I'd found

9    in the source code where the backing VB6 source

10   code, you know, runs through the case statements to

11   execute what is on the 267 list.  But it was my

12   understanding, and I also heard at the hearing, that

13   those are just names.  I've also seen the copyright

14   registration rejection letter.

15   Q.        Well, that's going to be handled with the

16   Copyright Office.

17             But no matter what some third-party does,

18   what I'm asking you is, there's a test name and then

19   there's the test behind the name.  It's not just --

20   there's not just a name in there without data behind

21   it to --

22   A.        That's not how --

23   Q.        -- execute?  Go ahead.

24   A.        I'm sorry.  That's not how it works in the

25   database.  I mean, as previous people have

83

1    testified, that name is a flag, it's a reference,

2    it's an identifier to a bit of code and it doesn't

3    work without that code.

4    Q.       Right.

5    A.       The code is in the VB6.  And the VB6 was

6    never provided to Amtec.  They had no access.  I

7    mean, that's another bearer you have to hit, you

8    have to show that they had access.  Again, that's my

9    understanding of copyright infringement claims.

10   Q.       So if the code behind the names is exact in

11   both databases, you don't have a problem with that?

12   A.       I don't --

13   Q.       It's a hypothetical.  Go ahead.

14   A.       -- understand your question.

15   Q.       Okay.  You have a name.  We can look at

16   these right here.  Let's see, what are they testing

17   here?  SET OFF QUICK EQSV.

18   A.       Okay.

19            MR. CARR:  Can we take a break?

20            MR. GIBSON:  Okay.  Yeah.

21            MR. ESTEP:  We'll take a break and we'll

22   pick back up with the main display page.

23            THE WITNESS:  Okay.

24                    (Recess.)

25   Q.       (BY MR. GIBSON) All right.  Just, I'm going

84

1    to ask a few questions along the line we were just

2    talking about and then move on.

3              Would it have been a mistake by Carrier to

4    have given Mr. Olita's Basic Language source code

5    for its IPCS stations to any third-party, including

6    Amtec?

7              MR. ESTEP:  Object to form.

8    Q.       (BY MR. GIBSON) Go ahead.

9    A.       Are we talking about the VB6 source code?

10   Are we talking about --

11   Q.       Anything.  Anything from Mr. Olita.  Any

12   source code from Mr. Olita --

13             MR. ESTEP:  Same objection.

14   Q.       (BY MR. GIBSON) -- or ECI.

15   A.       I believe that would have been

16   inappropriate to provide it.

17   Q.       All right.  And you've been told that

18   Carrier did not have Mr. Olita's source code;

19   correct?

20   A.       Correct.

21   Q.       Any -- any of it?

22   A.       Well, the VB6 source code.

23   Q.       Have you been told that any other source

24   code was in Carrier's --

25   A.       I reviewed Mr. Olita's deposition where he

85

1    said there were a hundred and -- I mean, this is

2    also in my report.

3    Q.        Okay, you're talking about the DOS code.

4    A.        Yes.

5    Q.        Anything else besides what's in your

6    report?

7    A.        Nothing other than what's in my report.

8    I've listed all the documents that I relied upon to

9    form my opinions in my report.

10   Q.        Now you've heard the -- you heard the

11   testimony about the HVAC language Mr. Olita created

12   for the HVAC industry yesterday.

13             Do you -- do you know anything about that?

14   A.        That's the first time I heard it was

15   yesterday.

16   Q.        And if the -- Okay.  So if the HVAC

17   language was the same, whether it was under DOS or

18   WINDOWS XP, the source code wouldn't have changed

19   for the stored procedures -- I'm sorry,

20   the stored -- Let me rephrase it.

21             If the HVAC language remained the same from

22   the DOS days to the WINDOWS XP days, the valid tests

23   and the test procedures would have been the same

24   notwithstanding the move to WINDOWS XP; correct?

25   A.        That's assuming that the HVAC language

86

1    is -- I'm confused by that whole part.

2    Q.       Well, let me ask you a quick question.

3             Have you ever created your own language

4    like my experts have?

5    A.       I have not created my own programming

6    language.

7    Q.       Have you ever created your -- So, okay.

8             Have you heard of that happening?

9    A.       Sure.

10   Q.       Okay.

11   A.       Yeah, I've heard of smaller languages used

12   in very specific purposes.  There have been

13   proprietary languages used in cases I've worked on

14   regarding sending commands to label printers where

15   they were only used for that context.

16   Q.       Okay.  Is it fair to say that when

17   Mr. Olita and ECI first implemented this system in

18   the Carrier plant it was cutting edge?  Is that your

19   understanding?

20            MR. ESTEP:  Object to form.

21   A.       I can't comment on what was cutting edge in

22   the HVAC industry.  I'm not an expert in the HVAC

23   industry.

24   Q.       (BY MR. GIBSON)  And is anything that

25   you've learned in the two depositions yesterday and

87

1  in the mistakes or mistake you've seen, has any of

2  that changed your opinion at all?

3  A.        It has not, no.

4  Q.        Now, yeah, back to the structure sequence

5  and organization.  Did you hear Mr. Carr's testimony

6  on that yesterday --

7  A.        I did not hear Mister --

8  Q.        -- that it really doesn't matter if there's

9  a change?

10  A.        -- Carr testify on the structure sequence

11  and organization specifically.

12  Q.        So if the format of the MES database is

13  different from the format of the ECI database, would

14  that alone mean that there's no copying?

15  A.        That alone?

16  Q.        Yes.

17  A.        No.

18  Q.        All right.  What about, how does -- Okay,

19  that was the structure.  So now let's add to it if

20  the structure and sequence are different between the

21  two databases, would that mean there's no copying?

22  A.        I believe not.  I believe that the test is

23  the structure sequence and organization, and those

24  are the items for review.

25            So if you wanted to compare databases for

88

1  evidence of copying, you would want to look at the

2  structure, how the tables are laid out, how they

3  relate to each.

4          You would want to look at the sequence, how

5  are the tables interacting, in what order, how do

6  they go.  Structure is also related to the types of

7  the fields, the field lengths, the constraints,

8  which Mr. Carr talked about.

9          And the organization is generally how the

10  tables are laid out and how they relate, so.  And

11  that's generally for the substantial similarity

12  comparisons that you would want to do normally in a

13  copyright --

14  Q.      Okay, one other --

15  A.      -- matter.

16  Q.      Okay, I'm sorry.  Are you finished?

17  A.      Yes.  Sorry.

18  Q.      One other sentence in your Summary of

19  Opinions, looks like the second -- third-to-last,

20  "Mr. Chenault has not provided enough information

21  for his analysis to be replicated, validated,

22  independently verified or relied upon.

23          Further, material issues with

24  Mr. Chenault's report throw his database testimony

25  into question."

89

1          Did Mr. Chenault and Mr. Carr's deposition

2     testimony for the last two days clear up your

3     questions about what they did or didn't do in this

4     case?

5     A.        It cleared up some of the questions I had.

6     Q.        What question do you still have of

7     Mr. Chenault or Mr. Carr with regard to what they

8     did?

9     A.        I'm still curious to know what the default

10    stored procedure that's on, I believe it's page 9 of

11    Mr. Chenault's report, about the origin of that.

12    I've heard from Mr. Stewart that he watched the

13    video and that that procedure was not there.

14          But in the scheme of things it really

15    doesn't matter too much about that procedure because

16    it's automatically generated code so not likely to

17    receive protection.

18    Q.        Okay.  But are you in a position to

19    independently verify what they're saying now that

20    you've heard their testimony?

21    A.        I would say no, because I still do not have

22    access to the development database that they relied

23    on or the development spreadsheet report that, you

24    know, was generated from it.

25          I do now know the origin of the blue and

90

1    red spreadsheet, which was one of my biggest

2    complaints, so.

3    Q.       And the development document that was

4    talked about has been sent to Mr. Estep.

5             Has Mr. Estep given that to you yet?

6    A.       No.  No, he has not.  I haven't had time.

7    Q.       Do you think maybe -- I'm not sure if I'm

8    understanding your testimony.

9             Is that the one document you need to be

10   able to validate?  Do you need anything else?

11   A.       Let me review.

12   Q.       Okay.

13   A.       I need to check my opinion, so.

14            (Witness reviewed a document.)

15   A.       So I'm just going to read from my report on

16   the points that I made.  And I want to make sure

17   that we have those items, if that's okay --

18   Q.       Sure.

19   A.       -- in response to your question.

20            So paragraph 38, the SQL query is critical

21   to his conclusions.  So the queries that were

22   actually run, I know we saw at least one of them,

23   but there may have been more, specifically, on page

24   16 and page 24, any and all queries run.

25            Now we do have the methodology for the

1  creation of the red and blue spreadsheet, so I at

2  least understand that.

3           I still don't understand why both Mr. Carr

4  and Mr. Chenault relied only on spreadsheet reports

5  rather than the databases themselves, considering I

6  do know that at least based on the report access to

7  the RES database was provided because there's

8  screenshots for that database.

9           There's been no link shown between the

10  spreadsheet and the actual RES software -- This is

11  all in my report -- software or database.

12           Column H, the description field does not

13  appear -- I should say the contents of the

14  description field in Column H do not appear in the

15  actual 19 RES database tables.

16           I exported all the database objects and

17  searched for those contents that I extracted

18  painstakingly from that red and blue spreadsheet to

19  search for them, and I did not find any.  And,

20  again, that's now in paragraph 41.

21           I do now understand the origin of the

22  Carrier side of the description field.

23           And, lastly, it's my understanding that

24  Mr. Chenault said that yesterday he was not an

25  expert in Microsoft SQL, so that does cause issues

92

 1    with his database testimony, at least that's my

 2    understanding of it.

 3    Q.        Do you have any problem with Mr. Carr's

 4    database testimony based on his experience?

 5              MR. ESTEP:  Object to form.

 6    A.        That might be a new opinion.  But my

 7    thoughts on the matter are simply why was the

 8    database not reviewed when you had access to it for

 9    at least a month in order to prepare your response

10    to my report.

11    Q.        (BY MR. GIBSON) Which database?

12    A.        RES database.

13    Q.        Oh, I see.

14    A.        The database where the alleged copying has

15    occurred.  All the conclusions are based on review

16    of an Excel spreadsheet, which is not the best

17    evidence that was available, to my understanding.

18    Q.        How do you normally view data in a

19    relational database?

20    A.        They would usually use either SQL Server

21    Management Studio or some other sequel database.

22    There's -- there's other tools you can use, or you

23    can use the script to rebuild the database, which is

24    what I did for the ECI registered database.

25    Q.        Can you use Excel to do that?

93

1  A.        You would have to export from Excel and

2  you'd have to know where it came from.  And as an

3  independent expert you would want to be able to say,

4  "Yes, I know where this data came from," as opposed

5  to, "This is a spreadsheet."

6            If I was provided a spreadsheet, I would

7  say, "Okay.  Where is the database?  I need to

8  verify that this actually exists in the database."

9  Q.        Okay.  If you have confirmation it exists

10  in the database, is that good enough from a -- from

11  a good source?

12  A.        As an --

13            MR. ESTEP:  Object to form.

14  A.        As an independent expert, I would want to

15  see it myself.

16  Q.        (BY MR. GIBSON) Well, if the source --

17  A.        That's me.

18  Q.        If the source of the spreadsheet came from

19  J.C. Stewart and Paula Davis in an email between the

20  two of them, is that a pretty good source in this

21  case?

22  A.        I would say that that spreadsheet

23  definitely came from J.C. Stewart in an email to

24  Paula Davis.  I'm not sure --

25  Q.        Actually, the other way around.

94

1    A.        -- where the data in that spreadsheet came

2    from, though.  I don't know the query, I don't know

3    where it came from.  I don't know how it was

4    created.

5              I mean, our reputation as independent

6    experts requires us to validate to the level that we

7    can.

8    Q.        As a forensic analyst in software

9    litigation, what would you have done in this case if

10   the plaintiff -- if I had hired you?

11   A.        So should I understand you're asking me

12   what I would do as your expert?

13   Q.        To find out -- Yes, to find out if the

14   claims we're making were sustained?

15   A.        First, I would start --

16   Q.        Go ahead.

17   A.        -- it is my understanding the burden of the

18   proof is on the plaintiff to show that copying has

19   occurred.  So, to start, I would first need to

20   understand what the registered work is.

21             And, in this case, it's my understanding

22   that it's the VB6 source code and the ECI database

23   scripts, as well as the 267 API names.

24   Q.        Okay.

25   A.        And then I would need to determine that

95

1    those names were present in the registered work,

2    because oftentimes there can be mistakes in that

3    regard.  I don't mean cleanroom mistakes in this,

4    just in clerical errors in terms of, perhaps,

5    registering the wrong version of a software.

6            So I would need to verify that it existed

7    in the database in the original product.  And then I

8    would need to search and determine if the same data

9    or slightly modified data or if there was evidence

10   that, you know, had it been used in -- in the new

11   product.  And I would want to look at whatever the

12   best evidence available is for those things.  And

13   the database, it's the database with -- assuming you

14   still have the database.

15           If the database had been lost, perhaps the

16   Excel spreadsheet would be the best possible

17   evidence.  It's just it's always imperfect.

18   Whatever you have, it's -- you want to look at the

19   best available evidence.

20   Q.       Would slightly aliased names, changing the

21   valid test names and slightly aliasing them, be a

22   red flag to you?

23   A.       I'm still not quite sure what you mean by

24   the aliasing of the names.  I haven't seen a list of

25   allegedly aliased terms provided, so I don't

96

1    understand.

2    Q.        How about anything that's contained in

3    Exhibit 121 between J.C. Stewart and Paula Davis

4    regarding what she has seen and what he has provided

5    her?

6                    (Document was passed.)

7    A.        And I have not seen this document prior.

8    Q.        That's why I'm giving it to you, 'cause I'm

9    going to -- And I'm showing you Exhibit -- Well, it

10   was 121 yesterday.  Right?  One twenty --

11               MR. ESTEP:  It is marked as Exhibit 121.

12               MR. GIBSON:  Okay.  And it's 106 to

13   Paula Davis's deposition, but -- Anyway, it's the

14   same document.

15   A.        Okay, I've reviewed it.

16   Q.        (BY MR. GIBSON) Okay.  I just want to go --

17   the first page, number 2 under the email from

18   Ms. Davis to Mr. Stewart dated September 25th, 2014,

19   at 1:30 p.m., the second request.  "What are the

20   following report parameters and where does the data

21   come from:  Refrigerant archive add date, unique

22   unit ID, custom tags."

23               Do you know one way or the other and have

24   you checked to see what the answer was to that

25   question from Mr. Stewart?

97

1  A.       This is the first time I've seen this

2  document, so I -- I would not have been asked to do

3  that.

4  Q.       "What brand model of bar code scanner do

5  you use?"

6           Have you seen anything, any answer to that

7  question?  Any evidence?

8  A.       Have not, no.

9  Q.       Okay.  If we can go to the second page of

10  that document, the top.  I guess it begins on the

11  previous page.  It's a email from Jeremy Fleming,

12  dated September 16, 2014.  It's at 7:46 a.m.  To

13  J.C. Stewart with a cc to Paula Davis.

14           It says, the second sentence, "Looking

15  through all the items you put on my flash drive, I

16  see lots of information, but I can't find the

17  PowerPoint slides you showed us.  Can you send those

18  to us also.  It was a good overview."

19           Have you seen either that flash drive or

20  the PowerPoint slides that are referenced in that

21  document?

22  A.       Don't believe so.  This is the first time

23  I've heard reference of them.

24  Q.       Okay.  Do you think it's important for you

25  as an expert in this case to look at those --

98

1   A.         I think it's important to --

2   Q.         -- two items?

3   A.         -- know what's on there.  I think it's

4   important for your experts to know what's on there

5   in order to analyze.  But I doubt that Carrier would

6   ask me to look at that.

7   Q.         And if you were -- if you were advising

8   Carrier on what it should and shouldn't produce in

9   discovery, would you advise Carrier to produce that

10  flash drive and produce those Power slide --

11  PowerPoint slides?

12             MR. ESTEP:  Object to form.

13  A.         Well, again, I'm not a lawyer, but I would

14  certainly want to know what was sent --

15  Q.         (BY MR. GIBSON) Okay.  Now, isn't --

16  A.         -- if it still exists.

17  Q.         As a forensic person, you're trained --

18  A.         I am trained.

19  Q.         -- you're trained to look for problems, for

20  issues that come up in these types of cases.

21             Isn't it typical that the person in

22  Mr. Stewart's shoes asks the other person to bring a

23  flash drive so we could put some information on it

24  and you can take it back to your office, what you

25  see there on September -- in the email of September

99

1   10th, 2014?

2           MR. ESTEP:  Object to form.

3   A.        I'm not sure I understand the question in

4   part.

5   Q.        (BY MR. GIBSON) Okay.  You've never seen

6   that done before where the person in Mr. Stewart's

7   shoes here asks the person in Mr. Fleming's shoes

8   from Amtec to come with his own flash drive, USB

9   flash drive?

10          Do you see that there in the September 10th

11  email?

12  A.        I mean, I would imagine that if they're

13  working on design they would be sharing documents

14  related to the design of the software.  I'm not sure

15  what the question is.

16          I mean, I've -- you know, without knowing

17  what's on that drive it's really hard to say whether

18  something improper was shared or not.

19  Q.        I'm just asking if it's suspicious at all.

20          MR. ESTEP:  Object to form.

21  A.        If it's suspicious?

22  Q.        (BY MR. GIBSON) To you.  To you as a

23  forensic analyst, is it suspicious?

24          MR. ESTEP:  Same objection.

25  A.        I'm not sure.  Again, I don't really know

100

1      the context of this thread.

2      Q.      (BY MR. GIBSON) It's either suspicious or

3      it isn't.  I mean, I don't think "not sure" is a

4      good -- a good answer.  Come on.

5              MR. ESTEP:  Object.

6      A.      I don't know.

7              MR. ESTEP:  I object to form.

8      Q.      (BY MR. GIBSON) You don't know if it's

9      suspicious?

10     A.      I don't know if it's suspicious based on

11     the context.

12     Q.      What is the context that you're seeing

13     there?

14     A.      From the thread that I can see here, it

15     seems like they're talking about design and

16     development and that Mr. Stewart asked Mr. Fleming

17     to bring a USB flash drive because he has several

18     files that may be useful.

19              I don't know what those files are.

20              And then they're talking about an NDA.  So

21     it's probably related to proprietary information

22     that's going into the new RES software.

23              I don't know what "looking at all the items

24     you put on my flash drive" means, I see lots of

25     information.  So not knowing, you know --

1  Q.       My question is --

2  A.       -- I think it would --  I think --

3  Q.       -- why wouldn't Mr. Stewart just put -- put

4  it on his own USB flash drive and give it to him

5  when they -- when they get there?

6  A.       Oh.  I don't know.  Yeah.

7  Q.       I'll ask him that.

8  A.       Okay.

9  Q.       I'm asking you if it's suspicious.  I don't

10  know you don't know --

11  A.       Right.  I think the information --

12  Q.       -- 'cause you haven't asked the question.

13  A.       -- contains --

14  Q.       But my question is, does it look

15  suspicious?

