**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ECIMOS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:15-cv-02726-JPM-cgc** |
| | ) | |
| **CARRIER CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PROPOSED JOINT PRETRIAL ORDER**

COME NOW the parties to the above styled case, by and through their counsel of record, and file this Proposed Joint Pretrial Order as follows:

I.

Any remaining jurisdictional questions and the proper rulings thereon.

By Plaintiff:

None.

By Defendant:

None.

II.

A list of pending motions and the proper rulings thereon.

By Plaintiff:

Plaintiff has filed a Motion for Adverse Inference Jury Instruction that is presently pending.

Plaintiff has also filed its response to Defendant's motion for summary judgment and response to motion to exclude expert testimony.

By Defendant:

1. Carrier's Motion to Exclude Expert Testimony of Stephen Olita, James Chenault, and William J. Carr (ECF # 241);

2. Carrier's Motion for Summary Judgment (ECF # 248);

3. Carrier's Motion to Bifurcate ECIMOS' Claim for Punitive Damages;

4. Carrier's Motion in limine to Exclude the Term Integrated Process Control System from Trial and Associated Videos;

5. Carrier's Motion in limine to Exclude Inadvertently Produced Emails Protected by the Attorney-Client Privilege;

6. Carrier's Motion in limine to Exclude Certain Matters Pertaining to ECI's QuickBASIC Code from Trial;

7. Carrier's Motion in limine to Exclude All Matters Pertaining to its Litigation Hold from Trial;

8. Carrier's Motion in limine to Exclude Certain Allegations and Theories Relating to Hardware Wiring;

9. Carrier's Motion in limine to Exclude All Matters Pertaining to ECIMOS' Contracts and Licensing Language with Other Customers;

10. Carrier's Motion in limine to Exclude the Term "Alias" From Trial;

11. Carrier's Motion in limine to Exclude Stephen Olita from Testifying about LabVIEW Code or National Instruments.

### III.

A short summary of the case that may be read to the venire at the beginning of voir dire.

By Plaintiff:

Plaintiff ECIMOS, LLC, alleges that after twenty years of a continuous business relationship with Defendant Carrier Corporation, Defendant breached the terms of the licensing agreement governing its use of Plaintiff's manufacturing quality control system. Plaintiff alleges that Defendant attempted to install the system's software on a Windows 7 operating system after support for the Windows XP operating system was discontinued without paying Plaintiff for the requisite upgrade. Plaintiff alleges that Defendant then misappropriated Plaintiff's valuable trade secrets by copying and sending critical components of Plaintiff's system to third parties to replace Plaintiff's system without the expense of an entire overhaul of Defendant's manufacturing quality control process. Plaintiff further alleges that Defendant infringed on Plaintiff's protected copyrights by copying both literal and non-literal elements of Plaintiff's database. Plaintiff claims licensing fees, lost revenue, and lost profits of its own; the portion of Defendant's profits attributable to the misappropriation and infringement; and punitive damages for what Plaintiff alleges is Defendant's willful malicious conduct.

By Defendant:

The only part of ECIMOS' quality control system in use by Carrier was the run test software program originally purchased by Carrier in 2002. As part of its manufacturing process, Carrier tests each unit using a run test software program. The tests are based on Carrier's own engineering specifications. Carrier creates the specific test procedures – the types of tests, the sequence of the tests, and parameters to be tested – performed on its units. The test results are recorded in a database. Carrier discontinued its use of ECIMOS' run test program after years of poor service, difficulties, and inefficiencies in the program and database. In 2014 Carrier began the process to obtain new run test software based on LabVIEW, a graphics-based programming language, that is particularly suited to manufacturing. Carrier hired Amtec Solutions Group to

develop its new RES run test program and associated database from scratch.  The new RES run test program and database created by Amtec completely replaced the old, outdated, and nearly obsolete program that Carrier purchased from ECIMOS over a decade earlier.  Carrier's new run test program and database were developed independently, to perform the test procedures that Carrier requires based on its engineering requirements.  Carrier originally purchased the ECIMOS run test software program in 2002 without any obligation to pay a license fee.  Carrier denies that is owes any licensing fees to ECIMOS.  Further, Carrier's new RES program does not infringe or copy any of ECIMOS's copyrighted works or trade secrets.  Carrier denies that it is liable to ECIMOS for any sums of money.

IV.

The respective contentions of the parties, including contentions with regard to the nature and amount of damages and with respect to liability.

By Plaintiff:

Beginning in 1984, Plaintiff developed a runtest system for HVAC manufacturers to test HVAC units for quality control.  In 1992 Plaintiff first installed its Integrated Process Control System ("IPCS") at Defendant's plant in Collierville, Tennessee.  After the install of the IPCS, Carrier's warranty claims dropped significantly.  In 2002, Plaintiff upgraded the IPCS to be compatible with the Windows-based operating system in use in Defendant's plant.  From the inception of the relationship in 1992, it was clear that Plaintiff was only granting Defendant a license to the software and database components of the IPCS.

When Microsoft discontinued support for the Windows XP operating system, Plaintiff upgraded the IPCS to be compatible with Windows 7.  At the same time, Defendant attempted to install the IPCS on Windows 7 without paying Plaintiff for the appropriate upgrade in violation of the terms of the software licensing agreement between the parties.  When Plaintiff learned of

Defendant's actions, Plaintiff informed Defendant that it would have to pay for the appropriate upgrade or it would be in breach of the licensing terms and would have to discontinue use of the IPCS.

Defendant instead sent copies of Plaintiff's valid tests, test procedures, and database schema to multiple software vendors, including Plaintiff's competitors, as part of Defendant's request for proposals.  Defendant was looking to replace Plaintiff's software without overhauling the entire quality control system which was in operation in Defendant's plant for nearly twenty years.   Defendant worked closely with a third-party contractor, Amtec Solutions Group ("Amtec"), to develop a software system to replace Plaintiff's IPCS software, providing Amtec with critical components of Plaintiff's system.   Defendant delivered to Amtec during the development process Plaintiff's valid tests and test procedures, copyright-protected database schema, and assembled hardware drawings, all of which were elements of the IPCS Plaintiff took efforts to protect as valuable trade secrets.  Defendant worked with Amtec through Defendant's employees who had intimate working knowledge of the details of Plaintiff's systems.

Defendant used those same employees with intimate detailed knowledge of Plaintiff's system to reconstruct in-house a database Defendant then claimed as its own.   Defendant leveraged Plaintiff's existing valid tests, test procedures, and database schema to create what Defendant claims is a whole new database developed independently of Plaintiff's system from scratch.  Defendant's employees with intimate detailed knowledge of Plaintiff's database were central in the creation of this supposedly new database.

As a direct result of Defendant's breach of the terms of the licensing agreement, the resulting misappropriation of Plaintiff's trade secrets, and the infringement of Plaintiff's registered copyrights, Plaintiff has suffered lost revenue and profits of $[to be proved at trial], including ongoing licensing fees of $65,000 per year and approximate service-pack hours of $[to

be proven at trial] per year.  Plaintiff claims a portion of Defendant's profits of $[to be proven at trial] since the original act of infringement in 2011; Plaintiff claims that 5% of those profits bear a causal nexus to Defendant's act of infringement.  Plaintiff also claims punitive damages for Defendant's intentional, malicious, reckless, willful breach of Plaintiff's software licensing agreement.  Plaintiff claims punitive damages exceeding the statutory cap because of Defendant's acts in intentionally and willfully concealing and/or destroying critical evidence in this case.


By Defendant:

Stephen Olita worked for Carrier in the 1970's in quality control where he first became familiar with the HVAC industry.  He developed several products for Carrier dealing with their testing procedures in Collierville and other plants.  In the 1990's Olita and his company, ECI, worked together with Carrier personnel to develop valid tests and test procedures to test Carrier's products, and to create and wire the testing hardware.  Tests were performed before the products left the Collierville plant.  Valid tests are individual functions that testing hardware performs during the course of quality control testing of a product.  Test procedures are the order in which valid tests are performed during a specific test.  ECI sold Carrier DOS based run test software that contained the valid tests and test procedures that Carrier and ECI had jointly developed. Carrier considered ECI to be its developer.

