IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| ECIMOS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:15-cv-2726-JPM-cgc |
| v. | ) | |
| | ) | |
| CARRIER CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER GRANTING IN PART AND DENYING IN PART
CARRIER'S MOTION FOR SUMMARY JUDGMENT

Before the Court is the Motion for Summary Judgment filed by Defendant Carrier

Corporation ("Carrier") on February 8, 2018.  (ECF No. 248.)  For the reasons discussed below,

Carrier's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.[1]

I.   **BACKGROUND**

A.   **Factual Background**

Carrier manufactures air conditioners.  (Answer to Second Am. Compl., ECF No. 53,

¶¶ 10, 15.)  In 1984, after having worked for Carrier as an electrical engineer, Stephen Olita

---

[1] Specifically, Carrier's Motion for Summary Judgment is **DENIED** as to ECIMOS's copyright infringement claim with respect to the database script source code and the RunTest source code, but **GRANTED** with respect to the Valid Test source code, except to the extent that it is contained within the former; **DENIED** as to ECIMOS's Digital Millennium Copyright Act claim; **DENIED** as to ECIMOS's breach of contract claim; **DENIED** as to Carrier's breach of contract counterclaim; **DENIED** as to ECIMOS's trade secret misappropriation claim with respect to both the Valid Test algorithms and the hardware wiring drawings; and **GRANTED** as to ECIMOS's conversion claim.

founded Plaintiff ECIMOS, LLC ("ECIMOS")[2] and developed the Integrated Process Control System ("IPCS"), a computerized information control system that aids in the production of air conditioners by ensuring that they have passed a series of customized "Valid Tests" before leaving the assembly line.  (See Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 226 at 3709-10,[3] 3682-88; Stephen G. Olita Honors and Awards, Prelim. Inj. Hr'g Ex. 2; ECIMOS Movie CD-ROM, Prelim. Inj. Hr'g Ex. 3.)  (See Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 226 at 3700.)  The software for the initial version of the IPCS ran on the DOS operating system.  (See Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 226 at 3688-89.)

In 1992, Carrier became ECIMOS's customer and began using the DOS-based IPCS software in the production of its air conditioners.  (Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 226 at 3688; see also Answer to Second Am. Compl., ECF No. 53, ¶ 16.)  Over the next ten years, Carrier apparently used the IPCS pursuant to one or more software licensing agreements with ECIMOS.[4]  (See Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 226 at 3688.)

In 2002, Carrier released a request for proposals ("RFP") for a "split system run test" for its manufacturing plant in Collierville, Tennessee, seeking to establish a single, consistent software system across the plant's testing stations.  (See Corrected Resp. to Statement of

---

[2] Technically, Mr. Olita founded ECIMOS's predecessor company, Electrical Controls, Inc. ("ECI"), in 1984.  This Order does not distinguish between ECIMOS and ECI.

[3] All citations to page numbers in docket entries are to the CM/ECF PageID number.

[4] Mr. Olita testified that he and Carrier had a licensing agreement for the IPCS software "from the beginning" of the parties' relationship in 1992.  (See Prelim. Inj. Hr'g Tr., ECF No. 226 at 3688.)  He also testified, however, that no licensing terms were sent out to customers with the initial DOS-based IPCS and that "We had a counter on the number of instances that the customer could use, so we had a self-regulating licensing agreement."  (Id. at 3703.)

Material (Sic) Facts, ECF No. 266, ¶¶ 1-2.)  ECIMOS responded with a proposal that included the delivery of new software, hardware, electrical panel fabrication drawings, and operation and maintenance manuals.  (See id., ¶¶ 1, 3.)  The parties agree that they entered into a contract pursuant to which ECIMOS delivered the new software, drawings, and manuals to Carrier (the hardware was installed by a different vendor), along with a lifetime service warranty on the new software.  (See id., ¶¶ 5-8, 17.)  The parties dispute, however, the moment of contract formation.[5]  (See id., ¶ 6.)  The new "RunTest" software for the upgraded IPCS was written in the Visual Basic 6 ("VB6") programming language and ran on the Windows XP operating system instead of the DOS operating system.  (See id., ¶ 4; Test. of Jim Rindin, Prelim. Inj. Hr'g Tr., ECF No. 226 at 3761-62, 3770-71.)

Beginning in 2004, Carrier purchased various additional IPCS-related items from ECIMOS, including wiring drawings, hardware installations, software modifications, and a 2011 "Service Pack" to handle various service items, such as the software modifications.  (See ECF No. 266, ¶¶ 20-36,[6] ¶ 59.)  ECIMOS's proposals for these additional items—unlike the 2002 proposal to develop Carrier's RunTest software—included the following licensing language:

> By using ECIMOS software you accept the following terms of this License Agreement.  If you do not agree with these terms, you may not use this software and must promptly return it for a refund. . . .
>
> The software and related documentation are copyrighted and may not be copied. Unauthorized copying, reverse engineering, decompiling, disassembling, translating, renting, sub-licensing, leasing, distributing, and/or creating derivative works based on the software, in whole or in part, are strictly prohibited. . . .

---

[5] Carrier contends that the parties' contract consists of ECIMOS's proposal and a purchase order from Carrier, but ECIMOS contends that Carrier accepted ECIMOS's proposal "long before" it sent ECIMOS a purchase order.  (See ECF No. 266, ¶ 6.)

[6] ECIMOS objects to Carrier's "attempt to make a legal argument within the context of a purported statement of undisputed material facts" but does not deny selling the items to Carrier.

> ECIMOS reserves the right to require an additional license and fee for use of the
> Software on any upgraded computer, processor, operating system, or controller.

(See, e.g., ECF No. 252-10 at 5703-04.)