16          My question is not whether it was done or

17  not or why it was done or what was in somebody's

18  brain.  My question to you is does it look -- as

19  a -- like a private eye in the software industry,

20  does it look suspicious to you?

21          MR. ESTEP:  I object to form.

22  A.       What I would say is that I would be

23  interested to know what is on that USB drive.  I'm

24  not going to speculate on whether that's suspicious

25  or not.

1  Q.        (BY MR. GIBSON) If Mr. Stewart put

2  information on there from the ECI database or the

3  ECI software, would that be another mistake?

4            MR. ESTEP:  Object to the form.

5  A.        This is a hypothetical?

6  Q.        (BY MR. GIBSON) This is another

7  hypothetical, of course.  I said "if."

8  A.        I would say that if -- if Mr. Stewart put

9  on code from the VB6 system, that would definitely

10 be improper.

11           If he put on the structure and sequence and

12 organization of the database, I think that would be

13 improper.  But there's a lot of tables in the

14 database, and, again, none of these projects go

15 perfectly.

16           As far as the data, I'm not so sure.  So I

17 think a lot of the data was generated together.

18 Q.        Okay.  And if there are any -- any -- Same

19 question with respect to the PowerPoint that's

20 mentioned.  Would your answer be the same for the

21 PowerPoint slides?

22 A.        I'm not sure what's in the PowerPoint

23 slides.  I mean, if they --

24 Q.        Well, hypothetically.

25 A.        If they disclose the elements that

1   Mr. Olita has alleged, there is intellectual

2   property, you know, then I would think that would

3   not be proper for that to go, you know, excluding

4   the data that's in the database.

5   Q.        If Mr. Olita did not give the DOS Quick

6   Basic source code in that 4.0 Quick Basic you

7   mentioned in your report to Carrier, do you know how

8   they got it?

9           MR. ESTEP:  Object to form.

10  A.        I have no idea how it got there.

11  Q.        (BY MR. GIBSON) Do you know how they could

12  have gotten it without Mr. Olita giving it to them

13  directly?

14  A.        I assumed that Mr. Olita maybe left it

15  there or it was part of the code that was -- I have

16  no idea.  I would have to guess.

17  Q.        I mean, I'm saying, couldn't they -- can

18  they get it from what they have on their system?

19  A.        Some of the code in there appeared to be

20  compiled Quick Basic code, which I would expect to

21  be available.  And some of it appeared to be source

22  code, which I would not expect to be there

23  necessarily.

24  Q.        You answered my question.

25           So other than the brief conversation you

1    had with Mr. Hoal at the preliminary injunction

2    hearing and the 20 or so conversations you've had

3    with J.C. Stewart, is there anybody else at Carrier,

4    not counting lawyers, that you've talked to?

5    A.       Maybe there was a person who got us into

6    the conference room there when we were there for the

7    inspection, but I can't think of anyone else I've

8    had a substantive conversation with.

9    Q.       All right.  What about Mr. Femec, have you

10   talked to Mr. Femec?

11   A.       I have a little bit, just in regard to the

12   issues surrounding the LabVIEW software, which I am

13   not an expert in.

14   Q.       What were you -- what was your question and

15   what was his answer?

16   A.       I'm not sure if I had too many questions

17   about it, actually, now that I think about it.

18            We did talk -- it might have been more

19   about sort of the expectations of expert witnesses

20   in matters like this.

21   Q.       Did you get Mr. Femec involved or did

22   somebody else find Mr. Femec?

23   A.       Counsel found Mr. Femec.

24   Q.       Okay.  Now, did you advise counsel to --

25   did you have anything to do with that?  Did you

105

1    advise counsel to find a LabVIEW expert?

2    A.       No.

3    Q.       Okay.  Now, anybody at Amtec?  Have you

4    talked to Mr. Fleming?

5    A.       I don't believe so, no.

6    Q.       Have you talked to Ms. Davis?

7    A.       No.  Definitely not.

8    Q.       Anybody else at Amtec?

9    A.       Not that I know of, no.

10   Q.       Okay.  You talked to Mr. Steakley, their

11   lawyer?

12   A.       Actually, Mr. Steakley engaged my firm on a

13   previous matter, or one of his colleagues did, in a

14   different case.  But, no, not a conversation --

15   Q.       Not about this case?

16   A.       -- related to this case.

17   Q.       Okay.  Let's see.

18   A.       I believe we got a referral from him to

19   Farris Bobango.

20   Q.       Anybody else I hadn't covered that you've

21   talked to in this case, whether they're internally,

22   an employee at Carrier, or externally, third-party

23   contractor like Amtec, Mike Boals, Mr. Femec?

24   Expert?  Anybody?

25   A.       At the injunction hearing we talked a

1    little bit with the person who was going to give a

2    presentation about the number of people employed at

3    Carrier and the impact of Carrier -- I'm trying my

4    best to remember.  That's all I can think of.

5              MR. GIBSON:  Okay.

6              THE WITNESS:  Is now a good time for a

7    bathroom break?

8              MR. GIBSON:  Sure.

9                   (Lunch recess.)

10   Q.      (BY MR. GIBSON) All right.  Mr. Siegel, I'm

11   just going to go through my understanding of how the

12   ECI software works with the ECI database and with

13   the hardware, and then I'm going to go through how I

14   understand before, when it was implemented, of

15   course, and then how nowadays the RES software

16   works.  Okay?

17   A.      (Witness nods head up and down.)

18   Q.      As I understand it, the ECI software or the

19   SQL stored procedures would call to the database to

20   pull, retrieve, however you want to say it, the

21   command -- the valid tests and test procedures from

22   the ECI database, which would then send the command

23   to the software as to what the software needed to

24   tell the hardware to do and what to test.

25              Is that a fair representation?

1            If I've said it wrong, tell me how you

2   understand it.

3   A.        Okay, that's not quite correct.

4   Q.        Okay.  Go ahead.

5   A.        From viewing the -- you said that the

6   stored procedures would be doing this.  From my --

7   Q.        Well, the SQL stored procedures.

8   A.        Right.  And there's only -- from my review

9   of the registered script code, there's only three

10  stored procedures.

11  Q.        Let's stop right there.

12            You can have the hard commands in the

13  software itself or you can have them as stored

14  procedures in the SQL?

15  A.        Right.  My point is that the stored

16  procedures in the SQL server are not doing that,

17  it's done in the code.

18  Q.        But you could do either; correct?

19  A.        Yeah.  Yes.

20  Q.        Does it have to do -- the calls have to be

21  made --

22  A.        You can have --

23  Q.        -- one way or the other?

24  A.        -- the calls to the database be in stored

25  procedures for the read/write, all that, you can

1    have it in the code.

2    Q.        Okay.  So when I said that, that's why I

3    used both because in some cases it might -- ECI used

4    it more -- used more hard stored procedures;

5    correct?

6    A.        Yes.

7    Q.        Okay.  Go ahead.

8    A.        So -- All right, could you rephrase the

9    question?

10    Q.        I'm just looking back at him.

11    A.        I wanted to clear up the stored procedure

12    issue.

13    Q.        Well, back to what I was talking about.  I

14    understand the MES database has 28 SQL stored

15    procedures and the ECI database has three SQL stored

16    procedures.  But I also understand that the ECI

17    software has hard -- has the stored procedures as a

18    lot of hard procedures, whereas, they're less hard

19    procedures in the RES database -- I mean, RES

20    software.

21    A.        Sorry, I know it's a lot.

22    Q.        So does that sound -- does that sound

23    correct?

24    A.        I would say that it's database calls that

25    are in the software as opposed to stored procedures.

1    They are different things.

2    Q.        Okay.  But, nevertheless, some way the

3    software or the stored procedures are making calls

4    to the database, to the stored procedures in the

5    database; correct?

6    A.        The software is interacting with the

7    database, either using stored procedures or hard

8    coded calls to the database or a mix of both.

9    Q.        Okay.

10   A.        The RES software uses a lot more stored

11   procedures.  It looks like the ECI database was not

12   designed to primarily use stored procedures, more

13   hard coded.  We've -- we've covered that in --

14   Q.        Right.  Right.

15   A.        -- Mr. Carr's testimony as well.

16   Q.        Okay.  And then so we have -- And the

17   stored procedures then tell the soft -- command the

18   software to tell the hardware to do X, whatever X

19   is, just to test the units?

20   A.        And you're asking what my understanding is?

21   Q.        I'm just saying is my understanding

22   correct?  I mean, I know it's a little -- I mean,

23   some day we're going to have a jury, so they're

24   going to know even less than I do.

25             But is that a fairly good way to put it, at

1   least as a layperson?

2   A.        So from a layperson perspective I would

3   think that --

4             MR. GIBSON:  James is shaking his head.

5   A.        -- the names --

6             MR. GIBSON:  Huh?  I'll stop.

7         (Mr. Olita conferred with Mr. Gibson.)

8   Q.        (BY MR. GIBSON) I said "stored," okay.  I

9   said "stored procedures" twice.

10            There's stored procedures which are a

11   product of the SQL server that make the calls to the

12   database.  But those also could be -- those calls

13   could also be made to the database as hard -- as

14   hard stored procedures within the software itself;

15   correct?

16   A.        What I'm trying to say is just if you're

17   talking about in the software, just say it's a

18   database call as opposed to a stored procedure.

19   That's all I'm --

20   Q.        Okay.

21   A.        I'm trying to clear up the terms so that --

22   Q.        Okay.  'Cause it's not a stored procedure

23   if it's in the software?

24   A.        Right.

25   Q.        It's a -- it's a database call if it's

1    in --

2    A.        A stored procedure is a term of art --

3    Q.        Right.  I gotcha.

4    A.        -- in the database land.

5    Q.        Okay.  I've been using "stored procedure"

6    too often, I got --  I'm with you.  Okay.

7              Plus, then the calls being made to either

8    the valid -- to the valid test and the test

9    procedures in the database that are then -- that

10   then communicate a command to the software to tell

11   the hardware what to do?

12             Is that a better way to put it?

13   A.        You're asking is that how the software --

14   Q.        Works.

15   A.        -- operates?

16   Q.        And database and hardware, basically, how

17   they interact with each other.

18   A.        It's my understanding that the software

19   chews up -- And I'm going to use lay terms again --

20   chews up those commands, finds the associated

21   command in case statements in VB6 forms, and then it

22   will execute the required VB6 code in order to

23   interact with the hardware in the way that it's been

24   defined.

25   Q.        Okay.  Now --

1              MR. GIBSON:  Did you find it, Jeff?  Okay,
2     good.
3     Q.       (BY MR. GIBSON) And then the RES software
4     sends calls to the MES database for the valid tests
5     and test procedures, which then communicate the
6     commands back to the software --
7              MR. ESTEP:  Object to form.
8     Q.       (BY MR. GIBSON) -- to tell the hardware
9     what to do in the RES system.
10             Does that sound correct?
11             MR. ESTEP:  Same objection.
12    Q.       (BY MR. GIBSON) And I understand that could
13    be done with the stored procedures.  Either -- Let
14    me back up.  I'll go a little bit broader since
15    stored procedures are -- there's so many more in the
16    MES database.
17             Either the stored procedures in the MES
18    database or the calls in the RES software call to
19    the test procedures and valid tests, which then
20    communicate back through the software to tell the
21    hardware what to do?
22             MR. ESTEP:  Object to form.
23    Q.       (BY MR. GIBSON) Go ahead.
24    A.       That's my understanding of how the programs
25    work.  Again, I'm not a LabVIEW expert, but from the

1    testimony I've heard and read and from what I've

2    seen from Mr. Femec, I understand that's how it

3    works.

4    Q.      Now, the way I just said, those two things

5    appear to be pretty much the -- very, very, if not

6    identical systems, almost -- almost identical

7    systems, in the broad sense.  I'm not -- I'm not

8    talking about the code or anything, I'm just talking

9    about in the broad sense that's how both systems

10   work?

11   A.      What I would say is that that is a function

12   of both systems.

13   Q.      Okay, a function.

14           Well, tell me -- well, why do you mean a

15   function?  What other functions are you talking

16   about?

17   A.      Well, the software can do more than one

18   thing, but, you know, that's -- that is --

19   Q.      So the software --

20   A.      Well, you're going to say this --

21   Q.      Well, let me back up.

22   A.      Okay.

23   Q.      So you're saying the software doesn't all

24   have to call to the database?

25   A.      I mean, you could use the software to do a

1   lot of different things.  I'm not sure all the

2   capabilities of the LabVIEW RES software or the VB6

3   software.  I was not asked to do that.  I can say

4   that is a function of both programs can operate in

5   that way.  That is a functionality that they share.

6   Q.      Okay.  And the test procedures that are

7   contained in both systems, however they're stored,

8   whatever format they're in, you haven't looked at

9   those test procedures, or have you?

10  A.      I believe I was provided by you,

11  Mr. Dixon[sic], with the ECI database scripts, and I

12  believe I was provided -- And you can correct me if

13  I'm wrong on this -- with the text format of the

14  data for the test headers, the test procedures, and

15  maybe -- I'm not exactly sure the three text files

16  that came along with that production, but they

17  appeared to be data that would have been in the ECI

18  database.

19  Q.      Okay.  What about with respect to the MES

20  database, have you looked at its test procedures?

21  A.      I've looked in the MES database.  I have

22  not kept a keen eye towards the procedures. I mean,

23  it appears that they're there, that there are

24  procedures in there.

25  Q.      Okay.  How did you get to those procedures?

1    A.        They should be within the MES database.

2    Q.        Okay.  Have you checked to see if they are

3    identical or similar to the test procedures in the

4    ECI database?

5    A.        That was not under the scope of my

6    engagement, so no.  No.

7    Q.        Okay.  And then the same question for the

8    valid tests.  Have you found them in the ECI

9    database?

10            MR. ESTEP:  Object to form.

11   A.        If we're -- Sorry.  And you also said have

12   I found the valid tests in the ECI database?

13   Q.        (BY MR. GIBSON) Yes.  Or anywhere.  Have

14   you seen the valid -- valid tests --

15   A.        I believe the valid --

16   Q.        -- that are actually in the database?

17            MR. ESTEP:  Object to form.

18   A.        Now I reviewed the names of the 267 APIs.

19   And I did search for those in the MES database and

20   did not find them.  I did not for the purposes of

21   this assume that they were missing from the ECI

22   database.  I did not go back to the ECI database to

23   see what was there, because I was provided the

24   structure, sequence, organization, the empty

25   database that wouldn't have contained those.

1          But I believe they were contained in the
2  text file data that was provided to me.  I mean, I
3  would expect them to be there since these tests were
4  run using ECI software.
5  Q.       (BY MR. GIBSON) Okay.  Something came up
6  with -- Mr. Estep yesterday was talking about the
7  names.
8          And did you not have the Carrier ECI
9  database?
10  A.       Did I not have the Carrier ECI database.
11          Do you --
12  Q.       The database I'm talking about is the one
13  that existed on the date that it went down and the
14  Amtec database went up.
15  A.       It may have been --
16  Q.       When I say -- I keep saying "Amtec
17  database."  I mean -- When I say "Amtec database,"
18  what I really mean is MES database.
19  A.        I probably was provided with access to, but
20  you -- Can you say that again?  You just confused
21  me --
22  Q.       I'm sorry.
23  A.       -- because I heard ECI and then MES.
24  Q.       Do you have a copy of -- Did you, when you
25  were doing your analysis, did you have a copy of the

117

1    Carrier ECI database when it -- when it went into
2    archives and wasn't used anymore in 2015, late 2015?
3    A.       I may have been provided a copy of that.
4    But I relied upon the registered scripts and the
5    data that was provided along with the scripts from
6    counsel.
7    Q.       Okay.
8    A.       I did not use it for any of my analysis and
9    opinions.
10   Q.       All right.  And Mr. Estep asked the
11   question of, I believe it was, Mr. Carr yesterday,
12   basically, saying if the name is not -- is changed,
13   the name of the test procedure is changed or of the
14   valid tests, then the database will not recognize
15   what you're asking for if the name -- for example,
16   if the name's backwards.  Instead the CHECK OFF --
17   I'm just looking at one, CHECK OFF CONTROL VOLTS.
18   If you say CONTROL VOLTS CHECK OFF then the database
19   won't know what to do.
20            Is that -- is that -- am I saying it right?
21            MR. ESTEP:  I'm going to object to form
22   because I think you have it backwards from what I
23   asked.
24   Q.       (BY MR. GIBSON) Go ahead.  If I say
25   the name -- if the name is in there, if we change

118

1    the name but we don't do something else with that,

2    you won't --

3          MR. GIBSON:  What?  Yeah, the software

4    won't work.  Oh, I'm talking about the data,

5    whatever.

6    Q.       (BY MR. GIBSON) The software -- something

7    won't work if you change the names?

8    A.       If all you do is change the name in the

9    database, the source code won't know what to do --

10   Q.       Right.

11   A.       -- with the command, because the source

12   code says, "Hey, case statement, give me this name,

13   I'm going to do this code."  If it says, "Hey, case

14   statement, I don't know what that is," the case

15   statement doesn't -- it just gets ignored.

16   Q.       Okay.  Now, and I know you haven't done

17   this, but I'm going to ask you.  It's more of a

18   hypothetical.

19          Let's say in the ECI database you have a

20   procedure that says CHECK OFF CONTROL VOLTS.  And

21   then in the MES database you have the same

22   procedure, but it's now called CONTROL VOLTS CHECK

23   OFF.

24          Even though those names are different, if

25   the procedures are the same then is there a

1   violation of copyright or some other trade -- trade

2   secret infringement?

3   A.        That depends.

4   Q.        Okay.  Tell me why it depends, and what do

5   you mean by that?

6   A.        So -- And, again, I'm not giving any legal

7   opinions --

8   Q.        Okay.  I know.

9   A.        -- I'm just basing everything on my -- I

10  just want to make sure it's clear, I'm not a lawyer.

11  Q.        Okay.

12  A.        But it is my understanding of the copyright

13  law that protection will generally extend to

14  original creative expression and works.  And, also,

15  there are things that limit that creative

16  expression.  In my report I talk about scènes à

17  faire, which is largely just the trappings that need

18  to be there to do what the product needs to do.

19  Q.        Okay.

20  A.        You would imagine that they would both --

21  both the ECI software and the RES software would

22  need to be able to scan the bar code on the unit to

23  get information off the unit before you test it.  I

24  would imagine that would be present in both, that

25  would likely fall under scènes à faire and not

1  received protection.  It's up to the trier of fact

2  to decide that, but that's what the argument would

3  be.

4  Q.      That's the unit itself?  I'm talking about

5  the --

6  A.      I realize you're getting to the tests as

7  well.

8          So another thing of scènes à faire is

9  things that are dictated by the requirements of the

10  company or the customer or the requirements of the

11  software.  If certain elements must be tested as

12  required by the customer, then those would not

13  likely receive protection under copyrighting.  So if

14  it is required -- And can you say that name of that

15  test again?

16  Q.      Well, I just -- I'm looking at this and

17  I'm -- I'm just -- whatever --

18  A.      Just as an example.

19  Q.      I'm just looking at examples as CHECK OFF

20  CONTROL VOLTS, and I said CONTROL VOLTS CHECK OFF.

21  A.      Sure.

22  Q.      I mean, it's the same --

23  A.      So if it needs to be verified that the

24  control volts are off regardless of the software

25  that is in use, that likely would not receive

121

1    protection as the name.