In 2002 Carrier's computer system changed to a Windows based operating system. Carrier put out a request for proposal to acquire a run test program that operated on Windows. At the time Carrier had multiple operating and testing systems, of which ECI's was only one. ECI won the contract to develop, but not install, "split system run test" software to operate testing hardware of multiple suppliers.  The contract also included providing Carrier with CAD

drawings of the hardware wiring so that Carrier could make changes, which it did.  The testing hardware is primarily off the shelf Opto 22 and Quad Tech Hipots.  ECI's run test program was created with Microsoft's Visual Basic 6 ("VB6") code.  However, ECI did not do the installation of the hardware; it only developed the VB6 software to operate with hardware.  Shelby Electric did the installation of the hardware from drawings sold to Carrier as part of the 2002 contract. The ECI proposal contained no licensing language and no confidentiality requirements.   The Carrier purchase order which accepted the proposal contained language giving Carrier a perpetual license to the product as part of its standard terms and conditions.  ECI objected to the standard terms and conditions.  As a result, the contract contained no licensing language and is a simple sale of goods with no restrictions.  ECI provided lifetime service for the software it sold, and this was one of the reasons it was awarded the 2002 contract.  The VB6 program and associated database contained the valid tests and test procedures that ECI and Carrier had jointly developed previously.  The ECI database sold to Carrier with the run test program gave Carrier the ability to create and order its own test procedures.  During the years that Carrier used the VB6 run test program and associated database, it frequently created new test procedures. Likewise, Carrier often made additions or changes to the electrical cabinets and changed the wiring.  ECI's competitor, LSI, installed run test hardware at Carrier using the ECI drawings.

Over the years Carrier required modifications to the VB6 code to test new products. While Carrier could create new test procedures, Carrier had no access to and could not modify the VB6 code.  Carrier relied upon ECI for that service.  Beginning in 2004, ECI sold to Carrier tweaks or modifications to the VB6 code to meet those needs and only then began placing licensing language in its proposals.  Carrier continued to use its purchase orders with language giving it either a lifetime royalty free license or outright ownership of the software.  Since the

parties' licensing language is in conflict, that language drops out of the contract.  What is left is a simple sale of goods with no restrictions.

Because of issues with service and problems with the VB6 software and associated database, Carrier began looking as early as 2006 for a substitute run test software program.  At that time Carrier considered going to a LabVIEW product.  LabVIEW is a graphical, non-textual language – utterly unlike VB6 – and is particularly well suited to manufacturing testing.

In 2011, Carrier switched to the Windows 7 operating system.  It tried to use the VB6 run test program on Windows 7, but had problems.  ECI was not able to fix the problem.  Carrier, working on its own without ECI's assistance, found a way to use the VB6 run test program on Windows 7.  Carrier was still considering moving to a LabVIEW based run test program, but had not yet committed to making a change.

On March 1, 2012, Olita established a new company called ECIMOS and bought ECI's intellectual property.  ECIMOS attempted to sell Carrier new run test software based on Windows VB.net, for the Windows 7 operating system, but Carrier was not interested.  ECIMOS then began demanding a monthly license fee of $50 from Carrier for each of its 103 test stations running the VB6 run test program in the Windows 7 operating environment.  Carrier denies that it owes a license fee to ECIMOS.  Carrier's purchase of the run test software does not require that it pay a license fee.  ECIMOS then began to hold service on the VB6 code hostage to its demand for a license fee.

Concerned about ECIMOS refusal to service the VB6 run test program and the obsolescence of the VB6 code, Carrier decided to change its run test program to a LabVIEW based product in 2014.  Carrier entered into a time and materials contract with Amtec Solutions Group ("Amtec"), a developer in Huntsville, Alabama, to develop a LabVIEW based testing system.  Working with JC Stewart, Carrier's Quality Engineer, Amtec developed the new Carrier

RES software and database from scratch.  Carrier rewired much of its hardware in the process. Carrier's RES software was running on all stations throughout the plant by October 2015, shortly before ECIMOS filed this lawsuit.  ECIMOS did not copyright the VB6 code and associated database schema until after this lawsuit was filed.

At all times while using the VB6 run test program and associated database, Carrier personnel determined what tests and test procedures, which they helped develop, to run on its products for quality control testing.  Likewise, Carrier now determines what tests and test procedures are used by its new RES program for quality control testing.  All tests performed by Carrier have been and are pursuant to its internal engineering requirements applicable to the specific model or unit being manufactured.

In its lawsuit, ECIMOS alleges that Carrier infringed on its copyrighted code and used its trade secrets.  Over the course of the lawsuit, ECIMOS advanced numerous theories of copying, including theft by LSI and ECI's former employees and reverse engineering by Carrier. ECIMOS later alleged that its copyrighted code was copied by Amtec.  ECIMOS has no proof that Carrier or Amtec had access to the VB6 code; in fact, all evidence is to the contrary.  More recently ECIMOS alleged that Carrier used LabVIEW software to pirate the VB6 code.  This theory has been rejected by ECIMOS' own expert, James Chenault, a LabVIEW expert, who found that there was no evidence of VB6 code in, or being used by, the Carrier's LabVIEW RES code.  The only claim regarding the copyrighted software now involves Chenault's theory that the new Carrier RES database was derived from the ECI database.  However, Chenault is not a database expert and is not qualified to offer any opinions about databases.  The new RES database is radically different in sequence, structure, and organization from the old ECI database. The new Carrier RES database is relational and efficient; the old ECI database is flat and terribly inefficient. The few things the two databases have in common are unprotectable or structural

elements necessary for any computer program to work.  These are not subject to copyright protection.  Carrier denies that its new RES program and database infringe upon or copy ECI's copyrighted VB6 code and database schema.

ECI's alleged "trade secrets" – the valid tests, tests procedures, and wiring diagrams – are not secret.  The valid tests and test procedures used by Carrier are based on its engineering requirements and developed with its input.   The VB6 code actually performs the required tests. The names of the valid tests, functions performed by the valid tests, and test procedures – but not the VB6 code – were well known to Carrier's employees.  Further Carrier had the right and ability to create and modify test procedures using ECI's run test program.  There is nothing secret about ECI's valid tests or test procedures.  Regarding the VB6 software, to the extent it was a "trade secret" as it includes the valid tests, several former ECI employees – including Michael Gray and Gail Roane – essentially took their knowledge with them to LSI, ECI's competitor.  David Tesluk, another former employee of ECI, started his own company to compete with ECI, using his knowledge of the program.  ECI did not have covenants not to compete or confidentiality agreements precluding its former employees from using and developing the VB6 run test software program.  ECI's former employees took with them the knowledge of ECI's software.  It is no longer secret.  Regarding the CAD wiring diagrams, ECI sold them to Carrier by contract, which Carrier required so that modifications to the drawings could be made as needed.  As discussed above, those contracts did not have any licensing or confidentiality language.  Further, the wiring of the hardware is open to all who look at it.  Over the years, Carrier, LSI, and Shelby Electric used the ECI diagrams to install and wire hardware. The wiring diagrams were never secret.

Carrier filed a counter-claim against ECIMOS for breach of contract, for not honoring a service agreement.  ECIMOS did not services its run test program and database as it was

obligated to do under the service agreement.  Carrier is seeking damages of $19,210.00 plus interest for sums that it paid to ECIMOS for service that ECIMOS did not perform.

Carrier denies that it is liable to ECIMOS under any of the claims alleged.  Its new RES run test program and database are independent works.

V.

A comprehensive written statement of uncontested facts that may be stipulated and read to the jury (possible sources of these agreed facts are the pleadings, discovery or admission of counsel.)

By Plaintiff:

1.      Plaintiff first installed the integrated process control system ("IPCS") in Defendant's Collierville, Tennessee, plant in 1992.

2.      The IPCS was upgraded from MS-DOS to be compatible with a Windows-based operating system in 2002.

3.      Plaintiff's principal Stephen G. Olita is the inventor of the IPCS.

4.      The IPCS was the quality control component of Defendant's manufacturing process.

5.      The system that Defendant used to replace Plaintiff's system was called the RES software and the MES database.

6.      The RES software and MES database went live in October 2015.

7.      Defendant's designated corporate representative JC Stewart was involved in the development of the RES software and the runtest portion of the MES database.