In 2011, ECIMOS informed Carrier that it was going to stop supporting Carrier's RunTest software because Microsoft was discontinuing support for Windows XP, rendering the RunTest software obsolete. (See Test. of JC Stewart, Jr., Prelim. Inj. Hr'g Tr., ECF No. 222 at 3098.) ECIMOS solicited Carrier to license ECIMOS's new, Windows 7-compatible software at a cost of $50 per month per testing station. (See Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 224 at 3531-32.) Carrier was not interested in licensing ECIMOS's new IPCS software. (Id. at 3531.) Instead, after updating the Collierville plant's operating system to Windows 7, Carrier installed its pre-existing RunTest software on the new operating system. (See Decl. of Stephen Olita, ECF No. 203-2, ¶ 9.)

Pointing to the licensing language in its recent proposals, ECIMOS insisted that Carrier license the new IPCS software or pay the monthly licensing fee for having installed ECIMOS's software on a new operating system. (See Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 224 at 3531-32.; Decl. of Stephen Olita, ECF No. 203-2, ¶ 9; Email Chain from Steve Olita to Balaji Suresh Dated 7/18/2014, Prelim. Inj. Hr'g Ex. 35.) Carrier refused to pay ECIMOS a monthly licensing fee for installing the software on Windows 7. (ECF No. 266, ¶ 64.) ECIMOS then refused to service Carrier's software in the Windows 7 environment. (See id., ¶ 65.)

In 2014, Carrier hired Amtec Solutions Group, Inc. ("Amtec") to develop an alternative software program "which would be simpler, easier to use, and more reliable than [ECIMOS's] and which would be Carrier's own intellectual property." (Decl. of JC Stewart, Jr., ECF No. 102-4, ¶¶ 3-4.) This new software program, called the Runtest Execution System ("RES"), is

4

written in the LabVIEW programming language and interacts with an associated "MES" database, just as ECIMOS's VB6 software interacts with an associated "ECI" database.  (See ECF No. 266, ¶¶ 42-43; Decl. of James Chenault, ECF No. 260-2 at 6100.)  LabVIEW is a "graphical" programming language that allows users to create complex software programs more efficiently than would be possible using a "text-based" programming language.[7]  (See Test. of James Chenault, Prelim. Inj. Hr'g Tr., ECF No. 223 at 3337-48.)  The parties agree that VB6 is a text-based programming language.[8]  (ECF No. 266, ¶ 39.)  Carrier contends that it did not provide Amtec with ECIMOS's RunTest VB6 source code or the associated database script source code.  (See Decl. of JC Stewart, Jr., ECF No. 252-13, ¶ 3.)

## B.    Procedural Background

On October 26, 2015, ECIMOS filed a Complaint against Carrier in the Chancery Court of Shelby County, Tennessee, alleging that Carrier reverse engineered ECIMOS's proprietary

---

[7] "Text-based" programming languages require users to type lines of text code that instruct computers to perform various functions.  (See Test. of James Chenault, Prelim. Inj. Hr'g Tr., ECF No. 223 at 3338-39.)  "Visual" programming languages allow users to produce executable lines of text code by manipulating visual elements on their computer screens.  (See id. at 3339.)  "Graphical" programming languages allow users to produce *visual* software programs by manipulating visual elements on their computer screens.  (See id. at 3339-40.)  Therefore, each subsequent programming language "generation" sits like a layer atop previous generations, allowing users to more easily and more quickly instruct computers to perform complicated tasks.  For example, Mr. Chenault testified that it would take a programmer several hours to create a text-based C++ program that draws a graph depicting 1,000 randomly-generated numbers but only about one minute to create a graphical LabVIEW program to do the same task.  (See id. at 3347-48.)  Mr. Chenault did not testify as to the length of time it would take a programmer to create a VB6 program to draw such a graph.  (See id.)

[8] Mr. Chenault testified, however, that Visual Basic is a visual programming language, as its name implies.  (See Prelim. Inj. Hr'g Tr., ECF No. 223 at 3339.)  But regardless of the manner in which VB6 programmers create their programs—*i.e.*, whether they type lines of text code, manipulate visual elements, or a combination of both—lines of text code are the outcome of their efforts.  (See id. ("The front panel contains graphics, and the back panel would contain the text code.").)

software and disclosed ECIMOS's confidential information to unauthorized users.  (ECF No. 1-3.)  ECIMOS brought five claims against Carrier for (1) breach of contract, (2) trade secret misappropriation, (3) conversion, (4) violation of the Digital Millennium Copyright Act, and (5) violation of the Copyright Act.  (Id.)  Carrier removed ECIMOS's Complaint to this Court on November 6, 2015.  (ECF No. 1.)   On November 18, 2015, Carrier answered ECIMOS's Complaint and filed a counterclaim against ECIMOS for attorney's fees.  (ECF No. 7.)

Effective December 2, 2015, ECIMOS obtained copyright registrations for its "ECI Run Test Source Code Licensed to Carrier A/C Collierville, TN" as well as its "ECI Database Script Source Code licensed to Carrier A/C for Run Test."  (ECF No. 251-1 at 5291-92.)  The U.S. Copyright Office rejected ECIMOS's application for a copyright in the names of its Valid Test procedures.  (See ECF No. 266, ¶ 41.)  Accordingly, the RunTest and database script copyright registrations are "the first and only two registrations" that are applicable to this case.  (See Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 224 at 3530.)

On February 8, 2016, Carrier filed an Amended Answer and Counterclaim to ECIMOS's Complaint, asserting two claims for attorney's fees and one claim for breach of contract against ECIMOS.  (ECF No. 22.)  ECIMOS amended its Complaint on February 16, 2016 and again on May 23, 2016.  (ECF Nos. 28, 42.)  In its Second Amended Complaint, ECIMOS named two additional defendants—Patrick White and his company, Engineered Controls and Integration, LLC—seeking a declaratory judgment "that ECIMOS is the sole owner of all the rights to the IPCS software and assembled hardware."  (ECF No. 42 at 471.)  On June 6, 2016, Carrier filed an Answer to Second Amended Complaint and Amended Counterclaim.  (ECF No. 53.)