2    Q.        Okay.

3    A.        That's the point I was trying to make.

4    Q.        And would it -- would it matter how

5    intricate the stored -- not stored, but the --

6    Strike that.

7            Would it matter how intricate the test

8    procedure is?  In other words, the more complicated

9    it is and the more code involved in implementing it

10   does that -- does that receive more protection than

11   something that's fairly easy to produce?

12   A.        Let me think for a second.

13           What I would say is that the code that

14   actually executes those commands would likely

15   receive protection.

16           But it is my understanding that the code

17   was never provided to the developer of the ECI --

18   the ECI VB6 code was never provided to the Amtec

19   developer to use as a basis for anything.

20   Q.        Well, that leads me to your music analogy,

21   which you knew I was going to get to that, didn't

22   you?

23   A.        I figured eventually.  I am a musician, so.

24   Q.        With page 8 through 10, is that where it --

25   No.

122

1    A.        Music analogy is on page 10.

2    Q.        Yeah.  Okay.

3              All right.  My question is a little

4    different than what you bring up there, but it --

5    I'm going to ask you -- These are all hypotheticals,

6    by the way.  I'm going to ask you the hypothetical.

7              Let's just say I write out a song and I

8    have -- with all the notes, and I have my sheet

9    music.  And you take my sheet music.  Let's say it's

10   three pages.  You take my sheet music and you Xerox

11   it, then you take it to a recording studio with some

12   other members of a band and record that song.

13   You've -- And let's say before I -- you get it I've

14   actually copyrighted the sheet music.  Okay?

15             You've violated my copyright at that point;

16   right?

17   A.        Again --

18   Q.        That's pretty obvious.

19   A.        Not a legal conclusion, but, yeah, I would

20   say definitely.

21   Q.        Now, a little bit less, but almost as bad.

22   Let's say the same thing except you actually sit

23   down and take my three pages of sheet music and

24   write out the sheet music yourself, but you're --

25   you're looking at my sheet music and copying it as

123

1    you do that.  Then you take it and record the song.

2            You're still violating my copyright; right?

3    A.       I would say for the music, yes, that's

4    true.

5    Q.       Okay.  You didn't download anything, you

6    didn't copy anything, you just wrote it out by hand?

7    A.       That is a literal copy of the sheet music,

8    yes.

9    Q.       Okay.  Now, let's say I -- we bring a

10   second person in and that person takes the sheet --

11   my sheet music and calls you up on the telephone and

12   reads you the notes and you write them out and then

13   you go record the song.

14           That would violate your -- my copyright as

15   much as the other two; right?

16   A.       If they read it to you such that the copy

17   that is made is a literal copy, then I would say,

18   yes, that would be a violation.

19   Q.       And then, finally, let's just say you see

20   my sheet music and you start playing it on an

21   instrument you have and so you learn the notes by

22   heart.  Then a month later you go write those notes

23   down, you have them memorized, then you go record it

24   and you go play that song and record that song and

25   sell it.

**124**

1          You've violated my copyright again; right?

2   A.        I would say again, if you are making a

3   literal copy, then I agree with you.

4   Q.        Okay.  So when -- if Mr. Stewart sent or

5   somebody else at Carrier sent Ms. Davis information

6   that they could only get from the ECI database or

7   ECI software, even if she didn't use it, it would be

8   a violation of ECI's copyright; correct?

9   A.        That is not my understanding.  My

10  understanding would be that it would need to be

11  used.

12  Q.        Okay.

13  A.        Also, if you only send somebody three notes

14  out of an entire piece, it is very unlikely that

15  that piece that you compose out of those three notes

16  is going to become a new or infringing work.

17  Q.        But that's covered --

18  A.        The amount --

19  Q.        -- infringement.

20  A.        -- is what matters.

21  Q.        But what about trade secrets?

22  A.        Trade secrets is an entirely different ball

23  game.

24  Q.        I can't send you the specs on -- I can't

25  send you the specs on somebody else's software

1    that's their trade secret information; correct?

2    A.        It's hard to switch gears right in the

3    middle of copyright to trade secret, because there

4    are so many different considerations you have to

5    worry about in terms of steps taken to protect the

6    material that was believed to be a trade secret and

7    whether people know what the trade secrets are.

8            But in your hypothetical example --

9    Q.        Yes.

10   A.        -- if it is known that those three notes

11   that are sent over the wire are trade secrets and it

12   is clear that steps have been taken to protect

13   those, then I would say that would be

14   misappropriation in that instance.

15   Q.        Okay.  And mistakes.  So -- And I know

16   you're using "mistake" fairly broadly, saying no

17   matter how it affects the ultimate decisions by the

18   trier of fact in this case, Mr. Stewart should not

19   have sent that spreadsheet to Ms. Davis.

20           Is that -- that's a mistake?

21   A.        As long as we're talking about that C zero,

22   whatever, 82 --

23   Q.        Yes.

24   A.        -- spreadsheet.  I do not believe he should

25   have sent that in regards to maintaining, you know,

**126**

1    the -- What did I say in my report?  "In order to

2    continue along the lines of principles of cleanroom

3    design."  That was not appropriate, that was a

4    mistake in that regard.

5    Q.      But by "mistake," you're not making -- you

6    don't know how that affects the legal conclusions in

7    this case?

8    A.      Correct.  I don't know if that material was

9    used, I don't know how that material was used, I

10   don't know -- Yeah.

11   Q.      Okay.

12   A.      I'll leave it at that.

13   Q.      Do you know what versions of the ECI

14   database you looked?

15   A.      I reviewed the ECI database script code

16   that was produced in response to the request for the

17   script that represented the registered work in the

18   copyright.

19   Q.      Now, is everything that you have been asked

20   to testify to and then as we sit here right now that

21   you think you'll be testifying to contained in this

22   report that's one twenty --

23   A.      I don't think I have a mark on this.

24   Q.      What did we decide it was?

25   A.      Is it this one?

1    Q.        Yeah, there it is, 123.  Does that contain

2    all the opinions that you're going to give in this

3    case, as far as you know, as we sit here right now?

4    A.        As far as I know, this is the extent of my

5    engagement.

6    Q.        Have you been asked to do anything else so

7    far?

8    A.        If we go to trial, I've been asked to show

9    up.

10   Q.        Okay.  If you're asked to perform any other

11   analyses or just think about this case down the road

12   between now and May 29th and come up with some more

13   conclusions or make another analysis, will you let

14   me know through counsel that you've -- I don't want

15   to find out for the first time at trial that you've

16   changed anything, okay --

17   A.        It's my --

18   Q.        -- or expanded.

19   A.        -- understanding that counsel would at

20   least contact you if they're having me do something

21   else along those lines.

22   Q.        All right.  So --

23   A.        But, yeah, I will inform counsel.

24             MR. GIBSON:  Okay.  If we can take about

25   five minutes, I think I'm almost done.

128

1          MR. ESTEP:  Sure.

2                    (Recess.)

3   Q.       (BY MR. GIBSON) Mr. Siegel, we were talking

4   about, basically, what you've done or been asked to

5   do and as is all in your report.  I'm going to ask

6   you just a few questions to make sure I understand

7   what you've done.

8          Have you made a trade secret analysis as to

9   whether there's a trade secret violation between the

10  ECI software and the RES software?

11         MR. ESTEP:  Object to form.

12  A.       Insofar as the 267 names were alleged as

13  identified trade secrets in this case, I did do an

14  analysis in that I searched for the 267 trade secret

15  names in the new MES database to see if they were

16  present, and I did not find them.

17         I also searched for those alleged trade

18  secret names in the LabVIEW software and text to see

19  if they were present, and I did not find them.

20  Q.       (BY MR. GIBSON) Okay.  Now my understanding

21  is that you looked at -- when you looked at the ECI

22  database, you looked at the ECI database for just

23  structure and it was empty.  In other words, you

24  didn't look at any of the data within the ECI

25  database.

129

1   A.        I reviewed the structure, sequence and

2   organization of the ECI database, which was provided

3   by the copyrighted script, which I believe we got

4   from you all.  I was also provided three text files

5   which appeared to be related to the test procedures.

6   Q.        Okay.  Did you look at a populate -- did

7   you look at a populated ECI database?

8   A.        I think the only time I looked at a

9   populated ECI database would have been at the

10  inspection.

11  Q.        All right.  Now, just to be clear.  Can the

12  name of a trade secret be changed but the underlying

13  implementation of the trade secret be copied?

14            MR. ESTEP:  I'm going to object to the

15  form.

16  A.        So I would say that in this matter that is

17  certainly a thing that could have happened.  But one

18  would expect that the implementation would be in the

19  code, and the code is not present in the RES code --

20  the VB6 code, so.

21  Q.        (BY MR. GIBSON) Now when you looked at the

22  MES database, did you look at the populated MES

23  database?

24  A.        I only looked at it so far as to search for

25  the registered, you know, alleged protected trade

130

1   secret names.

2   Q.        Okay.  Did you look at the -- in comparing

3   the two software pack -- or in comparing the two

4   software programs did you look at the software

5   programs as they were -- while they were interacting

6   with the database?

7   A.        No.  I only performed static code analysis,

8   static database analysis. I was provided only the

9   databases.  I was not asked to install or stand up

10  any of these systems for review.

11  Q.        Okay.  For the most part, the software

12  can't do much without the database and the database

13  can't do anything without the software.  Correct?

14  A.        With regard to these tests that we have

15  been talking about, the valid tests in ECI -- And

16  I'm not exactly sure the name of it -- the tests in

17  the MES database, I would say that they would

18  require the database and the software hand-in-hand

19  to work.

20  Q.        Which is why Mr. Chenault felt he needed to

21  run his analysis in the Carrier plant during a live

22  testing at the plant; correct?

23            MR. ESTEP:  Object to form.

24  A.        I can't speak to why Mr. Chenault felt that

25  way.

1    Q.        (BY MR. GIBSON) Well, do you agree with his

2    opinion that he needed to be able to do it at the

3    plant?

4    A.        I would say no.  I would say that he could

5    review the code to see where it should be pulling in

6    data.  He was provided the database, he should be

7    able to see the entry points and exit points of the

8    code, if he's an expert in LabVIEW.

9             I'm -- I'm not an expert in LabVIEW code, I

10   would assume that that's what he would be able to

11   do.

12   Q.        Okay.

13   A.        I wouldn't expect him to need to be there

14   if he has a complete backup of the database and the

15   software that works with it.

16   Q.        Okay.  So if you were in -- Back to if I'd

17   hired you on the plaintiff side in this case.  You

18   don't think you would have needed to go to the

19   Carrier plant and actually done a live inspection in

20   production to make your analysis?

21   A.        It depends on what point you're trying to

22   make.

23            If you're trying to analyze the software to

24   see what's in the database and how the database is

25   used in relation to the software, you should be able

132

1    to do that if you have the software and the

2    database.  I don't think you would need to be there.

3            In terms of verification of what software

4    is in use, you know, for that purpose it might be

5    useful to go to inspect and see what software is

6    running as far as you could tell from the displays.

7            MR. GIBSON:  Okay.  All right.  All right.

8    Thank you.  Appreciate it.

9            THE WITNESS:  All right.

10           MR. ESTEP:  I have no questions.

11            AND FURTHER DEPONENT SAITH NOT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

133

1          (WHEREUPON the proceedings concluded at

2    approximately 1:37 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                 Lisa J. Blake, LCR, RPR
                 LisaBlakeReporting.com
25                   901.485.9048

134

1                    REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE )

3    COUNTY OF SHELBY )

4              I, LISA J. BLAKE, LCR #483, RPR and Notary
     Public for the State of Tennessee, do hereby certify
5    that the above transcript of proceedings was
     reported by me and that the foregoing transcript,
6    consisting of Pages 1-134, at the time and place set
     forth in the caption thereof were stenographically
7    reported by me and constitute a true and correct
     transcript of said proceedings to the best of my
8    knowledge, skills and ability.

9              I FURTHER CERTIFY that I am not related to
     any of the parties named herein, nor their counsel,
10   and have no interest, financial or otherwise, in the
     outcome or events of this action.

11

12             I FURTHER CERTIFY that I am duly licensed
     by the Tennessee Board of Court Reporting as a
     Licensed Court Reporter as evidenced by the LCR
13   number and expiration date following my name.

14             I FURTHER CERTIFY that reading and signing
     was not requested.

15

16             IN WITNESS WHEREOF, I have hereunto
     affixed my official signature and seal of office
     this 19th Day of February 2018.

17

18

19         _____

20              Lisa J. Blake, LCR, RPR
                LCR #483, Expires 6-30-18

21

22              Notary Public at Large
                  State of Tennessee
23         Commission Expires:  03-30-20

24              901.485.9048

25         Lisa@LisaBlakeReporting.com

## A

**able (8)**
35:5;90:10;93:3;
119:22;131:2,7,10,25
**abstraction-filtration- (1)**
56:10
**access (9)**
54:7;61:7;62:13;
83:6,8;89:22;91:6;
92:8;116:19
**accidentally (1)**
50:3
**according (5)**
14:25;38:2;63:3;
65:7;75:11
**accurate (1)**
12:24
**Ackerman (2)**
46:23,25
**A-C-K-E-R-M-A-N (1)**
46:23
**actual (4)**
30:18;32:23;91:10,
15
**actually (24)**
20:20;22:6;37:6,23;
38:2,3;54:17;56:23;
57:8;61:4;67:3,10,17;
76:3;90:22;93:8,25;
104:17;105:12;
115:16;121:14;
122:14,22;131:19
**add (2)**
87:19;96:21
**addition (1)**
6:14
**address (1)**
5:8
**adherence (1)**
50:18
**administer (1)**
12:12
**administration (2)**
10:17;11:25
**administrator (3)**
10:18;13:21;42:10
**advise (3)**
98:9;104:24;105:1
**advising (1)**
98:7
**affecting (1)**
18:12
**affects (2)**
125:17;126:6
**affiliate (1)**
22:17
**again (34)**
18:5;22:6,10;24:20;
25:15,16;28:4,25;
38:6;41:7;50:13;53:2,
22;55:20;57:1;58:4,

12;61:5;62:12;63:4;
73:4;83:8;91:20;
98:13;99:25;102:14;
111:19;112:25;
116:20;119:6;120:15;
122:17;124:1,2
**against (1)**
51:14
**ago (1)**
32:1
**agree (9)**
15:20;20:11;43:25;
62:3,5;66:20,25;
124:3;131:1
**agreed (1)**
43:22
**agreement (5)**
18:19;29:20;36:23;
43:21;44:25
**agreements (1)**
38:3
**ahead (18)**
10:3;21:12;22:21;
34:5;35:25;44:17;
48:25;53:13;69:16;
79:21;82:23;83:13;
84:8;94:16;107:4;
108:7;112:23;117:24
**air (6)**
32:11;43:17;71:23;
72:2;76:15;81:1
**airplane (1)**
14:17
**Alexander (1)**
5:7
**alias (6)**
15:23,23;16:1,2,3,6
**aliased (6)**
15:14,19,21;16:8;
95:20,25
**aliasing (2)**
95:21,24
**allege (1)**
70:12
**alleged (9)**
41:21;53:20;69:7,8;
92:14;103:1;128:12,
17;129:25
**allegedly (1)**
95:25
**alleging (2)**
53:22;55:22
**allow (2)**
21:25;22:18
**allowed (3)**
21:9;37:19;58:10
**almost (7)**
21:3;28:9;60:20;
113:6,6;122:21;
127:25
**alone (4)**
58:8;60:16;87:14,
15

**along (7)**
42:10;55:6;84:1;
114:16;117:5;126:2;
127:21
**although (1)**
54:16
**always (3)**
12:8;28:9;95:17
**amount (1)**
124:18
**Amtec (29)**
37:9;40:5,6;41:5;
42:4,5,7;43:22;44:1,
13;45:6;47:11,13,14;
55:13;58:2,13;60:10;
61:7;83:6;84:6;99:8;
105:3,8,23;116:14,16,
17;121:18
**Amtec's (3)**
44:15,23;45:4
**analogy (2)**
121:20;122:1
**analyses (1)**
127:11
**analysis (14)**
8:6;12:2;48:2;70:1;
88:21;116:25;117:8;
127:13;128:8,14;
130:7,8,21;131:20
**analyst (2)**
94:8;99:23
**analyze (2)**
98:5;131:23
**Android (1)**
8:10
**Ann (1)**
46:23
**answered (1)**
103:24
**anymore (1)**
117:2
**apart (2)**
6:12;16:8
**API (1)**
94:23
**APIs (4)**
15:10;82:7,8;
115:18
**apologies (1)**
67:14
**appear (10)**
8:18;9:5,12;20:22;
52:5;68:11,12;91:13,
14;113:5
**appeared (5)**
28:12;103:19,21;
114:17;129:5
**appears (4)**
9:7;52:8,14;114:23
**appendices (1)**
65:12
**appendix (1)**
65:11

**Apple (1)**
8:9
**appreciate (2)**
19:5;132:8
**appropriate (5)**
33:18,23;36:14,23;
126:3
**architecture (5)**
71:13,15,16;76:25;
77:4
**archive (3)**
13:9,10;96:21
**archived (3)**
13:3;17:12;26:12
**archives (1)**
117:2
**area (2)**
6:14;20:11
**areas (1)**
8:4
**argument (1)**
120:2
**arguments (1)**
78:12
**around (3)**
6:10;20:21;93:25
**art (3)**
68:12;75:7;111:2
**article (3)**
52:10,10,13
**assembled (7)**
28:18;30:2,21;31:7;
34:1;35:23;37:18
**assessments (1)**
48:19
**assets (2)**
21:7,23
**assist (1)**
6:6
**assistance (2)**
42:4;46:19
**assisting (1)**
6:17
**associated (1)**
111:20
**Associates (1)**
13:21
**assume (16)**
5:14;40:12,20;41:3;
53:10;55:12;62:6;
67:11;69:4;71:25;
72:5;74:18,23,25;
115:21;131:10
**assumed (1)**
103:14
**assuming (4)**
68:22;69:20;85:25;
95:13
**assure (1)**
76:15
**Attachment (3)**
10:8;14:9,11
**attachments (1)**

**64:24**
**attention (2)**
24:3,7
**attorneys (4)**
23:21,25;24:2;
48:22
**August (1)**
19:9
**authenticate (1)**
66:9
**authenticated (1)**
66:6
**authored (1)**
73:24
**authoritative (1)**
62:4
**automatically (2)**
56:14;89:16
**available (4)**
92:17;95:12,19;
103:21
**average (1)**
60:20
**avoid (2)**
48:19;50:2
**avoided (1)**
63:21
**aware (14)**
19:22,24;29:25;
33:24;34:6;42:6;
67:24;69:7,12;72:10,
16;76:4,4,7
**awful (1)**
64:9

## B

**back (35)**
10:1;13:12;29:12,
19;32:1;37:13;39:1;
40:15;41:13,13,13;
47:18;53:1;54:2;
61:15,21,21;64:12,14;
72:15;73:21;77:22,
22;78:20;83:22;87:4;
98:24;108:10,13;
112:6,14,20;113:21;
115:22;131:16
**back-and-forth (2)**
32:2;35:15
**back-end (1)**
12:12
**background (5)**
5:12,25;10:5,7;26:2
**backing (1)**
82:9
**backup (4)**
12:16;13:9,11;
131:14
**backups (1)**
12:2
**backwards (2)**
117:16,22