By Defendant:

Carrier has a pending motion *in limine* to exclude use of the phrase IPCS.  This case is about run test software, database, and associated hardware.

1.     In 2002 Carrier put out a request for proposals ("RFP") for a "split system run test for its International Comfort Products line to Collierville," and on August 6, 2002, ECI submitted its proposal #3808.

2.     ECI Proposal #3808 also included the sale of new hardware in addition to software. It included new hardware from ECI, the reworking of other vendor's hardware, reworking of old ECI hardware, and three sets of electrical panel fabrication drawings, and operation and maintenance manuals. In addition, Carrier was to supply certain hardware.

3.     The software to be provided per ECI Proposal #3808 was Visual Basic to run on all the run test stations.

4.     An ECI competitor did the installation of ECI Proposal #3808 using the ECI drawings.

5.     ECI objected to Carrier's Standard Terms and Conditions applicable to ECI Proposal #3808 in Purchase Order Number 4600342969.  Exhibit 83.

6.     In 2013, ECIMOS ref. 1125 rev. B, April 30, proposed Proteus Project Software Flow Chart and software upgrade for Proteus line 6 run test and repair station for a total of $19,650.00. Carrier PO 8600088721 purchased for $19,650.00.

7.     ECIMOS obtained a copyright for the ECI Run Test Source Code, Copyright Registration Number TXu 2-012-860, Effective December 2, 2015.

8.     The ECI Run Test Source Code is written in VB6 language, which is a text-based computer language.

9.     ECIMOS obtained a copyright for the ECI Database Script Source Code, Copyright Registration Number TXu 2-012-982, Effective December 2, 2015.

10.     Carrier hired Amtec to develop a software program in LabVIEW to test Carrier's HVAC units.

11.     Carrier's new RES (Runtest Execution System) software program is written in a graphics-based computer language.

12.     Carrier is testing the same or similar model air conditioners and heat pumps with both the ECI VB6 software and Amtec's RES software programs.

13.     Carrier does not market, license, or sell software.

14.     On March 31, 2011, ECI proposed to Carrier a contract for a Service Pack ("Service Pack") of 160 hours, totaling $27,200 ($170 per hour), to handle miscellaneous service items including service calls, troubleshooting, program modifications, and software enhancements, among others.

15.     ECI accepted the Carrier Purchase Order, and both it and its successor ECIMOS provided services under the Service Pack.

16.     Carrier refused to pay ECIMOS a license fee for installing the VB6 code on Windows 7.

VI.

Contested issues of fact.  A written statement of contested issues of fact that will explain to the court the nature of the parties' dispute.

By Plaintiff:

At issue factually is:

1.     Whether Carrier breached the terms of ECIMOS's software licensing agreement when it attempted to install ECIMOS's software on the Windows 7 operating system;

2.     Whether Carrier utilized a proper cleanroom design when it hired Amtec to develop the RES software;

3.      Whether Carrier misappropriated ECIMOS's trade secrets when it sent the valid tests and test procedures to Amtec;

4.      Whether Carrier misappropriated ECIMOS's trade secrets when it leveraged the valid tests and test procedures to create the MES database;

5.      Whether Carrier directly infringed upon the literal elements of ECIMOS's copyrighted database scripting source code when creating the MES database;

6.      Whether the non-literal elements of the MES database are substantially similar to the non-literal elements of the ECIMOS database such that Carrier indirectly infringed upon ECIMOS's copyright protected database schema;

7.      Whether Carrier acted intentionally, maliciously, recklessly, and/or willfully in breaching the terms of ECIMOS's software license agreement;

8.      Whether Carrier acted maliciously or willfully in misappropriating ECIMOS's trade secrets;

9.      Whether Carrier intentionally or willfully concealed and/or destroyed evidence relevant to the determinations of the issues in the case;

10.     Whether Carrier acted with the intent to deprive ECIMOS of evidence relevant to the determination of issues in the case in concealing and/or destroying evidence;

11.     The amount of Carrier's gross profits attributable to the infringement.

By Defendant:

1.      ECI made several proposals in response to Carrier's RFP. The proposal for new Visual Basic software included database structure using SQL version 7 or greater.

2.      Carrier accepted ECI #3808 with its Purchase Order 4600342969, dated August 9, 2002 at a cost of $1,133,164.00.

3.      ECI Proposal #3808 did not include installation.

4.      The wiring diagrams ECI provided Carrier were Auto/CAD files to enable Carrier to make wiring changes, which Carrier did.

5.      ECI never objected to any Carrier's Terms and Conditions for Purchase (Commercial) other than the Carrier PO 4600342969.

6.      Steve Olita never went to Carrier's website to read Carrier's Standard Terms and Conditions.

7.      ECI Proposal #3808 did not contain any terms reserving ownership of the Visual Basic software in it, and ECI Proposal #3808 did not contain any language pertaining to licensing.

8.      Prior to 2004 ECI would make changes to Carrier's software without charge.

9.      The applicability of Carrier's Standard Terms and Conditions found on its website as Terms and Conditions for Purchase (Commercial) which set forth in Statement of Uncontested Facts, No. 7 above.

10.      Carrier considered ECI to be its developer.

11.      In 2004, ECI proposed to Carrier ECI ref. #1880, Oct. 27- drawing modifications for lines 8 and 9 run test @ $1,200 each. Carrier PO 4600657921 countered the terms of the proposal, and Carrier purchased two drawings for $2,400.00.

12.      In 2004, ECI ref. 1898, Nov. 4, proposed modifications for software and drawings for a total of $263,356.75. Carrier PO 4600663511 countered the terms of the proposal, and Carrier purchased only two drawings for total of $2,400.00.

13.      In 2004, ECI ref. 1899, Nov. 4, proposed Consulting/Service(s) for $19,950.00. Carrier PO 4600671202 countered the terms of the proposal, and Carrier purchased the services for a refrigerant upgrade.

14.     In 2004, ECI ref. 1915, Nov. 16, proposed drawing updates and software modification for a total of $24,900.00. Carrier PO 4600665858 countered the terms of the proposal, and Carrier purchased only two drawings for two run test line stations for a total of $2,400.00.

15.     In 2004, ECI ref. 1914, Nov. 16, proposed dual refrigerant software for two run test lines for a total of $200,542.50. Carrier PO 4600671243 countered the terms of the proposal, and Carrier purchased only certain of the refrigerant software for a total of $55,031.25.

16.     In 2005, ECI ref. 2218, May 27, proposed software enhancements for a total of $42,850.00. Carrier PO 4600748024 countered the terms of the proposal, and Carrier purchased all the work proposed.

17.     In 2005, ECI re. 2321, Aug. 31, proposed hardware for software drivers for a total of $9,299.00. Carrier PO 4600783849 countered the terms of the proposal, and Carrier purchased all the work proposed.

18.     In 2005, ECI ref. 2337, Sept. 9, proposed hardware and installation for a total of $9,399.05. Carrier PO 460783849 countered the terms of the proposal, and Carrier purchased all the work proposed.

19.     In 2006, ECI ref. 2737, Aug.1, proposed installation of hardware for a total of $3,625.00. Carrier PO 4600927634 countered the terms of the proposal, and Carrier purchased all the work proposed.

20.     In 2006, ECI ref. 2853, Nov. 8, proposed installation of hardware for a total of $6,462.36. Carrier PO 4600968474 countered the terms of the proposal, and Carrier purchased all the work proposed.

21.     In 2006, ECI ref. 2885, Dec. 1, proposed training for $1,200. Carrier PO 4600974769 countered the terms of the proposal, and Carrier purchased the one day run test training as proposed.

22.     In 2009, ECI ref. 3025 Revision B, April 15, proposed run test software modification for $4,500. Carrier PO 4601278384 countered the terms of the proposal, and Carrier purchased all the work proposed.

23.     In 2009, ECI ref. 3776, July 17, proposed software modification for a total of $16,825.00. Carrier PO 4601288686 countered the terms of the proposal, and Carrier purchased all the work proposed.