On December 21, 2016, Carrier filed a Motion for Summary Judgment as to ECIMOS's copyright claims.  (ECF No. 102.)  The Court denied the motion without prejudice on July 26, 2017, finding the issues premature in light of the remaining time for discovery.  (ECF No. 207.)

On August 4, 2017, ECIMOS filed a Motion for Preliminary Injunction seeking to enjoin Carrier from, *inter alia*, using the RES software it developed as an alternative to ECIMOS's RunTest software.  (<u>See</u> ECF No. 208.)  On August 9, 2017, pursuant to a joint stipulation, the Court dismissed Patrick White and Engineered Controls and Integration, LLC from this action. (ECF No. 210.)  On September 1, 5, and 7, 2017, the Court held a hearing on ECIMOS's Motion for Preliminary Injunction.  (ECF Nos. 215, 216, 219.)  The Court denied the motion on November 22, 2017.  (ECF No. 231.)

On February 8, 2018, Carrier filed the instant Motion for Summary Judgment as to all five of ECIMOS's claims as well as Carrier's own counterclaim for breach of contract.  (ECF No. 248.)  ECIMOS responded on March 14, 2018 and corrected its Response on April 16, 2018. (ECF Nos. 260, 266.)  Carrier replied to ECIMOS's Response on March 28, 2018 and updated its Reply on April 20, 2018.  (ECF Nos. 263, 267.)

## II.   LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense."  <u>Bruederle v. Louisville Metro Gov't</u>, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [a] court construes all reasonable inferences in favor of the nonmoving party." Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Mosholder, 679 F.3d at 448-49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587. "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 914 (6th Cir. 2013) (quoting Chapman v. UAW Local 1005, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted); see also Kalich v. AT&T Mobility, LLC, 679 F.3d 464, 469 (6th Cir. 2012).

In order to "show that a fact is, or is not, genuinely disputed," both parties must do so by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or showing "that an adverse party cannot produce admissible evidence to support the fact." Bruederle, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); see also Mosholder, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting Celotex, 477 U.S. at 325). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not those of a judge[.]"   Martinez, 703 F.3d at 914 (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

"The court need consider only the cited materials, but it may consider other materials in the record."   Fed. R. Civ. P. 56(c)(3).   "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'"   Pharos Capital Partners, L.P. v. Deloitte & Touche, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam) (quoting Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008), abrogation recognized by Anderson v. City of Blue Ash, 798 F.3d 338 (6th Cir. 2015)).

The decisive "question is whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"   Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 251-52).  Summary judgment "'shall be entered' against the nonmoving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'"   Rachells v. Cingular Wireless Employee Services, LLC, No. 1:08CV02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990)).   "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor."   Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 251).

"[I]n order to withstand a motion for summary judgment, the party opposing the motion must present 'affirmative evidence' to support his/her position."   Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992) (citing Liberty Lobby, 477 U.S. at 247-254; Street v. J.C. Bradford

& Co., 886 F.2d 1472, 1479 (6th Cir. 1989)).  "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment."  Rachells, 2012 WL 3648835, at *2 (quoting Thomas v. Christ Hosp. & Med. Ctr., 328 F.3d 890, 894 (7th Cir. 2003)).  Statements contained in an affidavit that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient. See Mitchell, 964 F.2d at 584-85.

## III.    DISCUSSION

### A.    Copyright Act

#### 1.    Substantive Law

To prevail on a claim for copyright infringement, a plaintiff must prove (1) that the plaintiff owns a valid copyright, and (2) that the defendant copied the protected elements of the plaintiff's copyrighted work.  See Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  "The first prong tests the originality and non-functionality of the work, both of which are presumptively established by the copyright registration.  The second prong tests whether any copying occurred (a factual matter) and whether the portions of the work copied were entitled to copyright protection (a legal matter)."  Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 534 (6th Cir. 2004) (citations omitted).

A plaintiff can establish that a defendant copied the plaintiff's work "by showing that the defendant had access to the copyrighted work and that the copyrighted work and the allegedly copied work are substantially similar."  Lexmark, 387 F.3d at 534 (citations omitted).  The Sixth Circuit has adopted a two-part test for determining substantial similarity: "the first step requires identifying which aspects of the artist's work, if any, are protectible by copyright; the second

involves determining whether the allegedly infringing work is substantially similar to protectible elements of the artist's work."   Kohus v. Mariol, 328 F.3d 848, 855 (6th Cir. 2003) (citations and internal quotation marks omitted).

A copyrighted work's protected elements—known as the work's "expression"—do not include the ideas underlying the work or the work's functional aspects that are "dictated by efficiency."  See Kohus, 328 F.3d at 855-56.  "To this end, the merger doctrine establishes that "[w]hen there is essentially only one way to express an idea, the idea and its expression are inseparable [i.e., they merge,] and copyright is no bar to copying that expression."  Id. at 856 (quoting Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600, 606 (1st Cir. 1988) (alteration in original).

A copyrighted work's protected expression also does not include *scenes a faire*—the work's elements that are "dictated by external factors."  See Kohus, 328 F.3d at 856.  "In the computer-software context, the doctrine means that the elements of a program dictated by practical realities—e.g., by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices—may not obtain protection."  Lexmark, 387 F.3d at 535.

"In trying to discern whether these doctrines apply, courts tend to 'focus on whether the idea is capable of various modes of expression.'"  Lexmark, 387 F.3d at 536 (quoting Mason v. Montgomery Data, Inc., 967 F.2d 135, 138 (5th Cir. 1992)).  "The question, however, is not whether *any* alternatives theoretically exist; it is whether other options practically exist under the circumstances."  Id. (emphasis in original) (citing Computer Assocs. Int'l, Inc. v. Altai, Inc., 982

F.2d 693, 708 (2d Cir. 1992); <u>Atari Games Corp. v. Nintendo of Am. Inc.</u>, 975 F.2d 832, 840 (Fed. Cir. 1992)).  "In order to characterize a choice between alleged programming alternatives as expressive, in short, the alternatives must be feasible within real-world constraints."  <u>Id.</u>

### 2.   Analysis

To prevail on its copyright infringement claim, ECIMOS must prove that Carrier copied the protected elements of (1) ECIMOS's copyrighted database script source code, (2) ECIMOS's copyrighted RunTest source code, or (3) ECIMOS's non-copyrighted Valid Test source code.[9] <u>See</u> <u>Feist</u>, 499 U.S. at 361.  The Court will discuss each in turn.