**bad (1)**
  122:21
**ball (1)**
  124:22
**band (1)**
  122:12
**bar (2)**
  97:4;119:22
**based (14)**
  18:17;25:24;37:7;
  49:9,10;56:19;58:7;
  67:13;72:7;74:18;
  91:6;92:4,15;100:10
**bases (1)**
  34:6
**Basic (7)**
  15:4;29:10;61:8;
  84:4;103:6,6,20
**basically (5)**
  57:21;77:20;
  111:16;117:12;128:4
**basing (1)**
  119:9
**basis (4)**
  29:21;69:25;78:12;
  121:19
**Bates (2)**
  66:23,25
**bathroom (1)**
  106:7
**bearer (1)**
  83:7
**beat (1)**
  38:10
**beating (1)**
  38:25
**become (1)**
  124:16
**beginning (2)**
  65:24;80:20
**begins (1)**
  97:10
**begun (1)**
  28:10
**behind (4)**
  81:13;82:19,20;
  83:10
**besides (3)**
  14:16;42:7;85:5
**best (5)**
  92:16;95:12,16,19;
  106:4
**better (5)**
  21:3;42:12;45:12;
  74:12;111:12
**big (4)**
  30:24,25;43:25;
  57:23
**biggest (1)**
  90:1
**bit (8)**
  10:5;12:11;67:4;
  83:2;104:11;106:1;

**112:14;122:21**
**blank (1)**
  12:17
**blue (3)**
  89:25;91:1,18
**Boals (3)**
  42:13,13;105:23
**Bob (1)**
  45:12
**Bobango (2)**
  47:6;105:19
**books (1)**
  30:25
**boss (1)**
  46:3
**both (12)**
  36:18;83:11;91:3;
  108:3;109:8;113:9,
  12;114:4,7;119:20,21,
  24
**bottom (3)**
  19:6,7;66:22
**brain (1)**
  101:18
**brand (1)**
  97:4
**break (8)**
  27:17,19,23,25;
  38:14;83:19,21;106:7
**Breaking (1)**
  52:11
**brief (1)**
  103:25
**briefly (1)**
  41:10
**bring (5)**
  24:7;98:22;100:17;
  122:4;123:9
**bringing (1)**
  57:9
**brings (3)**
  19:2;24:3;57:18
**broad (3)**
  54:15;113:7,9
**broader (1)**
  112:14
**broadly (1)**
  125:16
**brought (2)**
  28:20;57:7
**build (5)**
  11:1,3,5,10,15
**built (2)**
  24:21;43:7
**burden (4)**
  53:3,5;55:8;94:17
**business (6)**
  10:15;32:10;33:12;
  45:5;55:19;68:10

**C**

**C030116 (1)**

**70:19**
**C030117 (1)**
  71:9
**C030127 (1)**
  70:20
**C030177 (1)**
  64:17
**C030200 (1)**
  64:18
**call (8)**
  16:3;28:25;29:1;
  106:19;110:18,25;
  112:18;113:24
**called (8)**
  15:3,5;34:17;46:5,
  7,10;50:5;118:22
**calls (13)**
  48:21;79:7;107:20,
  24;108:24;109:3,8;
  110:11,12;111:7;
  112:4,18;123:11
**came (27)**
  9:9,10;10:22;17:7;
  20:9;65:9,16,16,17;
  66:3,23;67:5;71:20;
  73:9,11,14;74:22;
  75:9,18;93:2,4,18,23;
  94:1,3;114:16;116:5
**can (50)**
  8:6;9:16,20;10:23;
  12:9,16,16,18;25:16;
  27:19,23;38:20;
  45:11;48:19;49:15,
  16;50:2,7;54:10,18;
  56:17;63:15;64:16;
  77:17;79:25;83:15,
  19;92:22,23,25;94:7;
  95:2;97:9,17;98:24;
  100:14;103:17;106:4;
  107:12,13,22,25;
  113:17;114:3,4,12;
  116:20;120:14;
  127:24;129:11
**capabilities (1)**
  114:2
**captured (1)**
  43:17
**Carr (12)**
  15:18;33:6,10,17,
  18;73:22;83:19;
  87:10;88:8;89:7;91:3;
  117:11
**Carrier (99)**
  13:10;16:25;18:14;
  19:25;21:4,7,22;
  22:17;23:14,18,20;
  24:11,15,22;26:10;
  28:8,20;30:4,4,13,18;
  31:15,22;32:17,25;
  34:3,10,12;35:1,3;
  37:3,15;39:11,14;
  41:1,25;42:1,2,5;
  43:22,25;44:13,25;

**46:5,8;47:4,8,15;**
  50:18,22;53:20;
  54:25;55:23;57:7,12,
  16,24;58:9,17,24;
  59:6,10;60:13;66:23,
  23,25;67:7,21,22;
  70:19;71:22,22;72:1,
  6,11;74:25;75:4,7,8;
  76:20;80:24;81:3;
  84:3,18;86:18;91:22;
  98:5,8,9;103:7;104:3;
  105:22;106:3,3;
  116:8,10;117:1;
  124:5;130:21;131:19
**Carrier's (9)**
  24:22;32:10;36:10;
  55:19;68:10;75:14;
  76:14,15;84:24
**carries (2)**
  51:7,9
**Carr's (8)**
  33:12;64:21;65:7;
  75:17;87:5;89:1;92:3;
  109:15
**case (45)**
  7:15;8:17;14:25;
  15:21;18:8,25;26:6,7,
  10;27:2;44:14;45:1,9,
  10;46:13,16;47:1;
  51:1,13,16;61:7;62:3;
  70:3;76:6;80:20;
  82:10;89:4;93:21;
  94:9,21;97:25;
  105:14,15,16,21;
  111:21;118:12,13,14;
  125:18;126:7;127:3,
  11;128:13;131:17
**cases (6)**
  8:9;26:2;80:3;
  86:13;98:20;108:3
**cause (8)**
  22:11;47:14;54:20;
  70:24;91:25;96:8;
  101:12;110:22
**caused (1)**
  6:12
**cc (1)**
  97:13
**certain (5)**
  12:6;75:1,8;76:17;
  120:11
**Certainly (6)**
  16:10;22:23;37:12;
  60:24;98:14;129:17
**certified (1)**
  8:5
**change (11)**
  9:4;28:21,22;47:10;
  70:2,10,14;87:9;
  117:25;118:7,8
**changed (10)**
  20:18;27:12;31:15;
  72:16;85:18;87:2;

**117:12,13;127:16;**
  129:12
**changing (1)**
  95:20
**check (10)**
  15:14;52:7;90:13;
  117:16,17,18;118:20,
  22;120:19,20
**checked (2)**
  96:24;115:2
**Chenault (8)**
  15:18;88:20;89:1,7;
  91:4,24;130:20,24
**Chenault's (3)**
  70:1;88:24;89:11
**chews (2)**
  111:19,20
**Chinese (1)**
  50:5
**Christmas (1)**
  10:12
**citation (3)**
  51:24;54:6;62:12
**cited (2)**
  51:23;62:4
**citing (1)**
  52:1
**civil (1)**
  19:19
**claim (1)**
  78:9
**claims (5)**
  12:4;28:8;37:15;
  83:9;94:14
**clarify (4)**
  13:1;40:11,14;59:3
**cleanroom (47)**
  47:20,21,22;48:2,3,
  5,9,9,24;49:8,11,18,
  19,21;50:10,11,19;
  51:13,21;53:6,20,23,
  24;54:3,5,18,25;55:4,
  21,22,23,25;57:5,6,8,
  10;58:18,20,23;
  60:25;61:19,21;63:4,
  6;69:10;95:3;126:2
**cleanrooms (4)**
  52:20;53:3;55:9;
  61:23
**clear (11)**
  13:8;22:8;57:3;
  58:8;69:1;89:2;
  108:11;110:21;
  119:10;125:12;
  129:11
**cleared (1)**
  89:5
**clerical (1)**
  95:4
**click (1)**
  12:18
**client (1)**
  28:15

ECIMOS, LLC v.
Carrier Corporation

Case 2:15-cv-02726-JPM-cgc    Document 256-4    Filed 02/23/18    Page 138 of 150    PageID
6020

Joshua A. Siegel
January 11, 2018

**closely (1)**
49:24
**code (64)**
6:25;8:10,12;15:7,
8;31:25;34:6,23,25;
37:6;41:4;51:20;54:7,
12,19;56:15;57:15;
61:8;62:13;82:9,10;
83:2,3,5,10;84:4,9,12,
18,22,24;85:3,18;
89:16;94:22;97:4;
102:9;103:6,15,19,20,
22;107:9,17;108:1;
111:22;113:8;118:9,
12,13;119:22;121:9,
13,16,18;126:15;
129:19,19,19,20;
130:7;131:5,8,9
**coded (2)**
109:8,13
**coding (1)**
43:10
**coffee (1)**
27:24
**colleagues (1)**
105:13
**college (1)**
14:4
**Collierville (1)**
28:21
**column (4)**
80:15,16;91:12,14
**command (6)**
106:21,22;109:17;
111:10,21;118:11
**commands (5)**
86:14;107:12;
111:20;112:6;121:14
**comment (1)**
86:21
**common (2)**
7:1;48:21
**communicate (3)**
111:10;112:5,20
**communications (1)**
53:17
**companies (2)**
34:3;35:2
**company (8)**
7:20,21;21:8,24;
22:15;31:24;43:25;
120:10
**compare (4)**
7:7;15:2,7;87:25
**compared (5)**
17:9;81:14,20,21,
24
**comparing (4)**
7:4;8:12;130:2,3
**comparison (2)**
7:1;56:11
**comparisons (1)**
88:12

**compete (1)**
34:3
**competing (1)**
33:20
**competitors (3)**
37:20,20;57:24
**compiled (1)**
103:20
**complaints (1)**
90:2
**complete (1)**
131:14
**completed (1)**
28:17
**completely (1)**
44:1
**completeness (1)**
53:17
**complicated (2)**
12:19;121:8
**compose (1)**
124:15
**computer (1)**
8:4
**computers (1)**
10:19
**concede (1)**
36:21
**concerned (6)**
23:7,10,12,17,19;
73:6
**concerns (1)**
41:19
**conclusion (4)**
44:7;56:7;58:12;
122:19
**conclusions (4)**
90:21;92:15;126:6;
127:13
**conditioning (6)**
32:11;43:18;71:23;
72:2;76:16;81:2
**conduct (1)**
74:25
**conference (1)**
104:6
**conferred (1)**
110:7
**confirmation (1)**
93:9
**conflicts (1)**
22:24
**confused (4)**
77:3,8;86:1;116:20
**confusion (1)**
32:6
**conjunction (2)**
16:22;32:12
**Connecticut (1)**
14:7
**consecutive (1)**
63:18
**consider (1)**

37:11
**considerations (1)**
125:4
**considered (2)**
37:4,8
**considering (1)**
91:5
**constant (1)**
73:3
**constraints (1)**
88:7
**consultant (1)**
50:16
**consulting (1)**
6:5
**contact (3)**
46:1;62:17;127:20
**contain (1)**
127:1
**contained (5)**
96:2;114:7;115:25;
116:1;126:21
**contains (1)**
101:13
**contents (3)**
69:15;91:13,17
**context (12)**
12:25;22:22;50:12;
62:14;71:24;72:1,7;
80:11;86:15;100:1,
11,12
**continue (1)**
126:2
**contract (2)**
6:8;44:22
**contractor (1)**
105:23
**control (9)**
72:3,7;117:17,18;
118:20,22;120:20,20,
24
**Controls (4)**
34:14,18,21;36:8
**conversation (3)**
103:25;104:8;
105:14
**conversations (3)**
42:25;72:23;104:2
**conversion (1)**
20:5
**coordination (4)**
55:11;62:1,6,18
**copied (3)**
54:19;82:7;129:13
**copies (2)**
64:7,11
**copy (17)**
8:17;9:14,22;13:8;
51:25;52:2,6;56:23;
58:3;116:24,25;
117:3;123:6,7,16,17;
124:3
**copying (12)**

8:15;15:13;25:22;
26:3;38:8;56:8;87:14,
21;88:1;92:14;94:18;
122:25
**copyright (19)**
8:8;35:8;51:15;
52:12;78:9;79:1;
82:13,16;83:9;88:13;
119:1,12;122:15;
123:2,14;124:1,8;
125:3;126:18
**copyrighted (2)**
122:14;129:3
**copyrighting (1)**
120:13
**copyrights (3)**
6:16;7:3;49:25
**corporation (5)**
21:20,22,22;22:18;
47:4
**correctly (1)**
59:6
**counsel (13)**
6:6,17;14:21;17:7;
24:24;75:3;104:23,
24;105:1;117:6;
127:14,19,23
**counting (1)**
104:4
**country (3)**
21:8,21,22
**couple (1)**
39:1
**course (3)**
36:5;102:7;106:15
**Court (2)**
27:6;28:1
**courtroom (1)**
41:14
**covered (3)**
105:20;109:13;
124:17
**covers (1)**
17:25
**create (6)**
6:20;10:21;11:4,15;
12:13,15
**created (11)**
11:5;15:4;28:11,11;
31:20;81:6;85:11;
86:3,5,7;94:4
**creates (2)**
7:12;12:17
**creating (4)**
12:14,22;13:5;
56:19
**creation (1)**
91:1
**creative (2)**
119:14,15
**criminal (1)**
19:19
**critical (2)**

12:7;90:20
**CSE (2)**
42:14,14
**curious (1)**
89:9
**current (2)**
7:17;67:12
**currently (1)**
6:2
**custom (1)**
96:22
**customer (2)**
120:10,12
**customized (1)**
34:23
**cutting (3)**
61:21;86:18,21
**CV (1)**
8:2

**D**

**data (37)**
12:3;13:3,8;18:3;
21:17;32:7,8;43:15;
78:8,16;79:2,3,5,10,
10,12,15;80:6,7;
81:13;82:20;92:18;
93:4;94:1;95:8,9;
96:20;102:16,17;
103:4;114:14,17;
116:2;117:5;118:4;
128:24;131:6
**database (189)**
6:23;10:21;11:2,4,
5,6,17,19,22,24;12:1,
15,17,18,21,23;13:2,
5,9,11;16:16,20,25;
17:4,11,13,18,21,25;
18:1,2,3,8;21:10,14;
28:19;29:17;30:3;
32:8,9;34:1,11;35:22;
36:2;37:18;39:24;
40:1,21;41:18,18,22;
42:8,10;43:3,7,13;
44:4;56:5;65:9;74:7,
14,22;75:18,24,25;
76:6,6,7,11;77:5;78:5,
6,22,24;79:3,8,13,23;
80:17;81:15,16,22,22;
82:25;87:12,13;
88:24;89:22;91:7,8,
11,15,16;92:1,4,8,11,
12,14,19,21,23,24;
93:7,8,10;94:22;95:7,
13,13,14,15;102:2,12,
14;103:4;106:12,19,
22;107:24;108:14,15,
19,24;109:4,7,8,11;
110:12,13,18,25;
111:4,9,16;112:4,16,
18;113:24;114:11,18,
20,21;115:1,4,9,12,

16,19,22,22,25;116:9,
10,12,14,17,17,18;
117:1,14,18;118:9,19,
21;124:6;126:14,15;
128:15,22,22,25;
129:2,7,9,22,23;
130:6,8,12,12,17,18;
131:6,14,24,24;132:2
**databases (12)**
10:19;11:9;12:2;
13:25;41:2,3;76:5;
83:11;87:21,25;91:5;
130:9
**date (4)**
19:13;27:7;96:21;
116:13
**dated (2)**
96:18;97:12
**David (6)**
39:25,25;41:8,9,16;
42:9
**Davidian (2)**
53:9,10
**Davis (28)**
53:10;56:4;59:7,17;
60:15;62:25;63:1,10;
64:25;65:17,21,22;
67:10,17;68:1;70:4,
14;73:25;76:10;
80:19;93:19,24;96:3,
18;97:13;105:6;
124:5;125:19
**Davis's (5)**
59:22;64:4;66:6;
71:1;96:13
**day (3)**
31:3;60:21;109:23
**days (9)**
15:18;25:19;29:19;
30:12;42:3;60:7;
85:22,22;89:2
**day-to-day (1)**
8:13
**dead (5)**
38:10,13,13,25;
39:2
**deal (4)**
6:14;11:24;26:2;
68:1
**dealing (1)**
6:6
**decade (3)**
21:3;22:19;24:8
**December (1)**
10:16
**decide (2)**
120:2;126:24
**decided (2)**
32:9;38:6
**decision (1)**
47:10
**decisions (2)**
37:7;125:17

**deemed (1)**
38:9
**default (1)**
89:9
**defect-free (1)**
49:22
**defects (3)**
12:5,6,7
**define (1)**
15:23
**defined (5)**
49:20,21;52:23;
79:24;111:24
**defining (2)**
15:20;57:5
**definitely (6)**
30:15;45:14;93:23;
102:9;105:7;122:20
**definition (9)**
48:4,5,6;49:9,10,10,
13,24;63:3
**deliver (1)**
49:22
**demands (1)**
53:18
**depending (1)**
13:14
**depends (3)**
119:3,4;131:21
**depicted (1)**
40:10
**DEPONENT (1)**
132:11
**deposition (14)**
5:15;27:22;46:20,
24;59:24;60:1,3;66:7;
67:18,19;71:1;84:25;
89:1;96:13
**depositions (1)**
86:25
**derived (1)**
41:22
**described (2)**
7:24;10:14
**description (3)**
91:12,14,22
**design (45)**
11:2,3,5,10,15;
13:24;14:1;34:11;
35:9;47:21;48:3,10;
49:18;50:9,10,11,19;
51:13;53:23;54:5,18,
25;55:4,11,12,17,22;
57:10;58:18,20;61:2,
25;62:8,18,20,21;
63:4,6;69:10;71:13;
72:9;99:13,14;
100:15;126:3
**designed (6)**
31:11;34:2;47:22;
48:1;74:14;109:12
**designing (2)**
11:17;63:1

**designs (2)**
36:4,7
**desk (3)**
36:17,24;50:25
**detailed (1)**
15:6
**details (1)**
46:11
**determination (2)**
39:16,17
**determine (6)**
15:9,13;25:22;
28:12;94:25;95:8
**determining (2)**
8:13;39:11
**develop (11)**
6:9,24;13:24;14:1;
24:20;29:22;50:8;
51:20;61:5;81:4,8
**developed (22)**
6:25;18:10;25:24;
28:13,20;29:14,17;
30:1,17,22;31:24;
32:3,4,9,12,13,15;
33:8;41:20,24;43:7;
74:14
**developer (5)**
54:7;68:14;69:13;
121:17,19
**developers (12)**
23:23,24;39:5,22,
25;40:12,13,19,20,21,
25;41:6
**development (17)**
41:17;42:7;43:2,9;
44:3,15;47:23;48:6;
49:19,21;51:13;
55:17;65:25;89:22,
23;90:3;100:16
**develops (1)**
7:12
**dictated (2)**
32:10;120:9
**dictating (1)**
61:4
**difference (2)**
11:8,15
**different (23)**
29:3,4;34:24;36:5;
47:25;48:5;49:19;
50:6;67:6,15;72:22;
75:15,16;78:6;87:13,
20;105:14;109:1;
114:1;118:24;122:4;
124:22;125:4
**differently (4)**
17:22;20:19;31:12,
13
**difficult (1)**
7:6
**digital (1)**
8:6
**DIRECT-EXAMINATION (1)**