24.     In 2009, ECI ref. 3815, Aug. 27, proposed a run test monitoring program for a total of $14,995.00. Carrier PO 4601297363 purchased it for $14,995.00.

25.     In 2009, on Aug. 25 and Oct. 12, ECI submitted two proposals which Carrier did not accept.

26.     Third parties used ECI's drawings to install the ECI hardware and software.

27.     Carrier did not give Amtec the ECI database scripts, or access to them.

28.     Amtec did not have access to or utilize ECI's database scripts.

29.     Carrier's RES database does not use the same structure, sequence, and organization as ECI's database.

30.     Carrier's RES program does not use the names of ECI's "valid tests."

31.     Carrier's RES program cannot use the names of ECI's "valid tests." The "valid test" names, the 267 names set forth in Exhibit 82 (which were denied copyright protection), only work in conjunction with the VB6 code, and there is no VB6 code in the RES software.

32.     The ECI valid tests and test procedures are not found in Carrier RES database.

33.    On May 23, 2011, by Purchase Order No. 8600018111, Carrier accepted the work proposed by ECI reference No. 0004280, subject to the terms of its purchase order, and Carrier paid ECI the contract sum.

34.    When 113 hours remained on the Service Pack, ECIMOS sought to charge Carrier a license for using the VB6 code, for which Carrier had previously paid large sums, on a Windows 7 operating system.

35.    Despite requests to do so, ECIMOS refused to provide Carrier any services under the Service Pack because of its dispute with Carrier over a license fee for Carrier's use of the VB6 code on Windows 7.

36.    What portions of ECIMOS' two copyrights contain original, protected expression.

37.    What portions of ECIMOS' two copyrights contain unprotected expression based upon one or more of the following:

       • a portion of the work that is not original to the author;

       • a portion of the work that is in the public domain;

       • ideas; procedures; processes; systems; methods of operation; concepts; principles; discoveries; devices, but only to a unique expression of them in the computer code;

       • standardized elements that are indispensable or at least standard in the treatment of a particular subject. These are referred to as scènes à faire;

       • word, names, and common phrases; or,

       • functional elements or features of computer code which instruct a machine to do something.

38.    What portions of ECIMOS' two copyrights contain unprotected expression based upon one or more of the following:

• elements that are functions;

• elements that may only be expressed in a limited number of ways; or,

• elements that are necessary to execute instructions in the same order as another work in order to follow the manufacturer's requirements.

39.    The extent to which Carrier, not ECI or ECIMOS, created valid tests.

40.    The extent to which Carrier, not ECI or ECIMOS, created test procedures.

41.    Carrier's new RES database schema does not have the same or similar structure, sequence, and organization as the copyrighted ECI database scripts.

42.    Carrier's new LabVIEW RES program and database are independent works.

43.    ECIMOS did not sustain actual damages from any alleged copyright violation.

44.    There is no causal relationship between any copyright violations and Carrier's profits.

45.    Carrier did not circumvent a technological measure without the authority of ECIMOS.

46.    ECIMOS did not have registered copyrights at the time of alleged circumvention.

47.    ECIMOS did not sustain actual damages as a result of Carrier's alleged circumvention.

48.    ECIMOS does not possess any trade secret relevant to this case.

49.    The valid tests are not trade secrets.

50.    The test procedures are not trade secrets.

51.    Carrier modified the hardware drawings sold to it.

52.    Carrier modified the hardware in the electrical cabinets and/or changed the wiring.

53.    The hardware diagrams that ECI sold to Carrier are not trade secrets.

54.     ECIMOS did not take reasonable efforts to maintain the secrecy of its alleged trade secrets.

55.     ECIMOS did not sustain actual damages as a result of Carrier's alleged misappropriation of trade secrets.

56.     Carrier is not obligated to pay ECIMOS a monthly license fee.

57.     Carrier purchased the ECI run test software and database free of any license agreement.

58.     There is no consideration for the "license fee" for using the VB software when Carrier changed its operating system to Windows 7.

59.     Carrier did not breach any contractual duty of confidentiality.

60.     Carrier did not breach any contract by infringing on ECIMOS' copyrights.

61.     Carrier did not engage in any willful, intentional, malicious, reckless, or fraudulent conduct.

62.     ECIMOS has not provided evidence of its ownership of the two copyrights and the VB6 software.

63.     Whether ECIMOS can prove that the software code that it claims is infringed and on which it is suing is the same for which it received the two copyrights.


VII.

Contested issues of law.

By Plaintiff:

**Contract** – whether the 2002 upgrade of the IPCS software was a license between ECIMOS and Carrier or a sale of goods

**Misappropriation of Trade Secrets** – whether the valid tests, test procedures, or database schema qualify as trade secrets individually, severally, or jointly

**Copyright** – whether the literal and non-literal elements of ECIMOS's runtest software and database scripting source code and schema qualify as protectable expression for purposes of copyright infringement

**Damages** – whether ECIMOS is entitled to the damages set forth in section 4 above

By Defendant:

**Copyright Act**

1.  What is the scope of the protectable expression contained within ECIMOS' registered copyright for the VB6 source code?

2.  What unprotected expression must be excluded from ECIMOS' registered copyright for the VB6 source code based upon one or more of the following:

> • a portion of the work that is not original to the author;
>
> • a portion of the work that is in the public domain;
>
> • ideas; procedures; processes; systems; methods of operation; concepts;
> principles; discoveries; devices, but only to a unique expression of them in the
> computer code;
>
> • standardized elements that are indispensable or at least standard in the treatment
> of a particular subject. These are referred to as scènes à faire;
>
> • word, names, and common phrases; or,
>
> • functional elements or features of computer code which instruct a machine to do
> something.

3.  What unprotected expression must be excluded from the copy of ECIMOS' registered copyright for the VB6 source code based upon one or more of the following:

• elements that are functions;

• elements that may only be expressed in a limited number of ways; or,

• elements that are necessary to execute instructions in the same order as another work in order to follow the manufacturer's requirements.

4.     Carrier's new LabVIEW RES code is not substantially similar to ECI's VB6 run test code.

5.     If there are any portions of Carrier's new LabVIEW RES code that are substantially similar to ECI's VB6 run test code, are those portions minimal or trivial?

6.     Carrier did not infringe upon the protectable expression, if any, contained within ECIMOS' registered copyright for the VB6 source code.

7.     Carrier's new LabVIEW RES software is the product of independent creation.

8.     ECIMOS did not sustain any actual damages as a result of alleged infringement of its VB6 source code.

9.     What is the scope of the protectable expression contained within ECIMOS' registered copyright for the database schema?

10.     What unprotected expression must be excluded from ECIMOS' registered copyright for the database schema based upon one or more of the following:

• a portion of the work that is not original to the author;

• a portion of the work that is in the public domain;

• ideas; procedures; processes; systems; methods of operation; concepts; principles; discoveries; devices, but only to a unique expression of them in the computer code;

• standardized elements that are indispensable or at least standard in the treatment of a particular subject. These are referred to as scènes à faire;

• word, names, and common phrases; or,

• functional elements or features of computer code which instruct a machine to do something.

11.     What unprotected expression must be excluded from the copy of ECIMOS' registered copyright for the database schema based upon one or more of the following:

• elements that are functions;

• elements that may only be expressed in a limited number of ways; or,

• elements that are necessary to execute instructions in the same order as another work in order to follow the manufacturer's requirements.

12.   Amtec did not have access to the material contained within ECIMOS' registered copyright for the database schema.

13.   Carrier's new database schema is not substantially similar to ECI's database schema.

14.    If there are any portions of Carrier's new database schema that are substantially similar to ECI's database schema, are those portions minimal or trivial?

15.   Carrier did not infringe upon the protectable expression contained within ECIMOS' registered copyright for the database schema.