### a.   Database Scripts

Carrier argues that Amtec did not have access to the ECI database scripts because Carrier "did not give Amtec the actual source code for ECI's VB6 run test software program or database scripts, or access to them."  (ECF No. 250, ¶ 46.)  ECIMOS responds that *Carrier* had access to the ECI database scripts "and sent those database scripts to Amtec employees in the form of a 1500 page spreadsheet."  (ECF No. 266, ¶ 46.)  To support this contention, ECIMOS cites an email from October 2011.  (<u>Id.</u>; <u>see also</u> Prelim. Inj. Hr'g Ex. 27.)  Carrier replies that the relevant email was sent to a company unrelated to Amtec and that ECIMOS "presents no evidence that this particular spreadsheet actually represents the copyrighted database scripts." (ECF No. 267 at 6222.)

---

[9] The validity of the software and database source code copyrights are presumptively established by their copyright registrations.  <u>See</u> <u>Lexmark</u>, 387 F.3d at 534.  The same is not true for the Valid Test source code, even if the related application "has been resubmitted and ECIMOS is confident that with the additional information the copyright registration will be approved."  (<u>See</u> ECF No. 260 at 6059.)

ECIMOS does, however, present evidence that its database scripts made their way to Amtec.  For example, there is a remarkable degree of overlap between the database names used in the "RES/MES system" and those used in the ECI database: Carrier's code contains only nine new data fields, and of the remaining 159 fields, 86 match exactly and 73 match with only a prefix change.  (See Decl. of James Chenault, ECF No. 260-2 at 6107.)  While these data field names do not appear to be entitled to copyright protection, their presence in both parties' databases is evidence that Carrier provided ECIMOS's database to Amtec, along with any embedded database scripts.  The record therefore reflects a factual dispute as to whether Amtec had access to the ECI database scripts (and it is undisputed that Carrier had access to them).

The record also reflects a factual dispute as to whether the parties' database source codes are substantially similar.  To be sure, similarities between the MES database code and the unprotected elements of the ECI database code—such as those "dictated by external factors"—are insufficient to establish copying.  See Kohus, 328 F.3d at 856; Lexmark, 387 F.3d at 535. The ECI database code is not protected to the extent that it is dictated by the tests Carrier performs on its air conditioners or the wiring and other hardware Carrier uses to perform those tests.[10]

The similarities described by ECIMOS's expert, however, do not appear to relate to such *scenes a faire*.  For example, ECIMOS's expert explains that the MES database code includes a "stored procedure" that inserts test results into a single table—just as the ECI database code does—even though (1) the table in question no longer exists, and (2) the current RES/MES

---

[10] The parties agree that Carrier is testing the same or similar models of air conditioners using the MES and ECI databases and that Carrier's tests are dictated by Carrier's engineering requirements.  (ECF No. 266, ¶¶ 44-45.)  Although ECIMOS designed much of Carrier's testing hardware, Carrier would not infringe ECIMOS's copyrights by developing its own software to interface with the hardware, so long as it did not copy ECIMOS's software in the process.

interface records data into multiple tables.  (See ECF No. 260-2 at 6105.)  He concludes, based on an examination of Carrier's code, that the "unnecessary stored procedure was used by Paula Davis of AMTEC as a template to create the current utilized stored procedures."  (Id. at 6114.)

This similarity cannot be explained by the external restrictions imposed by Carrier's testing requirements because Carrier is not even making use of the similar code.  It also does not reflect the idea underlying the ECI database code or the code's elements that are dictated by efficiency.  Instead, the similarity appears to be with respect to a choice between programming alternatives that are "feasible within real-world constraints."  See Lexmark, 387 F.3d at 536 (citing Altai, 982 F.2d at 708; Atari, 975 F.2d at 840).

ECIMOS's expert also explains that "Carrier's choice not to replace [its ECIMOS-designed hardware] dictated that the RES software must follow the same interface" as the VB6 software.  (ECF No. 260-2 at 6100.)  That choice did not necessarily dictate, however, that the MES database must follow the same structure as the ECI database, which, unlike the VB6 software, is not a "middleman."  (See id. at 6103.)  Therefore, it would seem that the more similar the VB6 software is to the RES software, the more substantially similar the ECI database must be to the MES database.

ECIMOS may ultimately fail to establish these similarities at trial, but at the summary judgment stage, the Court construes "all reasonable inferences in favor of the nonmoving party." Robertson, 753 F.3d at 614.  ECIMOS's expert has provided a sworn statement that similarities between the parties' software "prove[] the MES database is a direct descendent of the ECI database" and that "direct copying of the [ECIMOS's copyrighted database scripts] shows that Carrier started development of the MES database with the ECI database."  (ECF No. 260-2 at

6104.)  The record reflects a factual dispute as to whether Carrier copied the protected elements of ECIMOS's database script source code.  Carrier's Motion for Summary Judgment is therefore **DENIED** as to ECIMOS's copyright infringement claim with respect to the database script source code.