**5:4**
**directly (2)**
34:3;103:13
**disagree (1)**
17:23
**disagreement (2)**
36:25;66:12
**disclose (1)**
102:25
**discovery (1)**
98:9
**discussed (3)**
47:19;66:5,20
**discussion (3)**
32:2;63:11;64:15
**display (1)**
83:22
**displays (1)**
132:6
**dispute (4)**
18:7,13;24:21;
46:22
**DisputeSoft (13)**
6:2,4,20;7:12,25;
10:11,14,22;45:8;
46:2,16;47:3,17
**distribution (1)**
19:18
**Dixon[sic] (2)**
17:8;114:11
**Document (44)**
22:9,13;43:23;45:7;
49:1;51:25;52:4,18;
58:11;63:10;64:20,
22,24;65:2,6,10,11,
14,18;66:24;67:2,7,
15;68:5;70:22;71:4,8;
72:8;74:4,9,15,19;
75:3;76:1;80:19;90:3,
9,14;96:6,7,14;97:2,
10,21
**documentation (2)**
53:6;56:20
**documents (4)**
54:2;56:5;85:8;
99:13
**done (26)**
16:12;36:17,22,25;
37:1,2;45:2;46:25;
47:3;51:1;55:18;
72:21,24;73:1,2;94:9;
99:6;101:16,17;
107:17;112:13;
118:16;127:25;128:4,
7;131:19
**DOS (10)**
20:18;29:10,19,19;
30:12;31:16;85:3,17,
22;103:5
**double-sided (3)**
9:8,10,15
**doubt (1)**
98:5

**Doug (1)**
14:22
**down (10)**
13:18;19:4;61:11,
11;66:4;106:17;
116:13;122:23;
123:23;127:11
**download (1)**
123:5
**drafted (8)**
68:17;69:22;71:4;
73:24;74:4,9,15;
80:19
**drawings (4)**
28:17;34:2;35:22;
37:18
**drive (13)**
59:15,18;97:15,19;
98:10,23;99:8,9,17;
100:17,24;101:4,23
**due (1)**
56:13
**duly (1)**
5:2
**during (1)**
130:21

### E

**earlier (3)**
20:21;73:19;78:1
**early (2)**
45:23,24
**easier (3)**
7:19;9:18;35:19
**easy (1)**
121:11
**EC10082xls (1)**
50:23
**ECI (98)**
15:5;16:22;17:4,5,
13,21;18:13;19:11,
23;26:11;27:3;28:3,
18,19;29:14,22;30:2,
3,15;31:11,16,16,21;
32:3,12,15;33:25;
34:1,10,11,11,12;
35:20,22,22;36:2,2;
37:17,17,18;41:22;
47:10;56:5;57:19;
65:9;74:22;75:18;
76:6,11;77:5;78:6,22;
80:17;81:15,22;
84:14;86:17;87:13;
92:24;94:22;102:2,3;
106:12,12,18,22;
108:3,15,16;109:11;
114:11,17;115:4,8,12,
21,22;116:4,8,10,23;
117:1;118:19;119:21;
121:17,18;124:6,7;
126:13,15;128:10,21,
22,24;129:2,7,9;

130:15
**ECI-developed (1)**
33:25
**ECIMOS (3)**
32:12;34:7,12
**ECI's (2)**
57:20;124:8
**edge (2)**
86:18,21
**effect (1)**
37:25
**eight (1)**
65:13
**eighth (3)**
21:8,20,21
**either (12)**
17:17;45:5;56:13;
68:16;92:20;97:19;
100:2;107:18;109:7;
111:7;112:13,17
**electrical (1)**
75:5
**electronic (1)**
53:17
**elements (7)**
15:8;55:22;56:12,
12;57:10;102:25;
120:11
**else (21)**
15:25,25;25:17,20;
27:23;35:6;38:18;
67:22;75:20;76:13;
85:5;90:10;104:3,7,
22;105:8,20;118:1;
124:5;127:6,21
**else's (2)**
36:14;124:25
**email (8)**
63:8;65:16;93:19,
23;96:17;97:11;
98:25;99:11
**emails (3)**
60:15,19,20
**employed (3)**
6:1,2;106:2
**employee (2)**
76:22;105:22
**employees (1)**
23:18
**Employment (2)**
10:10;13:19
**empty (3)**
78:24;115:24;
128:23
**engaged (4)**
25:21;28:9;48:13;
105:12
**engagement (3)**
17:15;115:6;127:5
**engineer (2)**
51:20;75:5
**engineering (1)**
75:3

**enlisted (1)**
47:9
**enough (3)**
56:20;88:20;93:10
**ensued (1)**
58:13
**ensure (1)**
51:18
**entered (2)**
16:25;52:24
**entire (2)**
51:8;124:14
**entirely (1)**
124:22
**entry (1)**
131:7
**environmentally (1)**
9:8
**EQSV (1)**
83:17
**errors (1)**
95:4
**essentially (1)**
12:22
**ESTEP (77)**
5:5;9:17;11:11;
21:11;22:3,20;23:13;
24:4,9,16;28:24;30:5;
33:6,10;34:4,15;
35:24;36:11;37:10;
39:13,23;44:5,16;
45:3;53:12;55:15;
59:2;63:17,21,23;
64:8,11;65:23;66:1,8,
11,14,17,20,24;68:25;
72:18;74:16;77:7;
81:18,23;83:21;84:7,
13;86:20;90:4,5;92:5;
93:13;96:11;98:12;
99:2,20,24;100:5,7;
101:21;102:4;103:9;
112:7,11,22;115:10,
17;116:6;117:10,21;
128:1,11;129:14;
130:23;132:10
**even (11)**
13:12;14:11,25;
29:1;30:18;37:4;
56:23;81:19;109:24;
118:24;124:7
**eventually (1)**
121:23
**everybody (4)**
24:19;27:22;38:18;
61:13
**Everybody's (2)**
27:20;61:14
**evidence (15)**
5:25;8:15;15:13;
25:22;31:1;38:8;56:8;
82:6;88:1;92:17;95:9,
12,17,19;97:7
**exact (3)**

17:17;80:16;83:10
**exactly (7)**
12:24;20:9;27:7;
44:21;45:11;114:15;
130:16
**examined (1)**
5:2
**examiner (1)**
8:5
**example (6)**
7:1;13:16;36:20;
117:15;120:18;125:8
**examples (1)**
120:19
**Excel (4)**
92:16,25;93:1;
95:16
**except (1)**
122:22
**excluding (1)**
103:3
**executables (1)**
34:24
**execute (4)**
79:11;82:11,23;
111:22
**executes (1)**
121:14
**Exhibit (29)**
8:16,23;10:4;24:14;
26:17,25;27:1;28:6;
37:14;39:6;40:10;
49:1;51:4;52:13;
57:19,22;63:13,14,14,
16;64:2,13;70:18,24;
71:1;80:11;96:3,9,11
**exhibits (1)**
63:18
**exist (6)**
16:1,16,19;17:17;
76:1,19
**existed (3)**
17:21;95:6;116:13
**existing (10)**
7:4;10:22;16:6;
71:14,15,17;72:4;
76:19;77:1,11
**exists (3)**
93:8,9;98:16
**exit (1)**
131:7
**expanded (1)**
127:18
**expect (15)**
13:7,7;23:17;24:5,
11;39:5;62:14;68:9;
80:24;81:3;103:20,
22;116:3;129:18;
131:13
**expectations (1)**
104:19
**experience (6)**
13:19,19;14:16,19;

36:13;92:4
**expert (18)**
8:17;14:21,22;
17:16;18:25;86:22;
91:25;93:3,14;94:12;
97:25;104:13,19;
105:1,24;112:25;
131:8,9
**expertise (1)**
8:4
**experts (5)**
15:1;25:19;86:4;
94:6;98:4
**export (1)**
93:1
**exported (1)**
91:16
**exposed (1)**
68:8
**expression (6)**
35:7;38:9;69:18;
80:5;119:14,16
**extend (1)**
119:13
**extensive (1)**
31:8
**extensively (1)**
14:8
**extent (2)**
19:20;127:4
**externally (1)**
105:22
**extra (1)**
52:2
**extracted (1)**
91:17
**eye (1)**
101:19;114:22

**F**

**facilities (2)**
41:1;57:25
**facility (1)**
7:13
**fact (8)**
6:17;18:18;38:7;
48:10;55:24;56:4;
120:1;125:18
**facts (5)**
6:19;28:16;29:2,3;
37:24
**factual (1)**
20:16
**fail (1)**
6:13
**fails (1)**
6:10
**fair (12)**
21:6;48:11,12;
53:11;58:21,22;62:9,
22,23;74:5;86:16;
106:25

**faire (3)**
119:17,25;120:8
**fairly (4)**
31:8;109:25;
121:11;125:16
**faith (1)**
57:12
**fall (4)**
60:12,13;74:3;
119:25
**families (4)**
71:16,20,22,23
**fans (1)**
76:17
**far (10)**
16:7;18:11;32:14;
46:2;102:16;127:3,4,
7;129:24;132:6
**Farris (2)**
47:6;105:19
**felt (3)**
53:4;130:20,24
**Femec (8)**
14:22;104:9,10,21,
22,23;105:23;113:2
**few (6)**
5:24;6:25;8:9;
45:14;84:1;128:6
**field (5)**
11:19;88:7;91:12,
14,22
**fields (3)**
11:18,19;88:7
**figure (5)**
28:10;37:23;38:2;
57:7;62:8
**figured (1)**
121:23
**file (1)**
116:2
**files (4)**
100:18,19;114:15;
129:4
**filter (3)**
38:8;56:11,12
**filtration (1)**
56:10
**final (1)**
51:17
**finally (1)**
123:19
**find (14)**
37:5;43:24;66:17;
91:19;94:13,13;
97:16;104:22;105:1;
112:1;115:20;127:15;
128:16,19
**finds (1)**
111:20
**fine (3)**
5:17;10:2;38:17
**finished (1)**
88:16

**firm (4)**
6:6;46:12;47:6;
105:12
**first (31)**
5:2,23;26:13,22;
28:2;31:3;40:16;
42:16;45:9,16,17,18;
46:1,4;49:8;53:19;
54:9;66:6;69:21;70:6,
12;72:8;73:21;85:14;
86:17;94:15,19;
96:17;97:1,22;127:15
**fit (1)**
46:12
**five (1)**
127:25
**flag (2)**
83:1;95:22
**flash (9)**
97:15,19;98:10,23;
99:8,9;100:17,24;
101:4
**Fleming (4)**
59:16;97:11;
100:16;105:4
**Fleming's (1)**
99:7
**flip (1)**
52:15
**floor (3)**
23:1,9;38:22
**folks (3)**
24:6;41:1,3
**follow (1)**
50:1
**followed (2)**
53:22;63:5
**following (2)**
54:5;96:20
**follows (1)**
5:3
**footnote (1)**
51:5
**forensic (4)**
8:6;94:8;98:17;
99:23
**forensics (1)**
8:5
**forgive (1)**
41:6
**form (51)**
17:18,18;21:11;
22:3,20;23:13;24:4,9,
16;28:24;30:5;34:4,
15;35:24;36:11;
37:10;39:23;44:5;
45:3,6;53:12;55:15;
59:2;65:23;66:8;69:1;
72:18;74:16;77:7;
81:18,23;84:7;85:9;
86:20;92:5;93:13;
98:12;99:2,20;100:7;
101:21;102:4;103:9;

112:7,22;115:10,17;
117:21;128:11;
129:15;130:23
**format (4)**
87:12,13;114:8,13
**forms (1)**
111:21
**formulate (1)**
25:23
**forth (2)**
54:2;72:15
**forward (1)**
31:15
**found (5)**
16:18;82:8;104:23;
115:8,12
**foundry (7)**
33:7,8,11,13,17,20;
36:20
**front (1)**
61:16
**function (4)**
113:11,13,15;114:4
**functionality (1)**
114:5
**functions (1)**
113:15
**further (5)**
13:12,13;14:24;
88:23;132:11

## G

**game (1)**
124:23
**Garrett (2)**
9:14;45:12
**gave (4)**
8:20;47:19;59:16,
17
**gears (1)**
125:2
**general (1)**
62:2
**Generally (11)**
6:22;7:16;50:25;
56:15;57:9;72:15;
75:10;80:3;88:9,11;
119:13
**generate (1)**
78:23
**generated (4)**
56:15;89:16,24;
102:17
**gets (2)**
79:12;118:15
**GIBSON (104)**
9:3,5,13,18,20;
11:14;21:12,16;22:4,
21;23:14;24:6,13,23;
28:25;30:6;34:9,16,
18,20;36:1,19;37:13;
38:16,19,22,24;39:15;

40:5;44:8,17;45:8;
49:3;52:2,5;53:13;
55:24;59:4,5;61:9,12;
63:12,20,22,24;64:1,
7,10,12,16;65:24;
66:2,9,16,18,22;
67:16;69:3,6;72:19;
74:20;77:9;81:20;
82:1;83:20,25;84:8,
14;86:24;92:11;
93:16;96:12,16;
98:15;99:5,22;100:2,
8;102:1,6;103:11;
106:5,8,10;110:4,6,7,
8;112:1,3,8,12,23;
115:13;116:5;117:24;
118:3,6;127:24;
128:3,20;129:21;
131:1;132:7
**given (9)**
25:7;62:20,20;
63:10;65:17;67:17;
77:9;84:4;90:5
**giving (5)**
48:8;57:2;96:8;
103:12;119:6
**goal (1)**
49:22
**go-between (2)**
62:7,24
**goes (1)**
79:3
**good (15)**
27:18;38:16,18;
46:12;57:12;58:20;
93:10,11,20;97:18;
100:4,4;106:6;
109:25;112:2
**goodness (1)**
8:25
**gotcha (1)**
111:3
**government (1)**
13:15
**granted (1)**
80:7
**Ground (1)**
52:12
**group (1)**
32:4
**groups (2)**
55:10;61:24
**guess (6)**
10:6;13:1;39:24;
70:24;97:10;103:16
**guessing (1)**
33:3
**guidelines (2)**
50:1,14
**guy (1)**
42:14
**guys (2)**
27:18;61:11

## H

**hand (1)**
123:6
**hand-in-hand (1)**
130:18
**handled (1)**
82:15
**handwriting (1)**
64:3
**Hanover (1)**
5:9
**happen (1)**
48:23
**happened (7)**
6:19;8:25;9:1,11;
20:21;54:17;129:17
**happening (2)**
76:23;86:8
**hard (12)**
53:4;99:17;107:12;
108:4,17,18,18;109:7,
13;110:13,14;125:2
**hardware (21)**
28:18;30:2,17,18,
21;31:1,8;34:1,11;
35:23;37:19;72:16,
21;106:13,24;109:18;
111:11,16,23;112:8,
21
**harmless (1)**
44:1
**Harvard (1)**
51:21
**hats (1)**
10:20
**head (4)**
42:17;66:4;106:17;
110:4
**headers (1)**
114:14
**hear (7)**
23:4;44:13;64:23;
75:17,19;87:5,7
**heard (28)**
5:12,18,19;15:1,18;
18:11;22:23;24:18;
33:5;39:10;42:3;
44:25;60:6;64:21;
72:14;78:15;81:7;
82:12;85:10,10,14;
86:8,11;89:12,20;
97:23;113:1;116:23
**hearing (8)**
14:18,20;30:25;
31:2;41:11;82:12;
104:2;105:25
**heart (1)**
123:22
**help (5)**
6:12;46:12;47:9;
48:19;57:10

**helping (1)**
46:24
**Hey (5)**
26:11;38:2;52:2;
118:12,13
**hired (10)**
6:11;7:22;14:22;
18:23;26:9;37:9;
51:19;58:14;94:10;
131:17
**hiring (2)**
50:16;58:2
**History (1)**
10:10
**hit (1)**
83:7
**Hoal (5)**
39:25;41:8,9,16;
42:9;104:1
**hold (1)**
44:1
**honest (1)**
23:16
**Honestly (1)**
45:4
**horse (3)**
38:10;39:1,2
**HTC (1)**
8:10
**Huh (1)**
110:6
**hundred (2)**
71:25;85:1
**Huntsville (1)**
59:23
**HVAC (10)**
34:3;75:12,13;
85:11,12,16,21,25;
86:22,22
**hypothetical (13)**
26:18,20;28:4;29:1,
2;68:20;69:4;83:13;
102:5,7;118:18;
122:6;125:8
**hypothetically (4)**
67:25;68:4;70:11;
102:24
**hypotheticals (2)**
33:16;122:5

## I

**ID (1)**
96:22
**idea (4)**
51:12;55:1;103:10,
16
**identical (3)**
113:6,6;115:3
**identified (1)**
128:13
**identifier (1)**
83:2

ignored (1)
  118:15
III (1)
  51:22
imagine (8)
  57:15;71:21;74:6;
  75:9,15;99:12;
  119:20,24
immediately (1)
  24:7
impact (1)
  106:3
imperfect (1)
  95:17
implement (3)
  28:21;57:8;58:19
implementation (4)
  37:19;47:23;
  129:13,18
implementations (1)
  6:8
implemented (19)
  30:3,15;31:21;
  32:15;33:19;36:8;
  53:24;58:17;60:12;
  61:19;72:25;73:2,3,7;
  74:8,8,14;86:17;
  106:14
implementing (1)
  121:9
important (8)
  12:8;27:20,21,21;
  78:7;97:24;98:1,4
improper (3)
  99:18;102:10,13
improvement (1)
  73:4
inappropriate (1)
  84:16
Inc (1)
  13:22
include (2)
  18:3;71:13
included (1)
  53:8
including (1)
  84:5
indemnify (2)
  44:1,13
Indemnity (2)
  43:21;44:25
independent (4)
  51:19;93:3,14;94:5
independently (4)
  41:20,24;88:22;
  89:19
indexes (1)
  11:21
individual (1)
  34:25
industry (7)
  53:4;75:12,13;
  85:12;86:22,23;

101:19
inform (1)
  127:23
information (11)
  69:11;88:20;97:16;
  98:23;100:21,25;
  101:11;102:2;119:23;
  124:5;125:1
informed (2)
  67:5,7
infrastructure (1)
  10:20
infringe (3)
  56:17;57:13,21
infringed (2)
  56:1,9
infringement (12)
  39:12,18;49:12;
  51:15;56:3,7,22,25;
  78:9;83:9;119:2;
  124:19
infringing (4)
  36:9;47:24;57:11;
  124:16
in-house (3)
  6:25;39:13,15
injunction (4)
  31:2;41:11;104:1;
  105:25
input (1)
  43:15
Insofar (1)
  128:12
inspect (1)
  132:5
inspection (8)
  27:5;45:15,16,17,
  18;104:7;129:10;
  131:19
install (3)
  12:16;79:14;130:9
installed (2)
  30:23;40:8
instance (2)
  12:15;125:14
Instead (1)
  117:16
instrument (1)
  123:21
Intel (3)
  51:16;52:11;53:5
intellectual (15)
  6:15;23:7,11,12,16;
  36:10,14;37:9,16;
  38:5;49:25;50:4;
  57:20;62:19;103:1
interact (3)
  11:20;111:17,23
interacting (3)
  88:5;109:6;130:5
interested (1)
  101:23
interfaces (1)