16.   Carrier's new database schema is the product of independent creation.

17.   ECIMOS did not sustain any actual damages as a result of alleged infringement of its database schema.

18.     ECIMOS has not proven a causal relationship between any copyright violations and Carrier's profits.

**Digital Millennium Copyright Act**

1.     Carrier did not circumvent a technological measure without the authority of ECIMOS.

2.      Carrier did not commit actual copyright infringement.

3.      ECIMOS did not sustain actual damages as a result of any alleged circumvention.

**Trade Secret Misappropriation**

1.      ECIMOS cannot prove the existence of any trade secret.

2.      ECIMOS did not take appropriate and necessary steps to protect any alleged trade secret.

3.      Carrier did not misappropriate any trade secret.

4.      ECIMOS did not sustain actual damages as a result of any misappropriation by Carrier.

**Breach of Contract**

1.      Carrier purchased the ECI VB6 run test source code free of any licensing agreement.

2.      Carrier purchased the ECI database schema free of any licensing agreement.

3.      Carrier purchased the CAD hardware drawings free of any confidentiality or non-disclosure requirement.

4.      ECIMOS' claimed licensing agreement does not obligate Carrier to pay a monthly licensing fee.

5.      There is no consideration for the "license fee" for using the VB software when Carrier changed its operating system to Windows 7.

6.      Carrier did not breach the licensing agreement by infringement or copying.

7.      ECIMOS did not sustain any actual damages as a result of any alleged breach by Carrier.

8.      ECIMOS breached the service pack agreement with Carrier.

9.      Carrier sustain actual damages as result of ECIMOS' breach.

**Injunctive Relief**

1.     ECIMOS will not sustain irreparable harm in the absence of injunctive relief, as monetary damages, if any, are adequate.

2.     An injunction would cause substantial harm to others, particularly Carrier's employees.

3.     The public interest is not served by the issuance of an injunction.

VIII.

A list of exhibits (except documents for impeachment only) to be offered in evidence by the parties and to the extent possible, a stipulation on their admissibility.  If the parties cannot stipulate, then the objections must be noted in the proposed pretrial order.  To the extent possible, objections shall be ruled on at the pretrial conference.

The parties are expected to have complied with Federal Rules of Civil Procedure 26(a)(3)(C) on pretrial disclosures.  That rule requires disclosures of witnesses, deposition testimony, and exhibits, (other than impeachment evidence), to the opposing counsel thirty days before trial.  Within fourteen days thereafter, the opposing party must serve and file a list disclosing any objection, together with the grounds therefor, to the admissibility of any exhibit, deposition testimony, or witness testimony.

Before the conference, each party shall furnish to the other party for copying and inspection all exhibits which are to be offered in evidence.

By Plaintiff:

Plaintiff will offer the following exhibits at trial:

1.     Exhibit 1:  Quality Control Manager Screen Shot

2.     Exhibit 2:  Stephen G. Olita Honors and Awards

3.     Exhibit 3:  ECIMOS Movie CD-ROM

4.      Exhibit 4:  IPCS Interactive Demo CD-ROM

5.      Exhibit 5:  IPCS Software Wyse Install Screen Shot

6.      Exhibit 6:  ECI Splash-Screen Screen Shot

7.      Exhibit 8:  ECI Software Licensing Terms

8.      Exhibit 10:  ECI Test Procedure Formatting Screen Shot

9.      Exhibit 11:  Screen Shot Set Volts LV

10.     Exhibit 12:  Screen Shot Check Min Volts

11.     Exhibit 19:  Screen Shot Wait for EVAP Purge

12.     Exhibit 21:  Confidential Disclosure Agreement for Jim Rindin

13.     Exhibit 26: 1/31/2012 Email: George Brunswick to Xiao Chen

14.     10/14/2011 Email from JC Stewart to G2 Technologies and attachments

15.     9/23/2011 Email from Roy Gunn to G2 Technologies and attachments

16.     10/14/2011 Email from JC Stewart to ViewpointUSA and attachments

17.     9/23/2011 Email from Roy Gunn to ViewpointUSA and attachments

18.     10/11/2011 Email from Roy Gunn to Jim Slemp/Amtec and attachments

19.     Exhibit 30:  Amtec Proposal dated 7/22/2010

20.     Exhibit 32:  Service Agreement

21.     Exhibit 34: Quality Control Instruction

22.     Exhibit 35:  7/18/2014 Email Chain from Steve Olita to Balaji Suresh

23.     Exhibit 46: 2/7/2014 Email Chain from JC Stewart to Scot Curtiss

24.     Exhibit 47: 4/11/2014 Email Chain from Steve Olita to JC Stewart

25.     Exhibit 48: 2/19/2014 Email Chain from JC Stewart to Steve Olita

26.     Exhibit 52:  IPCS Proposal dated 3/31/2011

27.     Exhibit 54:  CAR Executive Summary Section 2

28.     Exhibit 55:  10/30/2015 Email from David Hoal to Karthik Visvanathan

29.     Exhibit 56: 2/17/2016 Email from David Hoal to JC Stewart

30.     Exhibit 57:  2/16/2016 Email from David Hoal to Peter O'Connor

31.     All expert reports submitted by James Chenault and attachments

32.     All expert reports submitted by William J. Carr and attachments

33.     Exhibit 62:  Chancery Court Fiat

34.     Exhibit 63:  Chancery Court Summons

35.     Exhibit 67:  ECI AutoCAD Drawings

36.     U.S. Copyright Office Certificate of Regitration TXu 1-961-665

37.     U.S. Copyright Office Certificate of Regitration TXu 1-961-346

38.     U.S. Copyright Office Certificate of Regitration TXu 1-961-339

39.     Exhibit 71:  U.S. Copyright Office Certificate of Regitration TXu 2-015-860

40.     Exhibit 72:  U.S. Copyright Office Certificate of Regitration TXu 2-012-982

41.     Exhibit 77:  IPCS Proposal dated 9/18/2015

42.     Exhibit 78:  ECIMOS Invoice #1227 dated 9/18/2015

43.     Exhibit 86:  Carrier T&M Support Proposal

44.     Exhibit 103:  Runtest Test Plan

45.     Exhibit 104:   Amtec Solutions Group's Carrier Corporation Runtest Execution
        System Software Preliminary Design dated 10/22/2014

46.     Exhibit 105:  Email Chain dated 9/26/2014

47.     Exhibit 107:  10/03/2014 Email Chain from Paula Davis to JC Stewart

48.     Article of Harvard Journal of Law and Technology, Vol. 3, Spring Issue 1993,
        relied upon by Joshua Siegel in his expert report

49.    Documentation from Carrier Corporation on gross sales, including, not limited to, SEC filings

Plaintiff may offer the following exhibits at trial:

50.    Exhibit 106:  9/25/2014 Email Chain from Paula Davis to JC Stewart

51.    All declarations and reports submitted by Jeremy Fleming and attachments/exhibits thereto

52.    All declarations and reports submitted by JC Stewart and attachments/exhibits thereto

53.    All declarations and reports submitted by Joshua Siegel and attachments/exhibits thereto

54.    All declarations and reports submitted by Douglas Femec and attachments/exhibits thereto

55.    Response of Carrier Corporation to interrogatories and document requests

56.    Complaint, Amended Complaint, Second Amended Complaint, and all answers and replies to each

57.    All declarations of Stephen G. Olita and attachments/exhibits thereto

58.    All other documents previously marked as exhibits, but not specifically referenced herein

59.    Any exhibits listed by Defendant Carrier Corporation

By Defendant:

1.    Exhibit 24, Resume of Joshua Siegel

2.    Exhibit 33, Carrier Quality Control Instruction, August 12, 2004

3.    Exhibits 42, 43, 44, and 45, Photos

4.    Exhibit 83, Carrier Purchase Order, August 2002

5.       Exhibit 86, Amtec proposal February 27, 2014

6.       Exhibits 91 or 109, Application Run Test Source Code, United States Copyright

Office

7.       Exhibits 97 or 108, Application Database Scripts, United States Copyright Office

8.       Exhibit 110, Application Valid Tests, United States Copyright Office

9.       Exhibit 123, Joshua Siegel report, resume, and exhibits

10.       Supplemental report of Joshua Siegel, and exhibits

13.       Exhibit 126, Doug Femec report, resume, and exhibits

14.       Supplemental report of Doug Femec

15.       Jeremy Fleming report and resume, ECF # 230-3

16.       All proposals from ECI or ECIMOS to Carrier, all corresponding Purchase Orders

from Carrier and Carrier's applicable terms and conditions (Exhibit 83; ECF # 251-2 and -3;