### a.    RunTest Source Code

ECIMOS argues that its VB6 RunTest code and Carrier's LabVIEW RES code are substantially similar with respect to many "non-literal" structural and design elements.[11]  (ECF No. 260.)  ECIMOS's expert, however, has provided a sworn statement that ECIMOS's VB6 software "acts as a middleman" between ECIMOS's database and Carrier's testing hardware (which ECIMOS designed) and that "Carrier's choice not to replace the [hardware] dictated that the RES software must follow the same interface."  (ECF No. 260-2 at 6100.)  Specifically, "[t]he RES software performs the same functions when interacting with the MES database as the ECI software did when interacting with the ECI database."  (Id.)  Both the VB6 RunTest code and the RES software, therefore, likely contain many unprotectable *scenes a faire* that are dictated by external factors—namely, the underlying databases and the ECIMOS-designed hardware.  ECIMOS does not explain why, given that Carrier chose to continue using its ECIMOS-designed hardware, the structure and design of the parties' "middleman" software programs are substantially similar with respect to the protected elements of ECIMOS's VB6 RunTest software.  (See generally ECF No. 260.)

---

[11]  According to ECIMOS, these elements include "system loops that are repeatedly executed for the purpose of determining what steps to execute; communication with a database, despite this being only one of many ways of organizing and structuring data within a manufacturing testing system; and the method in which reports are generated and written to tables within the database."  (ECF No. 260.)

Moreover, ECIMOS's expert testified that Carrier's LabVIEW program did not copy ECIMOS's VB6 code and that he saw "no evidence" that the LabVIEW program was otherwise "using" the VB6 code.  (ECF No. 241 at 4393, 4451.)  The parties even agree that "Amtec did not have [ECIMOS's] run test software code" when it developed the RES software for Carrier. (ECF No. 266, ¶ 46.)  The record therefore appears to reflect that Carrier did not copy the protected elements of ECIMOS's VB6 RunTest software in the creation of the LabVIEW RES software.

The record is unclear, however, as to whether Carrier copied the VB6 RunTest code in the creation of the MES database *underlying* the LabVIEW RES software.  ECIMOS does not appear to make this accusation, asserting instead that Carrier "had access to [ECIMOS's] database scripts and sent those database scripts to Amtec employees in the form of a 1500 page spreadsheet."  (See ECF No. 226, ¶¶ 46-47.)  The factual question at trial, therefore, may simply be whether Carrier copied the protected elements of ECIMOS's database scripts in the creation of the MES database.  Given the parties' varied usage of certain technical terms, however,[12] the Court will not limit the trial to that question at this time.  Carrier's Motion for Summary Judgment is **DENIED** as to ECIMOS's copyright infringement claim with respect to the RunTest software source code.

---

[12] At various times, for example, the parties have referred to the "RES software," the "RES program," the "RES code," the "MES database," the "MES code," the "RES/MES system," "software," "code," "source code," "databases," "scripts," "database scripts," and "database source code."

### c.    Valid Test Source Code

ECIMOS does not have a copyright registration for its Valid Test names, and the record indicates that those names are not copyrightable because they are simply short phrases, including many industry terms of art.  (See ECF No. 266, ¶ 54.)  Indeed, the Copyright Office rejected ECIMOS's application for a copyright in the names of its Valid Tests for this very reason.  (See ECF No. 266, ¶ 41.)

ECIMOS has also applied to copyright the source code for its Valid Tests, but it appears that the Copyright Office has neither approved nor rejected ECIMOS's application.  (See ECF No. 260 at 6059.)  ECIMOS may therefore be unable to bring a copyright infringement claim with respect to the Valid Test source code.[13]  Even assuming that it can, however, ECIMOS makes no arguments that its Valid Test source code contains protectable elements after filtering out unprotected elements.  (See generally ECF No. 260.)  Instead, ECIMOS simply contends that

---

[13]  The Copyright Act provides that, with certain exceptions, "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.  In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights."  17 U.S.C. § 411(a).  The nation's circuit courts are split as to whether this language permits a plaintiff to bring an infringement action after only filing an application to register a copyright.  Compare La Resolana Architects, PA v. Clay Realtors Angel Fire, 416 F.3d 1195, 1201 (10th Cir. 2005) ("[The] statutory language clearly instructs that a copyright owner can sue for infringement only after the copyright is registered, or registration is refused."), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010), and Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC, 856 F.3d 1338, 1341 (11th Cir. 2017) ("Filing an application does not amount to registration."), with Apple Barrel Prods., Inc. v. Beard, 730 F.2d 384, 386-87 (5th Cir. 1984) ("In order to bring suit for copyright infringement, it is not necessary to prove possession of a registration certificate.  One need only prove payment of the required fee, deposit of the work in question, and receipt by the Copyright Office of a registration application."), and Cosmetic Ideas, Inc. v. IAC/Interactivecorp., 606 F.3d 612, 621 (9th Cir. 2010) ("We therefore hold that receipt by the Copyright Office of a complete application satisfies the registration requirement of § 411(a).").

its test procedures were found in Carrier's MES database.[14]   (ECF No. 266, ¶¶ 52, 57.)   The Valid Test source code, however, appears especially likely to include many unprotectable elements that are "dictated by external factors" like engineering requirements and other practical realities.   See Kohus, 328 F.3d at 856; Lexmark, 387 F.3d at 535.   Similarly, pursuant to the merger doctrine, the Valid Test source code appears likely to include many unprotectable testing ideas and functional aspects that are "dictated by efficiency."   See Kohus, 328 F.3d at 855-56.

Because ECIMOS has failed to produce a copyright registration or rejection for its Valid Test source code and has failed to explain why its Valid Test source code contains protectable elements, ECIMOS has failed to present "affirmative evidence" to support the position that the Valid Test source code is entitled to copyright protection.   See Mitchell, 964 F.2d at 584.   The Court will therefore limit the trial to the question of whether Carrier copied the protected elements of ECIMOS's copyrighted RunTest software or copyrighted database scripts.   Carrier's Motion for Summary Judgment is **GRANTED** as to ECIMOS's copyright infringement claim with respect to the Valid Test source code.[15]

## B.   Digital Millennium Copyright Act

### 1.   Substantive Law

The Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq*., was enacted in 1998 to address "the ease with which pirates could copy and distribute a copyrightable work in digital form."   Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 458 (2007) (quoting Universal

---

[14] "Test procedures" appear to be the order in which Valid Tests are implemented within a particular quality control test.