36:1
internal (1)
  7:19
internally (1)
  105:21
into (17)
  5:25;10:5;11:19;
  16:25;20:9,13;31:1;
  32:2,8;43:15,16;
  54:16;19;88:25;
  100:22;104:5;117:1
intricate (2)
  121:5,7
introduced (1)
  51:15
investigate (1)
  28:7
investment (1)
  53:18
involve (2)
  7:18;8:4
involved (22)
  7:16;8:1,3,7,9;24:1;
  39:10,11;40:1,7;42:7;
  43:8;45:9;47:17;48:8,
  9,16,17;60:11;63:2;
  104:21;121:9
involves (2)
  8:11;10:19
involving (3)
  7:3;46:11;48:13
IP (3)
  50:17;57:11,13
IPCS (11)
  28:17;30:1,14;
  33:24;35:9,10,11,14,
  16,17;84:5
issue (7)
  14:25;18:20;37:4;
  48:14;51:1,22;108:12
issues (8)
  6:7,12;46:13;58:4;
  88:23;91:25;98:20;
  104:12
items (5)
  87:24;90:17;97:15;
  98:2;100:23

                 J

James (3)
  24:18;81:7;110:4
January (5)
  10:11,13,16;13:19,
  22
JC (14)
  40:1;41:8;42:21;
  43:14;67:4;72:23;
  73:5,9,11;93:19,23;
  96:3;97:13;104:3
Jeff (4)
  46:4,5,7;112:1
Jeremy (1)

97:11
job (2)
  13:25;23:14
Johnson (4)
  34:14,18,20;36:8
jointly (2)
  18:10;32:9
Josh (1)
  16:9
JOSHUA (3)
  5:1,7;16:8
Journal (1)
  51:21
jump (4)
  77:17,17,18,22
jumped (2)
  10:3;40:19
jury (1)
  109:23

                 K

keen (1)
  114:22
keep (3)
  13:15,16;116:16
kept (1)
  114:22
keys (1)
  11:21
kind (3)
  16:11;54:15;60:4
knew (3)
  33:1;69:25;121:21
knowing (2)
  99:16;100:25
knowledge (11)
  30:20;47:5,7,12;
  50:7,7,21,21;51:18;
  55:18;59:11,12
known (1)
  125:10
knows (2)
  23:15;61:13

                 L

label (1)
  86:14
LabVIEW (20)
  14:11,16,18,19,21,
  22,25;15:2,4,8,12;
  41:19;43:9;104:12;
  105:1;112:25;114:2;
  128:18;131:8,9
laid (3)
  11:23;88:2,10
land (1)
  111:4
language (8)
  28:12;84:4;85:11,
  17,21,25;86:3,6
languages (2)

86:11,13
large (5)
  6:7,9;34:2;53:18;
  55:9
largely (2)
  17:23;119:17
largest (5)
  21:7,8,20,21,23
last (6)
  17:12;42:3;64:17;
  67:4;75:2;89:2
lastly (1)
  91:23
late (2)
  45:24;117:2
later (5)
  9:16;67:12;68:3;
  80:1;123:22
law (8)
  19:21;35:8;51:22;
  52:9,10,12;57:4;
  119:13
lawsuit (1)
  38:1
lawyer (6)
  18:23;39:16;44:20;
  98:13;105:11;119:10
lawyers (13)
  24:7;25:2;27:22;
  39:5,8,8,9,9,11,14;
  40:16,18;104:4
lay (1)
  111:19
layperson (2)
  110:1,2
leads (1)
  121:20
learn (3)
  23:25;24:2;123:21
learned (4)
  68:18;69:21;70:3;
  86:25
least (15)
  15:21;19:12;55:10;
  60:15;61:24;66:18;
  73:24,24;90:22;91:2,
  6;92:1,9;110:1;
  127:20
leave (2)
  9:23;126:12
left (2)
  80:15;103:14
legal (15)
  18:20,23;29:24;
  36:12;39:17;44:6,11;
  56:6;57:1,2;58:12;
  78:12;119:6;122:19;
  126:6
lengths (2)
  11:19;88:7
less (3)
  108:18;109:24;
  122:21

**letter (1)**
82:14
**level (1)**
94:6
**levels (1)**
12:7
**license (3)**
18:14,14;58:8
**licensed (2)**
22:1;33:12
**licensing (2)**
18:19;28:12
**lie (1)**
6:19
**likely (6)**
35:1;89:16;119:25;
120:13,25;121:14
**limit (1)**
119:15
**line (2)**
11:17;84:1
**lines (5)**
34:7;42:11;55:6;
126:2;127:21
**link (1)**
91:9
**Lisa (1)**
28:1
**list (2)**
82:11;95:24
**listed (2)**
42:9;85:8
**listened (1)**
25:18
**literal (3)**
123:7,17;124:3
**litigation (13)**
6:5;28:9;37:5,22;
44:2;46:10;48:13,20;
50:2,12;58:5,13;94:9
**litigations (1)**
7:2
**little (10)**
10:4;23:3;35:14;
67:4;104:11;106:1;
109:22;112:14;122:3,
21
**live (2)**
130:21;131:19
**lives (1)**
7:19
**locations (1)**
34:23
**long (4)**
12:8;38:19;53:7;
125:21
**look (38)**
8:2;9:2,6,20;10:6;
13:18;19:3;25:16;
48:25;51:3,4;55:7;
64:6,17;65:5;67:3;
70:16;71:7;77:14,17;
82:6;83:15;88:1,4;

95:11,18;97:25;98:6,
19;101:14,18,20;
128:24;129:6,7,22;
130:2,4
**looked (16)**
14:8;16:15,18;
59:15,17;72:15;
114:8,20,21;126:14;
128:21,21,22;129:8,
21,24
**looking (9)**
14:17;64:20;97:14;
100:23;108:10;
117:17;120:16,19;
122:25
**looks (3)**
64:8;88:19;109:11
**lost (1)**
95:15
**lot (20)**
6:11;8:11,13;10:20;
12:4;13:11,16;18:10;
50:6;60:24;68:9,11;
72:21;75:6;102:13,
17;108:18,21;109:10;
114:1
**lots (2)**
97:16;100:24
**loud (1)**
19:4
**Lunch (1)**
106:9

**M**

**main (1)**
83:22
**mainly (1)**
68:6
**maintain (3)**
51:20;54:3;55:4
**maintaining (3)**
10:19;69:10;125:25
**major (1)**
53:3
**makes (1)**
36:17
**making (7)**
47:10;48:8;50:8;
94:14;109:3;124:2;
126:5
**manage (1)**
41:2
**management (8)**
12:20,21;13:21;
23:1;67:8,21,22;
92:21
**manager (1)**
13:20
**manpower (1)**
55:8
**manual (5)**
14:18;56:18,19,24,

25
**manufacturing (1)**
7:13
**many (10)**
12:5;13:14;42:21;
48:7;53:6,7;54:1;
104:16;112:15;125:4
**mark (1)**
126:23
**marked (6)**
8:16,23;49:1;64:2,
3;96:11
**markup (1)**
8:18
**Maryland (2)**
5:10;6:3
**material (7)**
24:17;25:4;57:17;
88:23;125:6;126:8,9
**materials (1)**
46:18
**math (1)**
60:22
**matter (15)**
14:23;41:21;42:22;
50:18;80:6;82:17;
87:8;88:15;89:15;
92:7;105:13;121:4,7;
125:17;129:16
**matters (5)**
6:18;8:8;50:24;
104:20;124:20
**maximum (1)**
19:20
**may (23)**
14:9,9;19:19;27:6,
8;29:3;31:4;37:3,24;
38:3,4;42:9;45:18,19;
49:13;64:7;66:11;
74:17;90:23;100:18;
116:15;117:3;127:12
**maybe (13)**
13:9;26:24;39:24;
40:1;45:23,24,24,24;
77:3;90:7;103:14;
104:5;114:15
**McLean (3)**
46:9;64:5;66:13
**mean (60)**
8:2;11:7;12:13,25;
13:11;15:15,21,22;
17:20;22:1;24:18;
25:7,16,21;26:14;
31:23;32:5;40:12;
41:5;42:24;47:13;
49:11;52:21;54:20;
55:25;56:8;60:21;
62:4;65:1;66:11;
74:21;77:4;79:23;
80:8;81:12;82:4,25;
83:7;85:1;87:14,21;
94:5;95:3,23;99:12,
16;100:3;102:23;

103:17;108:19;
109:22,22;113:14,25;
114:22;116:2,17,18;
119:5;120:22
**meaning (2)**
17:19;33:25
**means (4)**
51:14;52:21;62:15;
100:24
**meant (2)**
40:20,25
**meet (1)**
34:24
**members (1)**
122:12
**memorized (1)**
123:23
**mention (2)**
24:12;57:23
**mentioned (10)**
40:16;57:18;63:7;
68:15,23;69:21;
73:14;77:16;102:20;
103:7
**mere (1)**
56:4
**MES (35)**
13:2;16:16,20,25;
17:11,18;40:21;42:8;
43:3,7,13;44:3;74:7,
13;75:23,25;76:6;
81:16,22;87:12;
108:14;112:4,16,17;
114:19,21;115:1,19;
116:18,23;118:21;
128:15;129:22,22;
130:17
**message (2)**
22:18;57:19
**methodology (1)**
90:25
**methods (1)**
28:14
**Microsoft (1)**
91:25
**middle (6)**
71:12;78:2,3,4;
80:16;125:3
**might (16)**
13:16;23:2,3;38:17;
39:6,22;43:17;44:2;
48:23;69:12,17,17;
92:6;104:18;108:3;
132:4
**migration (1)**
43:2
**Mike (1)**
105:23
**million (1)**
76:5
**mind (1)**
11:16
**minute (2)**

8:22;39:3
**minutes (2)**
14:17;127:25
**misappropriating (1)**
50:3
**misappropriation (2)**
8:8;125:14
**miss (1)**
14:15
**missed (1)**
14:9
**missing (1)**
115:21
**misspoke (2)**
32:18;67:3
**misstated (1)**
25:5
**mistake (30)**
50:22;58:24;59:7;
63:10;64:25;68:5,16,
20,22,23,24;69:1,4,9,
21;70:4,6,12,13,13,
17;76:21;77:10;84:3;
87:1;102:3;125:16,
20;126:4,5
**mistakes (10)**
50:8;59:11;63:8;
68:15,18;69:7;87:1;
95:2,3;125:15
**Mister (4)**
17:8;75:22;78:15;
87:7
**mix (1)**
109:8
**mockup (1)**
60:11
**model (6)**
10:15;71:15,19,21,
23;97:4
**models (4)**
36:5;71:16,22;
75:14
**modified (1)**
95:9
**modify (1)**
58:10
**moment (1)**
32:1
**month (2)**
92:9;123:22
**months (3)**
13:3;45:14,21
**more (22)**
10:5;11:17;43:11;
49:24,25;50:13;
65:13;67:11;73:6;
90:23;104:18;108:4,
4;109:10,12;112:15;
113:17;118:17;121:8,
9,10;127:12
**most (10)**
12:8;15:1;20:10;
36:24;37:20;48:15,

17;53:4;78:7;130:11
**mostly (2)**
25:21;60:6
**move (3)**
38:12;84:2;85:24
**moving (1)**
31:15
**much (19)**
6:24;14:19;17:17,
18;23:15;53:19;
54:23,24,24;59:1;
60:7;62:3,17;72:16;
73:6;89:15;113:5;
123:15;130:12
**multiple (2)**
34:2;42:23
**music (13)**
121:20;122:1,9,9,
10,14,23,24,25;123:3,
7,11,20
**musician (1)**
121:23
**must (3)**
72:6;75:4;120:11
**myself (2)**
38:7;93:15

## N

**name (23)**
5:6,7;16:4;42:16;
46:23;74:18;82:18,
19,20;83:1,15;117:12,
13,15,25,25;118:1,8,
12;120:14;121:1;
129:12;130:16
**names (28)**
15:9,14,19,21,23;
16:15;68:7,9;81:12,
13,13;82:8,13;83:10;
94:23;95:1,20,21,24;
110:5;115:18;116:7;
118:7,24;128:12,15,
18;130:1
**name's (1)**
117:16
**nature (1)**
43:19
**NDA (1)**
100:20
**nearly (1)**
22:19
**NEC (5)**
51:16,19;52:11,11;
53:5
**necessarily (5)**
35:5;43:10;56:8,22;
103:23
**need (31)**
12:5;13:15,16;
15:11,25;16:1,5;
20:13;25:15;27:17,
18,23,25;28:10;35:2;

43:17;59:3;80:25;
90:9,10,13;93:7;
94:19,25;95:6,8;
119:17,22;124:10;
131:13;132:2
**needed (7)**
15:12;32:11;33:1;
106:23;130:20;131:2,
18
**needs (9)**
23:10;32:10;34:24;
68:10;72:1;74:25;
75:14;119:18;120:23
**networks (1)**
10:20
**nevertheless (1)**
109:2
**new (14)**
6:9;12:17,18,22;
13:5;25:23;52:11;
63:16,18;92:6;95:10;
100:22;124:16;
128:15
**next (3)**
38:15;55:7;77:14
**night (1)**
67:4
**nine (2)**
51:7;78:4
**ninth (1)**
77:21
**NK (1)**
8:5
**Nobody (1)**
7:23
**Nobody's (1)**
7:22
**nods (2)**
66:4;106:17
**nomenclature (1)**
66:25
**none (1)**
102:14
**nonexisting (1)**
7:7
**nonprotectable (1)**
56:11
**normally (8)**
11:24;37:2;44:21;
48:21;50:15,20;
88:12;92:18
**Nortec (2)**
34:13;36:8
**note (1)**
51:12
**notes (11)**
8:19;9:2;60:4;
70:21;122:8;123:12,
21,22;124:13,15;
125:10
**notice (1)**
57:14
**notwithstanding (2)**

67:18;85:24
**nowadays (1)**
106:15
**number (6)**
5:14;36:9;70:19,24;
96:17;106:2
**numbering (1)**
63:18

## O

**Object (49)**
21:11;22:3,20;
23:13;24:4,9,16;
28:24;30:5;34:4,12,
15;35:24;36:11;
37:10;39:23;44:5;
45:3;53:12;55:15;
59:2;65:23;66:8;
68:25;72:18;74:16;
77:7;81:18,23;84:7;
86:20;92:5;93:13;
98:12;99:2,20;100:5,
7;101:21;102:4;
103:9;112:7,22;
115:10,17;117:21;
128:11;129:14;
130:23
**objection (5)**
44:16;66:1;84:13;
99:24;112:11
**objects (1)**
91:16
**obvious (1)**
122:18
**Obviously (3)**
36:5;54:20;74:13
**occur (1)**
44:2
**occurred (2)**
92:15;94:19
**O'Connor (1)**
42:19
**October (2)**
13:22;14:2
**off (11)**
42:16;83:17;
117:16,17,18;118:20,
23;119:23;120:19,20,
24
**office (5)**
10:18;12:11;79:1;
82:16;98:24
**officially (1)**
10:13
**Off-the-record (2)**
63:11;64:15
**often (3)**
12:20;22:25;111:6
**oftentimes (1)**
95:2
**ole (1)**
43:25

**Olita (18)**
17:7;28:16;29:14,
16;30:1,15;31:20,24;
81:8;84:11,12;85:11;
86:17;103:1,5,12,14;
110:7
**Olita's (3)**
84:4,18,25
**once (5)**
26:24;27:24;33:17;
37:22;38:1
**one (37)**
8:20;9:9,10,15,24,
25;10:8;14:9,11;21:7,
23;24:8;33:4;36:18;
38:15;39:4;50:15;
59:12;63:7;64:12;
68:23;71:4;88:14,18;
90:1,9,22;96:10,23;
105:13;107:23;
113:17;116:12;
117:17;126:22,25;
129:17
**one's (1)**
8:23
**only (21)**
9:13;26:25;31:3;
46:15,17;55:21;57:3;
60:6;63:5;65:1;69:9;
86:15;91:4;107:8,9;
124:6,13;129:8,24;
130:7,8
**open (3)**
12:9;56:14;80:13
**operate (2)**
76:17;114:4
**operates (1)**
111:15
**operating (1)**
52:22
**operator (2)**
22:25;23:1
**opinion (16)**
18:12;24:14;28:22,
23;48:9;49:18;53:25;
63:5;70:2,10,14;
77:23;87:2;90:13;
92:6;131:2
**opinions (12)**
18:17;25:23;47:19;
48:2;57:2;77:21,25;
85:9;88:19;117:9;
119:7;127:2
**opposed (3)**
93:4;108:25;110:18
**order (17)**
6:11;18:4,18;43:18;
50:2;51:18,20;57:13;
61:4;72:21;79:11;
81:1;88:5;92:9;98:5;
111:22;126:1
**ordered (1)**
27:6

**ordering (1)**
32:23
**organization (12)**
18:1;78:5,11,17,24;
87:5,11,23;88:9;
102:12;115:24;129:2
**organized (1)**
79:2
**origin (4)**
65:6;89:11,25;
91:21
**original (4)**
37:13;68:12;95:7;
119:14
**others (2)**
36:9;59:13
**out (30)**
11:23;12:3,6;13:8;
19:4;21:4;26:11;
28:11;37:5,23;38:2,8;
43:24;46:21;56:11,
12;57:7;65:8;66:17;
88:2,10;94:13,13;
122:7,24;123:6,12;
124:14,15;127:15
**outside (2)**
39:15;50:16
**over (14)**
5:20;10:12;11:11;
18:7,13;24:21;26:12;
27:12;35:16;45:12;
51:9;52:15;79:20;
125:11
**overall (2)**
71:13;72:9
**overview (1)**
97:18
**own (11)**
7:20,21;22:1,2;
35:7;38:3;56:19;86:3,
5;99:8;101:4
**owned (10)**
18:14;21:10;22:19;
24:15;33:11,12,17;
34:10;35:4;58:2
**ownership (5)**
18:7;33:5;36:10;
37:4;56:13
**owns (8)**
18:13;23:20;24:21;
28:8;37:6,16;47:15;
57:15