ECF # 251-5 through 251-11; ECF # 252-1 through 252-10)

17.       Opto 22 models constructed by JC Stewart for use by Amtec, and/or photographs

of same

18.       Carrier C-331 Engineering Requirements (Bates Nos. C030340 – C030490)

19.       United States Copyright Office letter to ECIMOS dated December 15, 2017

20.       Email correspondence to and from Stephen Olita and United States Copyright

Office

21.       ECI Test Procedure Header Table

22.       Selections from the ecicomplete.com website

23.       Depictions of LabVIEW RES code graphical language

24.       Depictions of ECI and RES database tables, structure, sequence, and organization

25.       Depictions of ECI's valid tests and RES commands and procedures

26.    Depictions of ECI and RES test structures and creation

27.    Depictions of ECI and RES screen displays

28.    HVAC Terms of Art

29.    Photographs of run test cabinets and wiring

30.    Carrier's LabVIEW RES code (previously provided pursuant to protective order)

31.    Carrier's RES database scripts (previously provided pursuant to protective order)


Identification of documents or exhibits that Carrier may offer at trial if the need arises:

1.    Exhibit 21, Confidential Disclosure Agreement, Jim Rindin

2.    Exhibit 25, Software warnings

3.    Exhibit 26, Email January 31, 2012

4.    Exhibit 29, Email October 11, 2011, with attachments

5.    Exhibit 30, Amtec proposal July 22, 2010

6.    Exhibit 32, Services Agreement with Amtec

7.    Exhibit 35, Emails July, 2014

8.    Exhibit 41, Carrier C-331 Engineering Requirements, dated 12/16/2014

9.    Exhibit 46, Emails January and February 2014

10.    Exhibit 47, Emails April 2014

11.    Exhibit 48, Emails February 2014

12.    Exhibits 49 and 51, Photos

13.    Exhibit 50, Opto 22 data sheet

14.    Exhibits 62 and 63, Chancery Court Fiat and Summons

15.    Exhibit 67, ECI wiring diagrams

16.    Exhibits 71 and 72, Certificates of Registration, United States Copyright Office

17.     Exhibit 78, Invoices from ECIMOS to Carrier

18.     Exhibit 80, Application, United States Copyright Office

19.     Exhibit 81, ECIMOS website screen shots

20.     Exhibit 82, ECIMOS responses to interrogatories

21.     Exhibit 104, Amtec Software Preliminary Design, October 2, 2014

22.     Exhibit 114, ECI User Manual

23.     Exhibit 116, ECI Developmental Database spreadsheet, in native format

24.     Exhibits 118 and 119, Carrier test results

25.     Amtec Corporation – Capabilities

26.     Emails between Paula Davis and JC Stewart, February 24, 2015 and March 6, 2015, with attachments

27.     Responses of ECIMOS to interrogatories and document requests

28.     Documents identified as QuickBASIC code

29.     Complaint, Amended Complaint, Second Amended Complaint, Carrier's Answers to each, and ECIMOS' Replies to each

30.     All Declarations of Stephen G. Olita, and exhibits

31.     All Reports and Declarations of James Chenault, and exhibits

32.     All Reports and Declarations of W. Jeff Carr, and exhibits

33.     All other documents previously marked as exhibits, but not specifically referenced herein.

34.     All documents or exhibits identified by ECIMOS, LLC that it will present or may present at trial.

See also Exhibit A, attached.

IX.

A list of witnesses for the parties, indicating those who will be called, in the absence of reasonable notice to opposing counsel to the contrary, and those who only <u>may</u> be called.  If any Rule 702 ("expert") witnesses, including treating physicians who will give expert testimony, are listed, the witness shall be identified as such, along with the subject matter of the expert testimony.

By Plaintiff:

<u>Will call:</u>

Stephen G. Olita

William J. Carr, ECIMOS's database expert; Mr. Carr will provide his expert opinion that Carrier infringed on ECIMOS's database with respect to the literal elements (source code) and non-literal elements (structure, organization, etc.)

James M. Chenault, ECIMOS's software expert; Mr. Chenault will provide his expert opinion that Carrier infringed on ECIMOS's database with respect to the literal elements (source code) and non-literal elements (structure, organization, etc.)

<u>May call:</u>

Scot Curtiss

James Rindin

David Hoal

JC Stewart

Paula Davis

Jeremy Fleming

Peter O'Connor

Roy Gunn

By Defendant:

Will Call:

JC Stewart, Carrier Corporation, 97 S. Byhalia Road, Collierville, Tennessee 38017, telephone (901) 854-3000.

Peter O'Connor, Carrier Corporation, 97 S. Byhalia Road, Collierville, Tennessee 38017, telephone (901) 854-3000.

Roy Gunn, Carrier Corporation, 97 S. Byhalia Road, Collierville, Tennessee 38017, telephone (901) 854-3000.

Steve Youngblood, Carrier Corporation, 97 S. Byhalia Road, Collierville, Tennessee 38017, telephone (901) 854-3000.

Jim Rindin, 729 Lake Meadow Cove, Collierville, Tennessee 38017.

Jeremy Fleming, 105 Misty Glen Drive, Madison, Alabama 35757.  Mr. Fleming may give expert opinion testimony consistent with his report on the subject of alleged copying of the VB6 source code and database scripts by Amtec.

Paula Davis, 153 Pine Hill Lane, Madison, Alabama.

Joshua Siegel, 12505 Park Potomac Avenue, Suite 475, Potomac, Maryland 20854, telephone (301) 251-6313.   Mr. Sigel will give expert opinion testimony consistent with his report, deposition testimony, and supplemental report on the subject of the alleged copying of the VB6 source code and database scripts.

Doug Femec, 534 High Street, Victor, New York, 14564, telephone (585) 924-7737.  Mr. Femec will give expert opinion testimony consistent with his report, deposition testimony, and supplemental report on the subject of the alleged copying of the VB6 source code, database scripts, ECIMOS' trade secrets, and manufacturing practices.

May Call:

David Hoal, 908 Valleywood Cove, Collierville, Tennessee 38017, telephone (901) 854-3947.

Charles Bishop, 343 E. Powell Road, Collierville, Tennessee 38017.

Michael Boals, DXC, 97 S. Byhalia Road, Collierville, Tennessee 38017, telephone (901) 854-3141.

Scot Curtiss

Stephen Olita

All witnesses identified by ECIMOS, LLC that it will present or may present at trial.

X.

Deposition testimony.  If a party desires to offer deposition testimony into evidence at trial, he shall designate only those relevant portions of same which he wishes read at trial and advising opposing counsel of same.  To the extent possible, objections will be ruled on at the pretrial conference.

By Plaintiff:

Deposition of Paula Davis

| Begin Page, Line | End Page, Line |
|---|---|
| p. 5, l. 12 | p. 5, l. 23 |
| p. 8, l. 21 | p. 9, l. 8 |
| p. 11, l. 9 | p. 11, l. 11 |
| p. 20, l. 24 | p. 21, l. 1 |
| p. 23, l. 21 | p. 23, l. 25 |
| p. 25, l. 19 | p. 26, l. 2 |
| p. 39, l. 12 | p. 40, l. 17 |
| p. 41, l. 19 | p. 43, l. 24 |
| p. 44, l. 23 | p. 46, l. 20 |
| p. 51, l. 9 | p. 54, l. 10 |
| p. 58, l. 10 | p. 60, l. 7 |
| p. 67, l. 13 | p. 68, l. 9 |

p. 73, l. 5          p. 73, l. 25
p. 74, l. 14         p. 74, l. 24
p. 80, l. 2          p. 80, l. 23
p. 85, l. 1          p. 85, l. 20
p. 87, l. 18         p. 88, l. 13
p. 97, l. 21         p. 100, l. 3
p. 103, l. 1         p. 104, l. 6
p. 123, l. 6         p. 123, l. 19