[15] To the extent that the Valid Test source code is contained within or otherwise inseparable from the RunTest source code or database script source code, however, Carrier's Motion for Summary Judgment is **DENIED** with respect to ECIMOS's Valid Test source code.

City Studios, Inc. v. Corley, 273 F.3d 429, 435 (2d Cir. 2001)).  The "anti-circumvention provision" of the DMCA provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title."  17 U.S.C. § 1201(a)(1)(A). "[T]o 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner[.]"  17 U.S.C. § 1201(a)(3)(A).

Some courts have found that, to bring a claim under the DMCA's anti-circumvention provision, a plaintiff must hold a copyright registration at the time of the alleged circumvention. See, e.g., Ford Motor Co. v. Autel US Inc., No. 14-13760, 2015 WL 5729067, at *6 (E.D. Mich. Sept. 30, 2015) (dismissing a claim because the alleged circumvention happened "long before" the plaintiff obtained a copyright registration and thereby brought the relevant work under the protections of the copyright laws).  Other courts explain, however, that "registration is not required to pursue a DMCA claim."  Exec. Corp. v. Oisoon, LLC, No. 3:16-cv-00898, 2017 WL 4310113, at *4 (M.D. Tenn. Sept. 28, 2017); see also Med. Broad. Co. v. Flaiz, No. CIV.A. 02-8554, 2003 WL 22838094, at *3 (E.D. Pa. Nov. 25, 2003) ("While a copyright registration is a prerequisite under 17 U.S.C. § 411(a) for an action for copyright infringement, claims under the DMCA, however, are simply not copyright infringement claims and are separate and distinct from the latter.") (citing Nimmer on Copyright, § 12A.18(B)).

## 2.    Analysis

ECIMOS brings its DMCA claim under the anti-circumvention provision.  (See Second Am. Compl., ECF No. 42, ¶ 68.)  ECIMOS did not obtain its copyright registrations until December 2, 2015, more than a month after it brought this action.  (See ECF No. 251-1 at

5291-92.)  Therefore, under some courts' reading of the anti-circumvention provision, Carrier is correct that "ECIMOS did not have registered copyrights at the time of alleged circumvention, which is a requirement of this Section."  (ECF No. 267 at 6225.)  See also Ford Motor Co., 2015 WL 5729067, at *6.  The better view, however, is that ECIMOS's intellectual property was "protected under" the copyright laws before ECIMOS obtained its copyright registrations. ECIMOS was unable to bring its *infringement* claims before applying for the registrations (or perhaps, as discussed earlier, before hearing back from the Copyright Office), but it does not follow that ECIMOS's password-protected software was outside the protections of the copyright laws entirely.

Carrier argues that there is "no dispute that Carrier did not give Amtec access to ECI's VB6 source code or database scripts, or circumvent control of those programs." (ECF No. 249.) ECIMOS argues that this "does not address circumvention in any capacity" because the relevant question is not whether Carrier disclosed ECIMOS's software to others, but whether Carrier circumvented the passwords on that software.  (See ECF No. 260 at 6065.)  Carrier replies that "ECIMOS has provided absolutely no direct evidence of circumvention, such as the software that would have been required to achieve such an act . . . ."  (ECF No. 267 at 6225 n. 10.)

Although ECIMOS must ultimately prove that its passwords were circumvented,[16] for purposes of the instant Motion, Carrier "bears the initial burden of demonstrating the absence of any genuine issue of material fact."  See Mosholder, 679 F.3d at 448 (citing Celotex, 477 U.S. at 323).  Carrier may not have possessed password-cracking software, but the record does not establish that such software was necessary to bypass ECIMOS's passwords.  If Carrier could

---

[16] Even if Carrier provided ECIMOS's database to Amtec, it does not follow that Carrier decrypted or otherwise avoided, bypassed, removed, deactivated, or impaired any of ECIMOS's passwords.  See 17 U.S.C. § 1201(a)(3)(A).

have accessed ECIMOS's code without bypassing any passwords, then ECIMOS's claim must

fail absent specific evidence of password-cracking.  On the other hand, if Carrier could only have

accessed the code by bypassing the passwords, and if bypassing the passwords did not require

specialized software, then drawing "all reasonable inferences in favor of the nonmoving party[,]"

see Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003),

evidence of copying ECIMOS's code is evidence of bypassing the passwords protecting it.

Carrier's Motion for Summary Judgment is **DENIED** as to ECIMOS's DMCA claim.

### C.    Breach of Contract

#### 1.    Substantive Law

Under Tennessee law,[17] a plaintiff alleging breach of contract is responsible for proving

(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the

contract, and (3) damages caused by the breach of contract.  Life Care Centers of America, Inc.

v. Charles Town Assocs. Ltd. P'ship, 79 F.3d 496, 514 (6th Cir. 1996).  "Ordinarily, a party who

first materially breaches may not recover under the contract."  Madden Phillips Const., Inc. v.

---

[17] "Because this is a diversity [claim], the law of the forum state, including the choice-of-law rules, apply."  Montgomery v. Wyeth, 580 F.3d 455, 459 (6th Cir. 2009).  "Tennessee follows the rule of *lex loci contractus*.  This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent."  Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999).  Under Tennessee law, a contractual choice-of-law provision is honored if "the other state had some material connection with the transaction."  Goodwin Bros. Leasing v. H & B Inc., 597 S.W.2d 303, 306 (Tenn. 1980).  With respect to a contract for a sale of goods, Tennessee law honors private choice-of-law provisions only if the other state has a "reasonable relation" to the parties' transaction.  See Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co., 823 F. Supp. 2d 786, 801 (W.D. Tenn. 2011).  Although Carrier's Terms and Conditions of Purchase provide that the parties' agreement(s) should be construed according to laws of New York, Carrier acknowledges that "[t]here is no connection in this case to the State of New York.  Most of the connections involve Tennessee[.]"  (ECF No. 249 at 5271.)  Therefore, the parties' contract claims are governed by Tennessee law regardless of whether their contracts' are for sales of goods or otherwise.