## P

**pack (1)**
130:3
**package (3)**
47:24,25;72:22
**page (26)**
10:6,7;49:4;51:9,9;
52:15;54:6;55:8;
61:15,17,23;62:12;

64:18;71:7;77:15,21;
  80:11;83:22;89:10;
  90:23,24;96:17;97:9,
  11;121:24;122:1
**pages (7)**
  26:1,2;53:7;54:1;
  58:25;122:10,23
**pages' (1)**
  53:7
**painstakingly (1)**
  91:18
**paper (2)**
  53:8;55:3
**paragraph (5)**
  55:7;77:21;78:4;
  90:20;91:20
**parameters (1)**
  96:20
**paraphrasing (1)**
  57:21
**Parmet (3)**
  46:4,6,7
**P-A-R-M-E-T (1)**
  46:6
**part (10)**
  7:25;10:7;17:14;
  21:3;25:11;43:1;86:1;
  99:4;103:15;130:11
**particular (4)**
  8:4;48:14;75:14,14
**parties (1)**
  20:10
**parts (1)**
  8:3
**passed (5)**
  22:9;52:4;67:22;
  70:22;96:6
**past (2)**
  48:20;60:7
**patent (1)**
  8:9
**patents (1)**
  6:15
**Paula (7)**
  56:4;65:22;93:19,
  24;96:3,13;97:13
**penalties (1)**
  19:19
**pending (1)**
  38:20
**people (10)**
  7:2;23:6,8,8;50:7;
  55:10;61:24;82:25;
  106:2;125:7
**perfectly (3)**
  23:16;51:2;102:15
**perform (1)**
  127:10
**performed (1)**
  130:7
**performing (1)**
  12:2
**perhaps (6)**

25:5;32:16;42:3;
  43:18;95:4,15
**period (1)**
  55:9
**permitted (1)**
  58:9
**person (12)**
  16:2;46:15,17;
  98:17,21,22;99:6,7;
  104:5;106:1;123:10,
  10
**personally (3)**
  8:1;30:20;48:1
**person's (1)**
  16:4
**perspective (1)**
  110:2
**pertain (1)**
  6:16
**Peter (1)**
  42:19
**phase (1)**
  6:11
**phases (1)**
  6:10
**pick (1)**
  83:22
**picking (1)**
  11:18
**piece (4)**
  53:8;55:3;124:14,
  15
**place (3)**
  18:18;35:16;36:24
**places (1)**
  13:11
**plaintiff (3)**
  94:10,18;131:17
**plan (1)**
  65:12
**planning (1)**
  11:22
**plans (5)**
  30:17,25,25;31:7,
  11
**plant (15)**
  19:25;24:22;28:21;
  30:4;31:22;32:17;
  34:25;35:4;60:13;
  76:24;86:18;130:21,
  22;131:3,19
**play (1)**
  123:24
**playing (1)**
  123:20
**please (1)**
  5:6
**Plus (10)**
  53:16;71:14,15,16,
  17,21,25;77:1,2;111:7
**pm (1)**
  96:19
**point (14)**

13:6;17:9;18:8;
  27:11;37:25;54:4;
  56:9;57:18;75:23;
  77:17;107:15;121:3;
  122:15;131:21
**points (3)**
  90:16;131:7,7
**pop (1)**
  27:15
**popped (1)**
  22:23
**populate (3)**
  79:10,12;129:6
**populated (5)**
  79:4,11;129:7,9,22
**portion (1)**
  19:18
**position (1)**
  89:18
**possible (4)**
  19:20;49:12;80:8;
  95:16
**potential (1)**
  44:2;68:24;70:16
**potentially (2)**
  50:2;57:13
**Potomac (1)**
  6:3
**Power (1)**
  98:10
**PowerPoint (6)**
  97:17,20;98:11;
  102:19,21,22
**practice (2)**
  6:14;7:17
**preface (1)**
  21:19
**prefer (1)**
  9:23
**preliminary (3)**
  31:2;41:11;104:1
**pre-litigation (1)**
  48:19
**prepare (1)**
  92:9
**present (11)**
  15:10;27:5;45:17;
  59:24;60:1;82:8;95:1;
  119:24;128:16,19;
  129:19
**Presentation (1)**
  80:12;106:2
**pretty (5)**
  16:7;62:3;93:20;
  113:5;122:18
**prevent (2)**
  47:24;62:17
**preventing (1)**
  50:12
**previous (4)**
  50:21;82:25;97:11;
  105:13
**previously (1)**

64:2
**primarily (2)**
  6:5;109:12
**principles (4)**
  53:23;54:5;63:6;
  126:2
**printed (1)**
  9:7
**printers (1)**
  86:14
**printout (2)**
  19:8,10
**prior (6)**
  18:18;48:13;50:17;
  51:18;61:6;96:7
**priority (1)**
  12:7
**private (1)**
  101:19
**probably (6)**
  21:14;33:1,5;56:23;
  100:21;116:19
**problem (4)**
  48:16,18;83:11;
  92:3
**problems (1)**
  98:19
**procedure (15)**
  17:19;52:22;79:22;
  89:10,13,15;108:11;
  110:18,22;111:2,5;
  117:13;118:20,22;
  121:8
**procedures (64)**
  16:19,24;17:10,11,
  20;18:5;43:19;71:18,
  20;72:5,6;73:13,17,
  23;74:21;77:2,12;
  78:18;79:8,17;80:4,
  17;85:19,23;106:19,
  21;107:6,7,10,14,16,
  25;108:4,15,16,17,18,
  19,25;109:3,4,7,11,
  12,17;110:9,10,14;
  111:9;112:5,13,15,17,
  19;114:6,9,14,20,22,
  24,25;115:3;118:25;
  129:5
**process (4)**
  43:9;44:15;57:10;
  73:4
**processes (3)**
  7:19;13:10;45:5
**produce (4)**
  98:8,9,10;121:11
**produced (1)**
  126:16
**product (7)**
  49:22;50:8;54:8;
  95:7,11;110:11;
  119:18
**production (2)**
  114:16;131:20

**program (2)**
  6:9;19:18
**programming (4)**
  40:2;43:2;79:25;
  86:5
**programs (4)**
  112:24;114:4;
  130:4,5
**project (3)**
  6:8,10,13
**projects (2)**
  7:18;102:14
**proof (1)**
  94:18
**proper (4)**
  58:20;61:19;69:10;
  103:3
**properly (2)**
  36:18,23
**properties (1)**
  6:15
**property (13)**
  23:7,12,16;36:10,
  15;37:9,16;38:5;
  49:25;50:4;57:20;
  62:19;103:2
**proposal (2)**
  73:15,18
**proprietary (3)**
  46:18;86:13;100:21
**prosecuted (1)**
  19:20
**protect (4)**
  38:4;57:11;125:5,
  12
**protectable (3)**
  38:9;69:17;80:4
**protected (3)**
  44:24;79:2;129:25
**protection (11)**
  51:14;56:13,16;
  80:7;89:17;119:13;
  120:1,13;121:1,10,15
**provide (2)**
  49:13;84:16
**provided (27)**
  17:6;28:14;29:23;
  48:2;65:20;67:21;
  75:2;78:22;83:6;
  88:20;91:7;93:6;
  95:25;96:4;114:10,
  12;115:23;116:2,19;
  117:3,5;121:17,18;
  129:2,4;130:8;131:6
**providing (1)**
  61:2
**pull (5)**
  12:6;26:11;27:3;
  28:3;106:20
**pulled (1)**
  26:14
**pulling (1)**
  131:5

**purchase (1)**
18:18
**purchased (1)**
30:18
**purport (1)**
14:20
**purpose (2)**
63:17;132:4
**purposes (2)**
86:12;115:20
**put (14)**
5:25;13:13;31:1;
71:4;97:15;98:23;
100:24;101:3,3;
102:1,8,11;109:25;
111:12

**Q**

**qualify (1)**
72:7
**quality (2)**
72:2;76:15
**quality-control (1)**
81:1
**queries (4)**
11:25;12:3;90:21,
24
**query (3)**
79:25;90:20;94:2
**QUICK (5)**
83:17;86:2;103:5,6,
20
**quickly (1)**
14:10
**quite (5)**
12:10;15:22;55:9;
95:23;107:3
**quotes (1)**
53:8

**R**

**Ralph (1)**
64:5
**rather (1)**
91:5
**read (8)**
5:11;19:3,4;25:15;
62:10;90:15;113:1;
123:16
**read/write (1)**
107:25
**reads (1)**
123:12
**real (1)**
37:24
**realize (1)**
120:6
**really (12)**
6:19;24:10,25;40:3;
45:25;54:18;60:7;
87:8;89:14;99:17,25;

116:18
**reason (1)**
9:14
**rebuild (1)**
92:23
**rebuttal (1)**
70:1
**recall (2)**
45:11,21
**receive (7)**
56:15,15;89:17;
120:13,25;121:10,15
**received (4)**
30:14;56:4;68:4;
120:1
**Recess (4)**
38:23;83:24;106:9;
128:2
**recognize (2)**
75:5;117:14
**recommend (1)**
58:18
**recommended (1)**
46:14
**record (6)**
9:19;122:12;123:1,
13,23,24
**recording (1)**
122:11
**recordkeeping (1)**
53:5
**records (3)**
13:14,17;53:16
**red (4)**
90:1;91:1,18;95:22
**refer (1)**
71:22
**reference (5)**
15:24;51:5;58:11;
83:1;97:23
**referenced (1)**
97:20
**referencing (1)**
69:9
**referral (1)**
105:18
**referring (3)**
39:13;55:20;63:16
**Refrigerant (1)**
96:21
**regard (6)**
50:23;89:7;95:3;
104:11;126:4;130:14
**regarding (5)**
37:14;43:9;48:3;
50:21;62:13;86:14;
96:4
**regardless (1)**
120:24
**regards (1)**
125:25
**registered (10)**
17:6;51:19;78:25;

92:24;94:20;95:1;
107:9;117:4;126:17;
129:25
**registering (1)**
95:5
**registration (4)**
15:9;17:24;18:2;
82:14
**rejection (1)**
82:14
**relate (2)**
88:3,10
**related (8)**
12:4,6;49:24;88:6;
99:14;100:21;105:16;
129:5
**relating (1)**
60:5
**relation (1)**
131:25
**relational (2)**
79:23;92:19
**relied (6)**
17:5;85:8;88:22;
89:22;91:4;117:4
**remain (1)**
22:18
**remained (1)**
85:21
**remember (6)**
27:8;33:14,16;
42:11,15;106:4
**repeat (1)**
44:12
**rephrase (6)**
16:17;21:17;22:10,
14;85:20;108:8
**replicated (1)**
88:21
**report (37)**
5:11,25;8:17;9:7,
12;15:6;17:3;25:8;
47:20;48:25;49:23;
51:4,23;63:4;68:16,
18;69:8,20,22;77:25;
85:2,6,7,9;88:24;
89:11,23;90:15;91:6,
11;92:10;96:20;
103:7;119:16;126:1,
22;128:5
**reporter (1)**
28:1
**reports (1)**
91:4
**represent (3)**
70:18,25;71:3
**representation (1)**
106:25
**represented (1)**
126:17
**representing (1)**
19:11
**reproduction (1)**

19:17
**reputation (1)**
94:5
**request (2)**
96:19;126:16
**requested (2)**
44:24;45:1
**require (4)**
55:9;58:12;61:24;
130:18
**required (3)**
111:22;120:12,14
**requirement (1)**
43:11
**requirements (5)**
55:19;76:14,15;
120:9,10
**requires (1)**
94:6
**RES (34)**
15:3,10;27:12;
40:13,21;41:18;44:3;
47:11,14,15;60:11;
65:25;72:25;73:7;
74:8,13;78:5;80:21;
91:7,10,15;92:12;
100:22;106:15;
108:19,19;109:10;
112:3,9,18;114:2;
119:21;128:10;
129:19
**research (1)**
49:19
**resources (1)**
53:18
**respect (2)**
102:19;114:19
**response (3)**
90:19;92:9;126:16
**restore (2)**
12:16;13:12
**restoring (1)**
12:1
**result (1)**
19:19
**results (2)**
43:16;68:7
**resume' (1)**
13:20
**retrieve (1)**
106:20
**review (9)**
5:16;52:10,10;
87:24;90:11;92:15;
107:8;130:10;131:5
**reviewed (14)**
18:1;22:13;25:12;
27:9;46:17;65:14;
67:2;84:25;90:14;
92:8;96:15;115:18;
126:15;129:1
**reviewing (2)**
8:11;46:19

**revive (1)**
39:2
**rewiring (2)**
72:21,24
**Rheem (2)**
34:14;36:9
**rhetorical (1)**
74:12
**Right (80)**
7:9,23;9:1;10:3;
12:18;15:5;16:9,12;
24:3;25:2,7,9;27:12;
28:2;33:22;34:19;
36:4,6;38:24;40:13;
42:19;47:20;48:24;
49:6;50:9,13;53:1;
54:14,23;55:13;
56:20;58:14;59:8;
60:25;63:7,20;70:23;
72:12;73:6;77:2,20;
78:2,3,7;79:14;80:13,
20;83:4,16,25;84:17;
87:18;96:10;101:11;
103:2,4;106:10;107:8,
11,15;108:8;109:14,
14;110:24;111:3;
117:10,20;118:10;
122:3,16;123:2,15;
124:1;125:2;126:20;
127:3,22;129:11;
132:7,7,9
**Rindin (3)**
24:19;32:4;81:7
**road (1)**
127:11
**room (2)**
60:7;104:6
**roughly (2)**
60:10,22
**rules (2)**
5:15;27:16
**run (12)**
72:2,6;75:4,8,11;
79:11,25;80:25;
90:22,24;116:4;
130:21
**running (7)**
11:25;34:7,13;35:1,
4;80:25;132:6
**runs (2)**
27:24;82:10

**S**

**SAITH (1)**
132:11
**same (30)**
12:23;17:17,18;
34:13;36:4,7;44:16;
55:8;57:24;64:20;
66:1;70:20;79:16;
80:25;81:1;84:13;
85:17,21,23;95:8;

96:14;99:24;102:18,
20;112:11;115:7;
118:21,25;120:22;
122:22
**saw (7)**
26:9,14;28:6;30:24;
53:9;76:23;90:22
**saying (10)**
24:19;57:11;89:19;
103:17;109:21;
113:23;116:16;
117:12,20;125:16
**scan (1)**
119:22
**scanner (1)**
97:4
**scènes (3)**
119:16,25;120:8
**scheme (1)**
89:14
**scope (4)**
17:14;25:12,12;
115:5
**scratch (1)**
7:13
**screen (6)**
22:23;23:8;26:13;
27:8,15;58:7
**screenshots (1)**
91:8
**script (7)**
18:2;32:22;92:23;
107:9;126:15,17;
129:3
**scripts (11)**
17:6,25;32:21,24;
78:22;81:9;82:2;
94:23;114:11;117:4,5
**search (5)**
38:8;91:19;95:8;
115:19;129:24
**searched (3)**
91:17;128:14,17
**second (15)**
18:15;39:21;62:10;
64:5;69:1,5;70:13,13;
71:7;88:19;96:19;
97:9,14;121:12;
123:10
**secret (13)**
8:8;35:8;119:2;
125:1,3,6;128:8,9,14,
18;129:12,13;130:1
**secrets (8)**
6:16;7:3;50:3;
124:21,22;125:7,11;
128:13
**seeing (4)**
23:8;24:13;27:8;
100:12
**seems (3)**
41:2;55:20;100:15
**segregating (2)**

50:6,7
**sell (1)**
123:25
**send (7)**
50:20;67:10;97:17;
106:22;124:13,24,25
**sending (4)**
58:24;59:7;69:11;
86:14
**sends (1)**
112:4
**sense (3)**
79:23;113:7,9
**sent (11)**
26:11;64:25;70:4,
13;90:4;98:14;124:4,
5;125:11,19,25
**sentence (6)**
19:3,6;51:17;78:2;
88:18;97:14
**September (5)**
96:18;97:12;98:25,
25;99:10
**sequel (1)**
92:21
**sequence (15)**
18:1;78:5,11,16,23;
80:16;81:9;87:4,10,
20,23;88:4;102:11;
115:24;129:1
**sequences (2)**
81:25;82:1
**server (4)**
12:19;92:20;
107:16;110:11
**set (5)**
50:1,14;55:23,25;
83:17
**sets (9)**
71:14,17,19,25;
72:1,4;77:1,11,11
**Settle (2)**
61:10,11
**seven (1)**
6:10
**several (4)**
8:7;12:11;34:7;
100:17
**severe (1)**
19:19
**shaking (1)**
110:4
**share (1)**
114:5
**shared (1)**
99:18
**sharing (1)**
99:13
**sheet (11)**
122:8,9,10,14,23,
24,25;123:7,10,11,20
**shell (1)**
78:24

**shoes (4)**
44:23;98:22;99:7,7
**show (4)**
63:12;83:8;94:18;
127:8
**showed (1)**
97:17
**showing (2)**
64:1;96:9
**shown (2)**
22:25;91:9
**side (4)**
36:18;40:1;91:22;
131:17
**sides (1)**
36:18
**SIEGEL (6)**
5:1,7,11;38:24;
106:10;128:3
**Silver (1)**
5:9
**similar (6)**
52:10;53:10;57:24;
75:6;78:13;115:3
**similarity (1)**
88:11
**simply (3)**
33:12;54:4;92:7
**single (3)**
32:19;53:8;55:3
**single-sided (1)**
9:16
**sit (3)**
122:22;126:20;
127:3
**sitting (3)**
19:25;21:4;41:13
**situation (1)**
26:20
**Skeeter (2)**
16:4,7
**slash (1)**
36:8
**slide (1)**
98:10
**slides (5)**
97:17,20;98:11;
102:21,23
**slightly (4)**
16:8;95:9,20,21
**smaller (1)**
86:11
**soft (1)**
109:17
**software (149)**
6:7,16,20;7:5,7,12;
12:5,17;13:24;15:3,3,
4,5,10;16:23;18:7;
19:11,23;22:2,19;
23:19;24:15;26:12;
27:3,4,12;28:3,8,11,
13,18;29:14,17,22;
30:3,15;31:16,16,21;

32:3,4;33:7,11,17,19,
25;34:10;35:20;36:2;
37:17;38:3;40:7,9,10,
13,21;41:19;43:10;
44:3;47:10,11,14,15,
23,25;53:4;56:1,3,5,
17,18,22;58:2;60:11;
61:3,5,6;72:22,25;
73:7;74:8,13;79:5,7,9,
9;80:21;91:10,11;
94:8;95:5;99:14;
100:22;101:19;102:3;
104:12;106:12,15,18,
23,23;107:13;108:17,
20,25;109:3,6,10,18;
110:14,17,23;111:10,
13,18;112:3,6,18,20;
113:17,19,23,25;
114:2,3;116:4;118:3,
6;119:21,21;120:11,
24;124:7,25;128:10,
10,18;130:3,4,4,11,
13,18;131:15,23,25;
132:1,3,5
**solutions (1)**
13:25
**Somebody (8)**
20:24;24:3;46:5,7;
104:22;124:5,13,25
**somebody's (1)**
101:17
**someone (4)**
24:11;36:14;42:10;
46:12
**sometime (1)**
20:11
**Sometimes (4)**
48:18,20;50:5;
54:16
**somewhere (2)**
13:14;76:8
**song (6)**
122:7,12;123:1,13,
24,24
**SOP (5)**
52:20,21,23;53:3;
55:21
**sophisticated (2)**
21:25;22:16
**sorry (18)**
11:13;13:12;20:3;
21:16;26:21;42:15;
45:22;65:12;67:6;
74:11;79:20;82:24;
85:19;88:16,17;
108:21;115:11;
116:22
**sort (4)**
7:16;8:15;12:9;
104:19
**sound (5)**
62:9;74:5;108:22,
22;112:10