Deposition of Jeremy Fleming

| Begin Page, Line | End Page, Line |
| --- | --- |
| p. 6, l. 14 | p. 6, l. 16 |
| p. 7, l. 20 | p. 7, l. 24 |
| P. 14, l. 20 | p. 16, l. 7 |
| p. 25, l. 12 | p. 29, l. 17 |
| p. 32, l. 9 | p. 35, l. 4 |
| p. 44, l. 15 | p. 48, l. 11 |
| p. 97, l. 11 | p. 97, l. 13 |
| p. 98, l. 19 | p. 100, l. 16 |
| p. 104, l. 2 | p. 104, l. 10 |


Preliminary Injunction Hearing Testimony of James Rindin (RE 226)

| Begin Page, Line | End Page, Line |
| --- | --- |
| p. 112, l. 17 | p. 115, l. 1 |
| p. 117, l. 3 | p. 117, l. 18 |
| p. 119, l. 1 | p. 120, l. 12 |

Preliminary Injunction Hearing Testimony of Joshua Siegel (RE 226)

| Begin Page, Line | End Page, Line |
| --- | --- |
| p. 139, l. 3 | p. 141, l. 5 |
| p. 151, l. 25 | p. 153, l. 15 |
| p. 159, l. 2 | p. 161, l. 5 |
| p. 162, l. 19 | p. 163, l. 4 |

Preliminary Injunction Hearing Testimony of JC Stewart (RE 222 & 223)

| Begin Page, Line | End Page, Line |
| --- | --- |
| p. 15, l. 18 | p. 17, l. 10 |

| | |
|---|---|
| p. 17, l. 14 | p. 17, l. 17 |
| p. 18, l. 8 | p. 20, l. 4 |
| p. 20, l. 19 | p. 23, l. 1 |
| p. 24, l. 13 | p. 28, l. 22 |
| p. 29, l. 7 | p. 33, l. 10 |
| p. 33, l. 15 | p. 34, l. 5 |
| p. 36, l. 10 | p. 37, l. 4 |
| p. 37, l. 19 | p. 39, l. 3 |
| p. 45, l. 4 | p. 45, l. 9 |
| p. 46, l. 3 | p. 46, l. 10 |
| p. 71, l. 20 | p. 72, l. 6 |
| p. 82, l. 3 | p. 82, l. 20 |
| p. 117, l. 10 | p. 117, l. 17 |
| | |
| p. 7, l. 20 | p. 9, l. 7 |
| p. 24, l. 3 | p. 25, l. 12 |

Preliminary Injunction Hearing Testimony of David Hoal (RE 223)

| Begin Page, Line | End Page, Line |
|---|---|
| p. 29, l. 8 | p. 30, l. 10 |
| p. 40, l. 9 | p. 45, l. 23 |

Preliminary Injunction Hearing Testimony of Roy Gunn (RE 223)

| Begin Page, Line | End Page, Line |
|---|---|
| p. 47, l. 22 | p. 48, l. 16 |
| p. 49, l. 23 | p. 50, l. 4 |
| p. 51, l. 7 | p. 52, l. 18 |
| p. 54, l. 5 | p. 55, l. 3 |

Preliminary Hearing Testimony of Steve Youngblood (RE 223):

| Begin Page, Line | End Page, Line |
|---|---|
| p. 164, l. 11 | p. 165, l. 8 |
| p. 166, l. 1 | p. 166, l. 10 |

Deposition of Joshua Siegel

| Begin Page, Line | End Page, Line |
|---|---|
| p. 5, l. 1 | p. 5, l. 10 |
| p. 17, l. 3 | p. 19, l. 1 |

| | |
|---|---|
| p. 49, l. 8 | p. 51, l. 2 |
| p. 57, l. 5 | p. 57, l. 17 |
| p. 59, l. 5 | p. 59, l. 9 |
| p. 61, l. 15 | p. 63, l. 6 |
| p. 68, l. 4 | p. 68, l. 14 |
| p. 69, l. 6 | p. 69, l. 23 |
| p. 87, l. 12 | p. 88, l. 15 |
| p. 103, l. 5 | p. 103, l. 23 |
| p. 113, l. 23 | p. 114, l. 5 |
| p. 125, l. 15 | p. 126, l. 4 |

Deposition of Douglas Femec

| Begin Page, Line | End Page, Line |
|---|---|
| p. 5, l. 1 | p. 5, l. 14 |
| p. 32, l. 6 | p. 33, l. 4 |

By Defendant:

    As designated in its pretrial disclosures.

XI.

    An estimate of the length of trial.

By Plaintiff:

    The jury trial in this matter will last an estimated 10 days.

By Defendant:

    A jury trial of 8 to 10 days is estimated.

XII.

    A statement indicating whether the case is a jury trial or non-jury trial.  If it is a jury case, counsel shall file with the court, two weeks prior to the beginning of trial, copies of all proposed jury instructions (one point per page), any special questions for voir dire examination of the jury venire, and any special interrogatories or verdict forms that counsel wish to submit to the jury. Counsel shall furnish opposing counsel with a copy of the same.  The court will conduct a

general voir dire and either ask the proposed special questions of counsel at that time, or allow counsel to conduct limited voir dire.

If the case is non-jury, the parties should submit proposed findings of fact and proposed conclusions of law in place of the proposed jury instructions.

The case is to be a jury trial.

## XIII.

The amount of the ascertainable damages.  The listing of the amount of damages shall not constitute an agreement as to the recoverability of same unless so stated.

ECIMOS's lost revenue, lost profits, lost licensing fees, and lost service-pack hours for Carrier's breach of contract, misappropriation of trade secrets, and copyright infringement is $[to be proven at trial].  Plaintiff seeks punitive damages exceeding the statutory cap because Carrier intentionally and willfully concealed and/or destroyed evidence relevant to the central issues in the case.  Carrier's gross profits are $[to be proven at trial], of which 5% is attributable Carrier's act of copyright infringement.

Carrier seeks damages for breach of contract in the amount $19,120 plus interest.

## XIV.

A list of the names of all attorneys interested in the case and copies of all interested firms' letterheads.

Everett B. Gibson, Ralph T. Gibson, and J. O'Neal Perryman of Bateman Gibson Law Firm.

Robert A. McLean and Garrett M. Estep, Farris Bobango Branan, PLC.

## XV.

A list of any special equipment such as video cassette recorders, overhead projectors, easels, computers, etc. that the parties intend to bring for use at the trial.  (The court provides a

presentation system including VGA monitors, an evidence camera, a video cassette recorder, and a video distribution system for these components. The court does not provide personal computers or laptops to counsel, however, at the Court's discretion, counsel may access the video distribution system with their own laptops to disseminate computer generated evidence.)

By Plaintiff:

Plaintiff needs no equipment not already available in the courtroom.

By Defendant:

Counsel for the parties will bring their laptop computers to the trial and may utilize the Court's audio/visual equipment.

This ___ day of May, 2018.