GGAT Dev. Corp., 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009). "In 'resolving disputes concerning contract interpretation, [the Court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.'" Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 889-90 (Tenn. 2002) (quoting Guiliano v. Cleo, Inc., 995 S.W.2d 88, 95 (Tenn. 1999)).

"A course of performance or course of dealing between the parties or usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Tenn. Code Ann. § 47-1-303. "A 'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." Id. "A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Id.

### 2. Analysis

#### a. ECIMOS's Claim Against Carrier

Carrier argues that, because ECIMOS objected to Carrier's proposed licensing language in 2002 without proposing its own licensing language, the parties' 2002 agreement was a simple sale of goods pursuant to which Carrier owned the initial RunTest software outright. (See ECF

No. 249 at 5259-60, 5269.)  Carrier further argues that, because the parties' proposed licensing language conflicted from 2004 and onward, that language was "knocked out," resulting in a series of additional sales of goods pursuant to which Carrier owned the rights to all modifications to the RunTest software.  (See ECF No. 249 at 5261, 5269-73.)  See also Tenn. Code Ann. § 47-2-207 ("Additional terms in acceptance or confirmation").

ECIMOS responds that Carrier accepted ECIMOS's licensing terms before sending any purchase orders to ECIMOS.  (See ECF No. 266, ¶¶ 6, 12.)  Carrier replies that "ECIMOS cites no factual support whatsoever for this novel (and wholly erroneous) proposition."  (ECF No. 267 at 6229.)  Carrier is incorrect.  ECIMOS cites evidence that Carrier never believed it purchased the RunTest software outright.  For example, ECIMOS points to a 2012 email in which George Brunswick, Carrier's Senior Controls Engineer, wrote that "Carrier does not have the rights to our existing runtest source code."  (ECF No. 260 at 6070; see also Prelim. Inj. Hr'g Ex. 26.)  ECIMOS also points to the Preliminary Injunction Hearing testimony of JC Stewart, Jr., in which he confirmed that Mr. Brunswick was correct.  (See ECF No. 260 at 6070; see also Prelim. Inj. Hr'g Tr., ECF No. 222 at 3100.)

Moreover, ECIMOS points to the fact that its licensing terms "appeared on the screen each time ECIMOS's product was installed on a computer and required the installer to physically act to accept the terms before moving forward with the installation process and gaining access to the product."  (ECF No. 260 at 6066.)  Carrier replies that these alleged "clickwrap agreements" were merely post-contract proposals to modify the parties' contract that could only be accepted expressly.  (ECF No. 267 at 6230-31.)  Even if the installations are not binding contracts, however, Carrier's willingness to install ECIMOS's software despite viewing the clickwrap language is evidence that the parties' had previously agreed to terms that did not contradict the

clickwrap language.  Similarly, Carrier's willingness to operate the RunTest software despite the "splash screen" stating "License To: Carrier – Collierville, TN" indicates that the parties agreed to licensing terms.[18]  (See Prelim. Inj. Hr'g Ex. 6.)

Finally, as Carrier insisted in response to ECIMOS's copyright infringement claim—and as ECIMOS has admitted—Carrier did not provide Amtec with the RunTest VB6 software to aid Amtec in the development of the RES software.  (See ECF No. 266, ¶ 46.)  If Carrier believed it owned the RunTest software outright, there would have been no reason to withhold the software from Amtec.

Therefore, Carrier's behavior toward ECIMOS and others clearly indicates that, as Mr. Brunswick acknowledged, Carrier did "not have the rights" to the RunTest software.  (See Prelim. Inj. Hr'g Ex. 26.)  Considering the parties' course of performance under each of their transactions and their course of dealing across their transactions, there is at least a factual question as to whether Carrier agreed to ECIMOS's licensing terms.  Carrier's Motion for Summary Judgment is **DENIED** as to ECIMOS's breach of contract claim.

### b.    Carrier's Counterclaim Against ECIMOS

The parties agree that "ECIMOS never completed the services contracted for under the Service Pack before it terminated the relationship" and that "ECIMOS has refused to reimburse Carrier" for the withheld services.  (ECF No. 266, ¶¶ 68-69.)  Because summary judgment was denied as to ECIMOS's breach of contract claim, however, Carrier's breach of contract claim is not ripe for summary judgment.  See Madden Phillips Const., 315 S.W.3d at 813 ("Ordinarily, a

---

[18] The "splash screen" appeared each time the software was launched on one of Carrier's testing stations.  (See Test. of Stephen Olita, Prelim. Inj. Hr'g Tr., ECF No. 226 at 3695.)

party who first materially breaches may not recover under the contract.").  Carrier's Motion for Summary Judgment is therefore **DENIED** as to its breach of contract counterclaim.

### C.    Trade Secret Misappropriation

#### 1.    Substantive Law

The Tennessee Uniform Trade Secrets Act ("TUTSA") prohibits the misappropriation of trade secrets, providing for both injunctive relief as well as damages.  See Tenn. Code Ann. §§ 47-25-1703, 1704.  For information to qualify as a "trade secret," (1) the information must derive independent economic value from not being generally known or ascertainable by proper means, (2) others must be able to obtain economic value from the information's disclosure or use, and (3) reasonable efforts must have been made to maintain the secrecy of the information. See Tenn. Code Ann. §§ 47-25-1702(4); see also Williams-Sonoma Direct, Inc. v. Arhaus, LLC, 304 F.R.D. 520, 527 (W.D. Tenn. 2015) (quoting J.T. Shannon Lumber Co. v. Barrett, No. 2:07-cv-2847-JPM-cgc, 2010 WL 3069818, at *4 (W.D. Tenn. Aug. 4, 2010)).  Among other ways, a trade secret is "misappropriated" if it is disclosed or used without consent by a person who knows or has reason to know that the person's knowledge of the trade secret was acquired "under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]"  Tenn. Code Ann. § 47-25-1702(2)(B)(ii)(b).