**sounds (3)**
36:22;72:12
**source (31)**
6:25;8:10,12;15:7,
8;31:25;34:22;54:7,
12,19;56:14;61:8;
62:13;82:9,9;84:4,9,
12,18,22,23;85:18;
93:11,16,18,20;94:22;
103:6;21;118:9,11
**speak (3)**
48:10;67:11;130:24
**speaking (1)**
58:23
**specific (2)**
54:16;86:12
**specifically (3)**
27:8;87:11;90:23
**specification (4)**
55:10;61:25;62:7,
17
**specifications (4)**
61:2;75:11;77:10,
11
**specifies (1)**
75:3
**specify (1)**
10:25
**specs (3)**
30:2;124:24,25
**speculate (1)**
101:24
**spent (3)**
14:17;53:20;54:25
**spreadsheet (22)**
50:23;58:25;59:1,7;
63:8;70:7,8;89:23;
90:1;91:1,4,10,18;
92:16;93:5,6,18,22;
94:1;95:16;125:19,24
**Spring (2)**
5:9;51:22
**SQL (14)**
12:9,10,12,19;
90:20;91:25;92:20;
106:19;107:7,14,16;
108:14,15;110:11
**stack (1)**
9:24
**stage (1)**
11:22
**stages (1)**
65:25
**stamp (1)**
66:25
**stamps (1)**
66:23
**stand (1)**
130:9
**standard (3)**
45:6;52:22;63:3
**standpoint (2)**
43:11,11

**start (3)**
94:15,19;123:20
**started (1)**
10:12
**starts (1)**
49:3
**State (5)**
5:6;6:9;29:23;
46:21;48:4
**stated (1)**
14:20
**statement (5)**
62:3,5;118:12,14,
15
**statements (2)**
82:10;111:21
**states (1)**
53:25
**static (2)**
130:7,8
**stations (3)**
72:10,13;84:5
**stay (2)**
21:9,25
**Steakley (2)**
105:10,12
**stealing (1)**
56:18
**step (2)**
25:25;56:10
**steps (7)**
18:4;38:4;50:15;
57:12;81:9;125:5,12
**Steve (3)**
16:4,6,7
**Stewart (32)**
23:11;40:2;41:8;
42:22,25;43:1,6,8,14;
55:18;59:16;60:15;
61:1;62:25;65:17;
72:23;73:9,11;89:12;
93:19,23;96:3,18,25;
97:13;100:16;101:3;
102:1,8;104:3;124:4;
125:18
**Stewart's (3)**
61:4;98:22;99:6
**still (17)**
15:22,25;16:5;20:7,
16;24:14;61:16,17;
81:17;89:6,9,21;91:3;
95:14,23;98:16;123:2
**stop (3)**
38:25;107:11;110:6
**stored (44)**
17:19;68:7;73:23;
78:18,19;79:17,22;
80:4;85:19,20;89:10;
106:19;107:6,7,10,13,
15,24;108:4,11,14,15,
17,25;109:3,4,7,10,
12,17;110:8,9,10,14,
18,22;111:2,5;112:13,

15,17;114:7;121:5,5
**Street (1)**
5:9
**Strike (1)**
121:6
**strong (1)**
44:11
**structure (17)**
17:25;78:3,4,11,16,
23;87:4,10,19,20,23;
88:2,6;102:11;
115:24;128:23;129:1
**structured (1)**
11:20
**stuck (2)**
25:6,8
**student (1)**
14:4
**Studio (3)**
12:20;92:21;122:11
**stuff (2)**
36:24;79:25
**subsidiary (1)**
22:17
**substantial (1)**
88:11
**substantially (1)**
78:13
**substantive (1)**
104:8
**summaries (2)**
46:20,25
**summary (2)**
77:21;88:18
**summer (1)**
45:25
**support (7)**
41:18;71:14,15,17;
72:4,22;77:1
**Sure (70)**
5:16;9:17;12:24,25;
13:10;15:22;18:21;
20:15;21:5;22:22;
23:6,15;24:10;27:7;
29:21,23;30:8,11;
33:2;35:21;42:15,16;
43:4,23;44:21;45:4,
11,25;49:7,15,15,15,
17;54:11,13;56:24;
57:16;59:19;60:23;
62:19;64:16;65:2;
70:20,21;71:24;
73:17;74:10;81:19;
82:4;86:9;90:7,16,18;
93:24;95:23;99:3,14,
25;100:3;102:16,22;
104:16;106:8;114:1,
15;119:10;120:21;
128:1,6;130:16
**surprise (19)**
21:9,24;22:15;23:4,
5;31:9,10;37:15,21;
43:24;44:9,10,12,18;

60:9,14,17;80:18,22
**surrounding (2)**
6:7;104:12
**suspicious (10)**
99:19,21,23;100:2,
9,10;101:9,15,20,24
**sustained (1)**
94:14
**switch (1)**
125:2
**sworn (1)**
5:2
**system (17)**
7:13;21:4;22:2;
28:17,19;30:1,14;
33:24;35:17;57:25;
69:12;71:13;72:9;
86:17;102:9;103:18;
112:9
**systems (15)**
7:5,7;10:17,18;
12:3,12;13:21;34:13;
35:9;113:6,7,9,12;
114:7;130:10

**T**

**table (1)**
68:8
**tables (5)**
88:2,5,10;91:15;
102:13
**tags (1)**
96:22
**talk (6)**
11:11;41:16;42:19;
54:20;104:18;119:16
**talked (20)**
14:18;39:9;41:9,10;
42:21;59:1;60:2,3;
66:18;68:23;76:5;
88:8;90:4;104:4,10;
105:4,6,10,21,25
**talking (48)**
21:20;23:2;29:5,6;
32:21;33:7;35:10,12,
19;37:16;40:11;
42:13;49:23;53:21;
54:14,17;55:13,21;
57:6;59:19;61:18;
62:2;65:4;70:5;72:13;
74:22;76:10,25;
79:20;81:24;84:2,9,
10;85:3;100:15,20;
108:13;110:17;113:8,
8,15;116:6,12;118:4;
120:4;125:21;128:3;
130:15
**talks (3)**
51:12;55:3;71:12
**tape (1)**
13:13
**task (1)**

15:11
**team (17)**
55:10,11,11,12,17;
61:25,25;62:1,6,7,8,
18,18,19,20,21;63:1
**tease (1)**
6:12
**Technologies (2)**
21:21;22:16
**technology (2)**
6:7;51:22
**teeing (1)**
78:12
**telephone (1)**
123:11
**telling (1)**
66:3
**temperatures (1)**
76:18
**ten (1)**
65:13
**term (3)**
16:22;79:24;111:2
**terms (12)**
22:24;58:8;68:11,
12;75:6,6;95:4,25;
110:21;111:19;125:5;
132:3
**test (56)**
16:18,24;17:10,11,
20;18:4;32:11;33:1;
42:18;43:19;68:10;
71:14,17,19,20,25;
72:4,5,10;73:13,17;
74:21;76:16,22;77:1,
2,11,12;78:18;79:7,8;
80:16;81:25;82:18,
19;85:23;87:22;
95:21;106:21,24;
109:19;111:8,8;
112:5,19;114:6,9,14,
14,20;115:3;117:13;
119:23;120:15;121:7;
129:5
**tested (2)**
32:24;120:11
**testified (8)**
5:3,13;67:8;73:10,
19,23;78:1;83:1
**testify (4)**
17:16;67:9;87:10;
126:20
**testifying (1)**
126:21
**testimony (31)**
5:13;15:1;18:11;
22:24;24:18;25:18;
46:20;49:2;58:17;
59:6,22;60:5;61:20;
64:21,23;65:7,8;
72:14;75:18,19;81:7;
85:11;87:5;88:24;
89:2,20;90:8;92:1,4;

109:15;113:1
**testing (5)**
42:18;43:17;81:9;
83:16;130:22
**tests (47)**
16:19,21;17:10,12,
20;24:20;32:7,13,14,
18,20;72:1;75:1,4,8,
10,10,15;77:5;78:19;
80:25;81:1,4,5,6,8,11,
14,15,16,21,21,22;
82:3;85:22;106:21;
112:4,19;115:8,12,14;
116:3;117:14;120:6;
130:14,15,16
**theirs (1)**
38:5
**Thereabouts (1)**
72:12
**thick (1)**
64:9
**thinking (1)**
45:23
**third (3)**
70:16;76:7;80:11
**third-party (8)**
42:6;47:9;50:16;
56:14;61:3;82:17;
84:5;105:22
**third-to-last (1)**
88:19
**though (8)**
7:20;8:23;27:19;
29:1;30:18;34:19;
94:2;118:24
**thought (10)**
20:21;21:10;22:19;
34:9;35:3;40:25;58:1;
63:17;67:6,14
**thoughts (1)**
92:7
**thousands (3)**
53:6,7;54:1
**thread (2)**
100:1,14
**three (13)**
6:11;55:10;60:20;
61:24;107:9;108:15;
114:15;122:10,23;
124:13,15;125:10;
129:4
**throw (1)**
88:24
**Thursday (1)**
19:8
**ticketing (1)**
12:3
**timeframe (1)**
29:5
**times (8)**
5:14;6:11;12:4;
42:21,23;48:7;50:6;
76:5

title (1)
52:9
titled (1)
52:11
TM (1)
13:21
today (3)
5:19;16:20;73:8
together (4)
24:19;71:5;81:10;
102:17
told (10)
24:23;25:3;26:10;
29:3,16;38:25;67:9;
80:15;84:17,23
took (1)
57:12
Tool (1)
12:20
tools (2)
6:25;92:22
top (3)
42:17;52:22;97:10
towards (1)
114:22
trade (12)
6:16;7:3;8:8;35:8;
50:3;119:1,1;124:21,
22;125:1,3,6,7,11;
128:8,9,13,14,17;
129:12,13,25
trained (3)
98:17,18,19
transcript (2)
59:22;66:15
trappings (1)
119:17
trial (2)
127:8,15
trier (2)
120:1;125:18
triers (2)
6:17;38:7
true (4)
14:13,14;29:1;
123:4
truth (1)
6:18
Try (2)
11:11;37:23
trying (12)
7:11;25:25;29:15;
30:7;54:13;57:6;
106:3;110:16,21;
121:3;131:21,23
turn (1)
76:17
twenty (2)
96:10;126:22
twice (1)
110:9
two (19)
15:17;20:25;25:19;

42:3;60:7,21;64:7,11;
68:15;76:4;86:25;
87:21;89:2;93:20;
98:2;113:4;123:15;
130:3,3
type (4)
23:18;26:6,7;79:25
types (3)
11:18;88:6;98:20
typical (1)
98:21

**U**

ultimate (1)
125:17
ultimately (1)
59:17
Unauthorized (1)
19:17
unclear (2)
57:14;58:6
under (9)
19:21;28:13;29:23;
72:9;85:17;96:17;
115:5;119:25;120:13
underlying (1)
129:12
understood (1)
40:23
unique (1)
96:21
unit (5)
32:19;96:22;
119:22,23;120:4
United (2)
21:21;22:16
units (13)
32:11;33:1;43:18;
68:11;71:23;72:2,6;
75:1,16;76:16;81:2,
10;109:19
University (2)
14:5,6
unless (3)
24:1,2;50:25
unlikely (1)
124:14
unusual (1)
23:3
up (42)
13:12;14:5,6;22:23,
25;26:11,14;27:3,15;
28:3;37:25;47:18;
52:22;53:1;55:23,25;
57:7,9,18;66:4;73:21;
78:12,21;83:22;89:2,
5;98:20;106:17;
108:11;110:21;
111:19,20;112:14;
113:21;116:5,14;
120:1;122:4;123:11;
127:9,12;130:9

upgraded (1)
31:20
upon (8)
17:5;49:9,10;57:11;
69:1;85:8;88:22;
117:4
USB (4)
99:8;100:17;101:4,
23
use (22)
12:9,10,12,20;20:1,
10;36:14;58:9;79:4;
92:20,22,23,25;97:5;
109:12;111:19;
113:25;117:8;120:25;
121:19;124:7;132:4
used (18)
15:7;16:22;48:6;
69:25;75:6;79:9;
86:11,13,15;95:10;
108:3,3,4;117:2;
124:11;126:9,9;
131:25
useful (2)
100:18;132:5
uses (2)
79:10;109:10
using (8)
12:2;49:24;57:17;
61:3;109:7;111:5;
116:4;125:16
usually (4)
7:4;38:9;80:4;
92:20

**V**

valid (28)
16:19,21;17:10,12,
20;32:7,13,14,18,20;
78:19;79:7;81:21,22;
85:22;95:21;106:21;
111:8,8;112:4,19;
115:8,12,14,14,15;
117:14;130:15
validate (2)
90:10;94:6
validated (1)
88:21
various (1)
76:23
vault (1)
13:13
VB6 (16)
15:7;29:21;31:24;
34:6;82:9;83:5,5;
84:9,22;94:22;102:9;
111:21,22;114:2;
121:18;129:20
vendor (1)
81:4
verification (1)
132:3

verified (2)
88:22;120:23
verify (3)
89:19;93:8;95:6
verse (1)
8:10
version (6)
12:23;17:13;29:10,
11;34:25;95:5
versions (1)
126:13
versus (1)
51:16
video (1)
89:13
videos (1)
27:9
view (2)
18:8;92:18
viewing (1)
107:5
violate (1)
123:14
violated (2)
122:15;124:1
violating (1)
123:2
violation (4)
119:1;123:18;
124:8;128:9
Visual (2)
15:4;61:8
voltages (2)
76:18,23
VOLTS (7)
117:17,18;118:20,
22;120:20,20,24
Volume (1)
51:22

**W**

Wait (1)
8:22
wall (1)
50:5
Warning (1)
19:15
watched (1)
89:12
way (19)
27:16;28:22,23;
37:1;48:10;61:21;
63:24;79:1;93:25;
96:23;107:23;109:2,
25;111:12,23;113:4;
114:5;122:6;130:25
wear (1)
10:20
week (1)
75:2
weren't (2)
32:13,14

Wesleyan (2)
14:5,6
what's (14)
8:14,16;11:7,14;
37:23;56:19;64:1;
85:5,7;98:3,4;99:17;
102:22;131:24
whenever (1)
31:19
whereas (1)
108:18
WHEREUPON (1)
49:1
Whoa (2)
18:9,9
whole (7)
9:6;20:1;21:17;
22:5;30:1;56:9;86:1
willing (1)
44:13
WINDOWS (6)
20:6,18;31:17;
85:18,22,24
wire (1)
125:11
within (8)
75:12,13,13;76:17;
80:7;110:14;115:1;
128:24
without (9)
50:8,16;61:5;82:20;
83:3;99:16;103:12;
130:12,13
WITNESS (15)
11:13;22:13;38:13,
17,21;49:2;64:13;
65:14;66:4;67:2;
83:23;90:14;106:6,
17;132:9
witnesses (2)
17:16;104:19
word (1)
14:11
words (2)
121:8;128:23
work (26)
7:19;8:11;11:21;
16:1,6;24:10;25:12;
43:6;46:25;47:4;
51:19;57:20;62:4;
72:13;80:20;81:3;
83:3;94:20;95:1;
112:25;113:10;118:4,
7;124:16;126:17;
130:19
worked (6)
15:12;24:19;46:16;
80:3;81:8;86:13
working (2)
7:18;99:13
works (5)
12:1;25:8;82:24;
106:12,16;111:14;

**ECIMOS, LLC v.**
**Carrier Corporation**

Case 2:15-cv-02726-JPM-cgc   Document 256-4   Filed 02/23/18   Page 150 of 150   PageID
6032

**Joshua A. Siegel**
**January 11, 2018**

113:3;119:14;131:15
**world (1)**
  28:7
**worried (2)**
  39:6,22
**worry (2)**
  61:10;125:5
**write (4)**
  122:7,24;123:12,22
**written (3)**
  44:21;53:16;63:14
**wrong (5)**
  8:20;36:25;95:5;
  107:1;114:13
**wrote (2)**
  69:8;123:6

**X**

**Xerox (1)**
  122:10
**XP (6)**
  20:6,18;31:17;
  85:18,22,24

**Y**

**y'all (1)**
  59:2
**year (1)**
  60:13
**years (2)**
  13:14;20:25
**year's (1)**
  60:10
**yesterday (17)**
  33:6;48:6;49:20,21;
  59:1;64:22;65:8;
  73:20,22;85:12,15;
  86:25;87:6;91:24;
  96:10;116:6;117:11
**York (4)**
  34:16,18,20;36:8

**Z**

**zero (1)**
  125:21

**1**

**1:30 (1)**
  96:19
**10 (5)**
  26:1,2;42:24;
  121:24;122:1
**100 (2)**
  71:14;77:1
**1005 (3)**
  60:14,15,19
**103 (7)**
  63:13,14,14,16;
  64:2;66:6;72:10

**104 (3)**
  70:18;71:1;80:11
**106 (1)**
  96:12
**10th (2)**
  99:1,10
**121 (3)**
  96:3,10,11
**123 (6)**
  8:16;9:4;10:4;
  57:19,22;127:1
**124 (7)**
  19:2;24:14;26:17;
  28:6;37:14;39:6;
  40:10
**125 (4)**
  49:2;51:4;52:13;
  64:14
**14-page (1)**
  52:9
**15 (2)**
  49:4;51:9
**1500 (1)**
  58:25
**16 (3)**
  51:10;90:24;97:12
**19 (1)**
  91:15
**1990 (1)**
  51:22
**1992 (5)**
  29:6,7,18;30:10,16

**2**

**2 (1)**
  96:17
**20 (2)**
  42:24;104:2
**2002 (3)**
  20:21;21:2;31:19
**2004 (6)**
  19:14;20:11,17,22;
  21:2;31:19
**2005 (2)**
  13:22;14:2
**2006 (1)**
  5:9
**2010 (2)**
  10:16,22
**2011 (6)**
  10:11,13,16,24;
  13:20,22
**2014 (5)**
  60:12;74:3;96:18;
  97:12;99:1
**2015 (6)**
  27:6;45:24,25;
  60:13;117:2,2
**2016 (5)**
  27:6;45:19,20,23,
  24
**21 (1)**

**73:23**
**213 (2)**
  54:6;62:12
**219 (5)**
  52:16,17;61:15,17,
  23
**24 (1)**
  90:24
**25th (1)**
  96:18
**267 (12)**
  15:10;16:15;32:20;
  81:11,14,15,16;82:11;
  94:23;115:18;128:12,
  14
**28 (2)**
  73:23;108:14
**29th (1)**
  127:12

**3**

**30 (3)**
  14:17;71:15,21
**31 (1)**
  19:9
**350 (5)**
  71:17;72:4,5;74:21;
  77:1
**38 (1)**
  90:20

**4**

**4.0 (1)**
  103:6
**41 (1)**
  91:20

**6**

**6 (2)**
  15:4;61:8

**7**

**7 (1)**
  77:21
**7:46 (1)**
  97:12
**750 (1)**
  71:16

**8**

**8 (1)**
  121:24
**82 (1)**
  125:22

**9**

**9 (5)**

10:6,7;13:3;26:1;
89:10