**Exhibit A**
**Pre-Trial Order Exhibit List**

| Exhibit No. | Description | Date | Document Identification | Stipulation as to Authenticity |
|---|---|---|---|---|
| 21 | Confidential Disclosure Agreement, Jim Rindin | 02/26/2004 | | |
| 24 | Resume of Joshua Siegel | | | |
| 25 | Software warnings | | | |
| 26 | Email G. Brunswick to X. Chen and JC Stewart | 01/31/2012 | | |
| 29 | Email R. Gunn to J. Slemp with attachments | 10/11/2011 | | |
| 30 | Amtec proposal | 07/22/2010 | | |
| 32 | Services Agreement with Amtec | 01/06/2015 | | |
| 33 | Carrier Quality Control Instruction | 08/12/2004 | | |
| 35 | Emails S. Olita and B. Suresh | 07/2014 | | |
| 41 | Carrier C-331 Engineering Requirements | 12/16/2014 | | |
| 42 | Photo Mid-tier Control Board | | | |
| 43 | Photo ECI cabinet | | | |
| 44 | Photo PROCIX cabinet | | | |
| 45 | Photo ECI and PROCIX cabinets | | | |
| 46 | Emails JC Stewart and S. Curtiss | 01/2014 and 02/2014 | | |
| 47 | Emails S. Olita and JC Stewart | 04/2014 | | |
| 48 | Emails JC Stewart, S. Olita and S. Curtiss | 02/2014 | | |
| 49 | Photo Opto 22 | | | |
| 50 | Opto 22 data sheet | | | |
| 51 | Photo Opto 22 | | | |
| 62 | Chancery Court Fiat | 10/26/2015 | | |
| 63 | Chancery Court Summons | 10/26/2015 | | |
| 67 | ECI wiring diagrams | | | |
| 71 | Certificate of Registration, United States Copyright Office | 12/02/2015 | | |
| 72 | Certificate of Registration, United States Copyright Office | 12/02/2015 | | |
| 78 | Invoices from ECIMOS to Carrier #1227 | 09/18/2015 | | |
| 80 | Application, United States Copyright Office | 11/24/2015 | | |
| 81 | ECIMOS website screen shots | | | |

| | | | |
|---|---|---|---|
| | (collective) | | |
| 82 | ECIMOS responses to interrogatories | 06/15/2016 | |
| 83 | Carrier Purchase Order #4600342969 | 08/09/2002 | |
| 86 | Amtec proposal | 02/27/2014 | |
| 91 | Application Run Test Source Code, United States Copyright Office | 11/24/2015 | |
| 97 | Application Database Scripts, United States Copyright Office and Emails S. Olita and Copyright Office | 10/2016 | |
| 104 | Amtec Software Preliminary Design | 10/02/2014 | |
| 108 | Application Database Scripts, United States Copyright Office | 11/24/2015 | |
| 109 | Application Run Test Source Code, United States Copyright Office | 11/24/2015 | |
| 110 | Application Valid Tests, United States Copyright Office | 11/24/2015 | |
| 114 | ECI User Manual | | |
| 116 | ECI Developmental Database spreadsheet, in native format | | |
| 118 | Carrier test results | 07/21/2014 | |
| 119 | Carrier test results | 07/21/2014 | |
| 123 | Joshua Siegel report, resume, and exhibits | 10/30/2017 | |
| 126 | Doug Femec report, resume, and exhibits | 10/30/2017 | |
| | ECI proposal # 3709, 2002-04-24 | 04/24/2002 | ECI # 251-2 | |
| | Carrier Terms and Conditions | | ECF # 251-3 | |
| | Contract 2004-10-27 proposal | 10/27/2004 | ECF # 251-5 | |
| | Contract 2004-11-04 proposal 1898 | 11/04/2004 | ECF # 251-6 | |
| | Contract 2004-11-04 proposal 1899 | 11/04/2004 | ECF # 251-7 | |
| | Contract 2004-11-16 proposal 1915 | 11/16/2004 | ECF # 251-8 | |
| | Contract 2004-11-16 proposal 1914 | 11/16/2004 | ECF # 251-9 | |
| | Contract 2005-05-27 proposal 2218 | 05/27/2005 | ECF # 251-10 | |
| | Contract 2005-08-31 proposal 2321 | 08/31/2005 | ECF # 252-1 | |

| | Contract 2005-09-12 proposal 2337 | 09/12/2005 | ECF # 252-2 | |
|---|---|---|---|---|
| | Contract 2006-08-01 proposal 2737 | 08/01/2006 | ECF # 252-3 | |
| | Contract 2006-11-08 proposal 2853 | 11/08/2006 | ECF # 252-4 | |
| | Contract 2006-12-01 proposal 2885 | 12/01/2006 | ECF # 252-5 | |
| | Contract 2009-04-15 proposal 3025 | 04/15/2009 | ECF # 252-6 | |
| | Contract 2009-07-17 proposal 3776 | 07/17/2009 | ECF # 252-7 | |
| | Contract 2009-08-27 proposal 3815 | 08/27/2009 | ECF # 252-8 | |
| | Contract 2011-03-31 proposal 4208 | 03/31/2011 | ECF # 252-9 | |
| | Contract 2013-04-30 proposal 1125 | 04/30/2013 | ECF # 252-10 | |
| | Contract 2009-08-25 proposal 3812 | 08/25/2009 | ECF # 252-11 | |
| | Declaration of James Chenault | 02/23/2018 | ECF # 256-1 | |
| | Declaration of James Chenault | 03/04/2018 | ECF # 260-2 | |
| | Declaration of William J. Carr | 02/23/2018 | ECF # 256-2 | |
| | Affidavit of Stephen Olita | 01/15/2016 | ECF # 26-1 | |
| | Affidavit of Stephen Olita | 01/21/2016 | ECF # 15-1 | |
| | Declaration of Stephen Olita | 07/11/2017 | ECF # 203-2 | |
| | Declaration of Stephen Olita | 08/04/2017 | ECF # 208-1 | |
| | Declaration of Stephen Olita | 09/29/2017 | ECF # 228-3 | |
| | James Chenault Report with Exhibits | 09/27/2017 | ECF # 227 | |
| | James Chenault and William J. Carr Rebuttal Report with Exhibits | 11/29/2017 | ECF # 234 | |
| | Jeremy Flemming report and resume | 10/30/2017 | ECF # 230-3 | |
| | Supplemental report of Doug Femec | 04/29/2018 | ECF # 268-1 | |
| | Supplemental report of Joshua Siegel, and exhibits | 04/30/2018 | ECF # 268-2 and -3 | |
| | Second Amended Complaint | | ECF # 42 | |
| | Carrier's Answer and Counterclaim to Second Amended Complaint | | ECF # 53 | |
| | ECIMOS' Reply to Carrier's Answer and Counterclaim to Second Amended Complaint | | ECF # 54 | |

| | | | |
|---|---|---|---|
| | Responses of ECIMOS to interrogatories and document requests | | |
| | Amtec Corporation—Capabilities | C017920-C017337 | |
| | Carrier C-331 Engineering Requirements | C030340-C030490 | |
| | Carrier's LabVIEW RES code (previously provided pursuant to protective order) | | |
| | Carrier's RES database scripts (previously provided pursuant to protective order) | | |
| | Carrier 2009 and 2011 Nomenclature | | |
| | Carrier 2015 Nomenclature | | |
| | HVAC Terms of Art | | |
| | ECI Valid Tests | | |
| | LabVIEW examples | | |
| | RES Parameters and Commands | | |
| | Results Tables ECI | | |
| | Results Tables RES | | |
| | Screen Calibration ECI | | |
| | Screen Calibration RES | | |
| | Screen History ECI | | |
| | Screen History RES | | |
| | Screen Main ECI | | |
| | Screen Main RES | | |
| | Screen Manual CCN ECI | | |
| | Screen Manual CCN RES | | |
| | Screen Manual ECI | | |
| | Screen Manual RES | | |
| | Screen Script Example RES | | |
| | Screen Test Creation ECI | | |
| | Screen Test Creation RES | | |
| | Tables ECI | | |
| | Tables RES | | |
| | Test Creation Table ECI | | |
| | Test Creation Table RES | | |
| | ECI Test Procedure Header Table | | |
| | Emails S. Olita and United States Copyright Office | 10/2016 | |
| | Emails D. Kreher and United States Copyright Office | 10/2017 and 11/2017 | |

| | | | |
|---|---|---|---|
| | United States Copyright Office letter to ECIMOS dated December 15, 2017 | 12/15/2017 | | |
| | Emails P. Davis and JC Stewart, February 24, 2015 with attachments | | C029556-C029568 | |
| | Emails P. Davis and JC Stewart, March 6, 2015 with attachments | | C029534-C029533 | |
| | Opto 22 models constructed by JC Stewart for use by Amtec, and/or photographs of same | | | |
| | Selections from the ecicomplete.com website | | | |
| | Photo Brick Opto 22 | | | |
| | Photo Snap Opto 22 | | | |
| | Photo Cabinets | | | |
| | Photo ECI and PROCIX on the same line | | | |
| | Photo inside of the ECI cabinet | | | |
| | Photo inside of the PROCIX cabinet | | | |
| | Documents identified as QuickBASIC code | | See list at ECF # 228-3 | |
| | | | | |