#### 2.    Analysis

##### a.    Valid Test Algorithms

Carrier argues that because its software does not "use or call" ECIMOS's software or database, Carrier did not disclose the algorithms behind ECIMOS's Valid Tests.  (ECF No. 249

at 5256-57.)  ECIMOS responds that this is simply a reiteration of Carrier's argument against ECIMOS's copyright infringement claim and that "Carrier does not deny the existence of a trade secret and does not deny disclosure."  (ECF No. 260 at 6062-63.)  Carrier replies that the test procedures are dictated by Carrier's engineering requirements and are therefore not trade secrets. (ECF No. 267 at 6226.)

ECIMOS's Valid Test algorithms may be dictated by engineering requirements, but it does not follow that they are "generally known or ascertainable by proper means."  See Tenn. Code Ann. §§ 47-25-1702(4).  ECIMOS arrived at its testing algorithms "after years of trial and error experimentation."  Hickory Specialties, Inc. v. B & L Labs., Inc., 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979).  Moreover, the record reflects that ECIMOS's algorithms would be economically valuable to others (for example, its competitors) and that ECIMOS has taken steps to maintain their secrecy, including by hiding them behind passwords and using confidentiality language in its contracts.[19]  There is at least a factual dispute as to whether ECIMOS's testing algorithms are trade secrets.  Moreover, for the reasons discussed in the Court's copyright infringement analysis, there is a factual dispute as to whether Carrier disclosed the algorithms to Amtec.[20]  Accordingly, Carrier's Motion for Summary Judgment is **DENIED** as to ECIMOS's trade secret misappropriation claim with respect to the Valid Test algorithms.

---

[19] For example, ECIMOS's 2005 proposal for certain software enhancements contains the following language: "The software and related materials are considered confidential.  Licensee agrees to handle the software in a manner such that access is limited to personnel within Licensee's organization who have a need to have access to the software, and Licensee shall inform the personnel of their obligations under this Agreement.  Licensee is also required to take all reasonable steps necessary to prevent disclosure of the software to any third party.  Licensee shall promptly notify ECI of any disclosure of the software inconsistent with this Agreement." (ECF No. 251-10 at 5501.)

[20] As explained in the Court's copyright infringement analysis, the record reflects that Carrier did not disclose the VB6 RunTest code to Amtec unless it did so through the underlying

b.     **Hardware Wiring Drawings**

With respect to ECIMOS's second alleged trade secret—the hardware wiring drawings it provided to Carrier—the analysis appears to turn on the outcome of ECIMOS's breach of contract claim.   ECIMOS's proposals for hardware wiring drawings provide that ECIMOS "grants to Licensee a non-exclusive, non-transferable license to use the software program and related documentation in this package (collectively referred to as software)."   (See, e.g., ECF No. 251-8 at 5457.)   The proposals further provide that "[t]he software and related materials are considered confidential."   (Id. at 5458.)   Because there is a factual dispute as to whether the parties agreed to those terms, there appears to be a factual dispute as to whether Carrier misappropriated the hardware wiring drawings.

The parties do not disagree.   Carrier argues that "as dictated by the terms of the sale and operation of Tennessee's UCC, ECI sold the wiring diagrams to Carrier."   (ECF No. 249 at 5258.)   ECIMOS responds that "Carrier seemingly acknowledges that if ECIMOS prevails on the breach of contract issue [then] Carrier is guilty of misappropriating ECIMOS's trade secrets with respect to the hardware wiring drawings."   (ECF No. 260.)   In reply, Carrier references its "knockout rule" arguments and contends that "this contract interpretation dispute is a legal issue ripe for summary judgment."   (ECF No. 267 at 6227-28.)

Accordingly, because summary judgment was denied as to ECIMOS's breach of contract claim, Carrier's Motion for Summary Judgment is **DENIED** as to ECIMOS's trade secret misappropriation claim with respect to the hardware wiring drawings.

---

MES database.  For the same reason, if ECIMOS's testing algorithms are not contained within the MES database, the record reflects that Carrier did not disclose them to Amtec.  ECIMOS's trade secret misappropriation claim will proceed to trial, but the claim will fail as to the testing algorithms if the material Carrier disclosed could not have contained the algorithms.

### D.      Conversion

Carrier argues that "[t]he misappropriation of trade secrets claim and the conversion claim require the 'same proof', which results in preemption."  (ECF No. 249 at 5258.)   In response, "ECIMOS concedes that its conversion claim is preempted by [its] claim for misappropriation of trade secrets, and that claim is thereby withdrawn." (ECF No. 260 at 6073.) Carrier's Motion for Summary Judgment is therefore **GRANTED** as to ECIMOS's conversion claim.

## IV.     CONCLUSION

For the foregoing reasons, Carrier's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.[21]

**IT IS SO ORDERED**, this 31st day of May, 2018.

/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

---

[21] Specifically, Carrier's Motion for Summary Judgment is **DENIED** as to ECIMOS's copyright infringement claim with respect to the database script source code and the RunTest source code, but **GRANTED** with respect to the Valid Test source code, except to the extent that it is contained within the former; **DENIED** as to ECIMOS's Digital Millennium Copyright Act claim; **DENIED** as to ECIMOS's breach of contract claim; **DENIED** as to Carrier's breach of contract counterclaim; **DENIED** as to ECIMOS's trade secret misappropriation claim with respect to both the Valid Test algorithms and the hardware wiring drawings; and **GRANTED** as to ECIMOS's conversion claim.