**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| ECIMOS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 2:15-cv-2726-JPM-cgc |
| v. ) | |
| ) | |
| CARRIER CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**ORDER DENYING CARRIER'S MOTION FOR EXTENSION OF TIME AND
ORDER REDUCING PENALTIES**

Before the Court is Carrier's Motion for Extension of Time or, in the Alternative, Motion to Reduce Penalties, filed on August 13, 2020. (ECF No. 601.) Carrier moves the Court for an extension of time to complete the rollout of the non-infringing run-test software and database, asserting that: (1) it has acted diligently to install the non-infringing run-test software and database; (2) it has experienced delays that could not have been fully appreciated at the time when it provided its two-week rollout plan to the Court; (3) delays caused by the COVID-19 Pandemic have impeded Carrier's ability to complete rollout within the Court's two-week schedule; and (4) not granting the extension would harm innocent third parties. (See id. at PageID 13720–25.) Second, Carrier argues that the Court's escalating penalty structure, starting at $500,000 and increasing by $250,000 each week, is an improper valuation of ECIMOS's licensing fee for Carrier's continued use of ECIMOS's intellectual property, and that the penalty violates both the Due Process and the Excessive Fines Clauses of the United States Constitution. (See id. at PageID 13725–31.) Carrier recommends that if

the Court is inclined to reduce the sanction, it should reduce the award to $25,000 per week, totaling $100,000 per month. (Id. at PageID 13731.)

ECIMOS filed its Expedited Response on August 13, 2020. (ECF No. 606.) ECIMOS rejects Carrier's proposal and asserts that the Court's Order is appropriate and properly penalizes Carrier for its continued delays. (See generally id.)

The Court held a hearing on the Motion on August 14, 2020 at 9:30 a.m. Present were counsel for ECIMOS and Carrier, as well as the Special Master Nik Baer. The Court heard a status update[1] on the rollout from the Special Master and testimony from Lisa Oliver, Carrier's rollout project manager, and William Jeffrey Carr, ECIMOS's technical expert.

For the reasons provided at the hearing and for the reasons set forth below, the Court **DENIES IN PART** and **GRANTS IN PART** Carrier's Motion. August 17, 2020 will remain the deadline for completion of the rollout of the non-infringing run test software and database at Carrier's Collierville, Tennessee plant. The Court will modify the Order on Rollout Plan (ECF No. 588) to direct the payment of the potential penalty to the Court and to reduce the amount of the sanction to $250,000 per week with no escalating penalty structure.

**I.     Background**

On November 26, 2018, the Court entered the Judgment and Permanent Injunction in this case. (Judgment and Permanent Injunction, ECF No. 400.) Carrier was enjoined from using ECIMOS's RES run-test software and database in its Collierville, Tennessee plant, but the Court stayed enforcement of the injunction until Carrier was able to develop a replacement

---

[1] The Special Master's August 13, 2020 Report has been docketed and can be found at ECF No. 605.

2

non-infringing run-test software and database. (Id. at PageID 11050–51.) Carrier was ordered to pay ECIMOS a $50 per run-test station monthly fee each month the RES run-test software and database were still in use at Carrier's Collierville plant. (Id.)

The process of developing the new run-test software and database has been ongoing since the judgment was entered in November 2018. Development of the DSA software was completed in February 2020. (See Special Master's Sixteenth Report, ECF 547 at PageID 12654 (discussing completion of families 1 through 14 of requirements).) Carrier was to submit a proposed rollout plan on March 12, 2020. (Order Setting Schedule, ECF No. 548 at PageID 12704.) A status conference to review Carrier's proposed rollout plan was set for April 2, 2020. (Id.)

The COVID-19 pandemic prompted a change to the testing and rollout schedules. (See Setting Letter, ECF No. 555.) The Court held a status conference on May 5, 2020 to review the testing schedule proposed by Carrier. (See May 5, 2020 Min., ECF No. 563.) During the conference, Carrier requested that the Court allow DSA to continue the development of new families of requirements, despite the completion of the development of families of requirements for the non-infringing run-test software and database. (See Order Following Conference, ECF No. 567.) ECIMOS objected to the development of additional requirements during the testing phase of the litigation. (Id.) The Court overruled ECIMOS's objections and granted Carrier's request for additional time to complete testing and the development of these new requirements.[2] (Id.) Based on the presentation of the Parties, the Court adopted a schedule requiring Carrier to begin testing by no later than June 22, 2020 and

---

[2] Carrier's original proposed testing schedule anticipated that the testing of the new run-test software and database would begin on April 6, 2020 and would be completed by May 8, 2020. (Special Master's Seventeenth Report, ECF No. 554 at PageID 12835.)

to complete all testing by no later than July 27, 2020. (Id. at PageID 13668.) In accordance with the schedule, the deadline for development of new families of requirements was to coincide with the end of testing, that is, no later than July 27, 2020. (Id.)

Carrier did not complete the testing of the new non-infringing run-test software and databased and the development of new requirements by the July 27, 2020 deadline. (See Special Master's Twenty-First Report, ECF No. 585 at PageID 13549–51; see also Order Following August 3, 2020 Conference, ECF No. 592 at PageID 13683.) A deadline of August 17, 2020 was then established for Carrier to come into full compliance with the November 26, 2018 Permanent Injunction. (Order Setting Deadline, ECF No. 586.) On July 29, 2020, an Order on Rollout Plan for the Non-Infringing Run-Test Software and Database was entered adopting the two-week rollout time frame proposed by Carrier but providing for a line-by-line rollout rather than a station-by-station rollout. (ECF No. 588.) Specifically, rollout was to begin on August 3, 2020 and to be completed by no later than August 17, 2020. (Order on Rollout Plan, ECF No. 588 at PageID 13671.) Carrier's failure to complete rollout by the August 17, 2020 deadline would lead to the imposition of a $500,000 weekly penalty, which would increase by $250,000 each additional week that Carrier failed to comply with the permanent injunction. (Id. at PageID 13673.)

The Court held a hearing on August 3, 2020 to review Carrier's plan to meet the Court's rollout schedule. (Min., ECF No. 591.) Carrier requested an additional exception to the Court's Order that adopted the requirement that the development of new requirements be completed by no later than the July 27, 2020 deadline. (Id.) The Court granted a limited exception and allowed DSA to continue the development of the Opto-22 Snap and IO configuration requirements necessary for Carrier to operate production lines 6, 7, and 8 of its

4

Collierville plant, despite the lack of diligence shown by Carrier during the testing and development phase of the new DSA database and software. (ECF No. 592 at PageID 13684.) Carrier also was required to pay ECIMOS a $50,000 licensing fee for its continued use of ECIMOS's intellectual property. (Id.)

## II. Discussion

### A. Carrier's Request for an Extension of Time

An extension of time is not appropriate in this case. As the Court stated during the hearing, Carrier has failed to marshal the resources necessary to complete the development, testing, and rollout of the non-infringing run-test software and database. Carrier did not begin testing of the non-infringing run-test software and database until several days after the June 22, 2020 scheduled start date. (See Special Master's Twenty-First Report, ECF No. 585 at PageID 13549, ¶ 15.) Plaintiff's expert, Jeff Carr, testified that on several occasions during the five-week testing period, Carrier did not send a single employee to DSA's Pittsburgh facility to conduct testing of the new run-test software and database. During the last weekend of the designated testing period, no testing was conducted. (See Special Master's Twenty-Second Report, ECF No. 587 at PageID 13607, ¶ 6.) Faulty Carrier hardware also hampered DSA's ability to conduct testing. (See id. at PageID 13549–50, ¶¶ 17–18.)

Carrier's inability to develop the Opto-22 Snap and IO configuration requirements during the testing period, requirements that are of critical importance to run-test lines 6, 7 and 8, is emblematic of Carrier's continued lack of diligence throughout this process. It was revealed at the August 3, 2020 hearing that Carrier knew of the need to develop these requirements several weeks before the end of testing but did not submit these requirements for

5

review by the Special Master and ECIMOS until the very end of the testing period. It was not until Carrier Project Manager Lisa Oliver was assigned to manage completion of the project that Carrier began to act with diligence and effectiveness in the rollout of the DSA software and database.

Carrier showed a lack of oversight and planning throughout the rollout of the non-infringing run-test software and database. For example, Carrier did not anticipate that a key computer hardware component,[3] which was necessary for operation of its run-test stations, was not compatible with the new run-test software and database. Carrier had no supply of these components on hand at the Collierville plant. Although the addition of Oliver to the team has greatly improved Carrier's efficiency, Carrier's continued failure to prepare and marshal the resources necessary to complete rollout in a timely manner still jeopardizes the success of this project.

ECIMOS's response time in reviewing and approving bugs presented to the Special Master also does not warrant an extension of the August 17, 2020 deadline. Jeff Carr's testimony demonstrates that he promptly responded to Carrier's bug reports and that he made himself available, despite his day job, from 7 a.m. to 11 p.m. every day to review bugs to be submitted to DSA for fixes. (See Hr'g Ex. 2.) The only delays in Carr's response time were attributable to requests submitted outside of those hours (i.e., between 11:01 p.m. and 6:59 a.m.) and during hearings requiring Carr's appearance before the Court. While ECIMOS[4] has not sent personnel to Carrier's Collierville plant during rollout of the non-infringing run-test

---

[3] This is the "Sea card" (derived from the name of the provider) identified in the testimony on Friday August 14, 2020. See Testimony of Lisa Oliver.

[4] ECIMOS is a very small entity with very limited personnel.

software and database, ECIMOS's remote review and approval of bug reports submitted to DSA has in no way impeded Carrier's ability to meet the August 17, 2020 deadline. Any delay in the review process is attributable to the clean room procedure, a process necessary to ensure against the potential misappropriation of ECIMOS intellectual property during the rollout of the non-infringing run-test software and database.

COVID-19 is also not to blame for Carrier's inability to finish testing of the new software and database and the development of new requirements, and to prepare for the rollout of the non-infringing run-test solution and database. Carrier's failure to marshal adequate resources to complete testing in an expeditious and diligent manner has not been materially related to the COVID-19 pandemic. The COVID-19 pandemic has existed since early March. Carrier agreed to the testing schedule knowing that COVID-19 might impact testing and development. Carrier, however, despite a clear ability to do so, has consistently failed to marshal resources to prepare for a successful rollout and to adjust for any potential delays that might be caused by COVID-19.

Finally, although the Court recognizes that an inability to meet the August 17, 2020 deadline could harm Carrier's customers, the responsibility for any such negative externalities rests solely with Carrier. Carrier has had months to avoid these consequences but has failed to take adequate steps to avoid any such hardships.

      **B.**      **Carrier's Legal Objections to the Court's Penalty**

            *1.*      *The sanction is not a licensing fee payable to ECIMOS.*

Carrier's argument that the $500,000 escalating penalty is a licensing fee is inaccurate.[5] The penalty is not a licensing fee; it is an exercise of the Court's contempt power to sanction Carrier for its continued failure to comply with the Court's Orders. The $500,000 escalating penalty structure is a civil contempt sanction used to "compel obedience to [the] [C]ourt's order . . . ." TWM Mfg. Co. v. Dura Corp., 722 F.2d 1261, 1273 (6th Cir. 1983); see also Dayton Newspapers, Inc. v. Teamsters Local Union No. 957, 176 F. Supp. 2d 765, 769–70 (S.D. Ohio 2001) ("The authority to punish for contempt is an inherent power of all American courts," and "the contempt authority of district courts plainly embraces the power 'to enforce obedience to their lawful orders, judgments, and processes.'" (quoting Ex Parte Robinson, 86 U.S. 505, 511 (1873))). The sole purpose of the sanction is to coerce Carrier's compliance with this Court's orders.

        2.     *The imposition of the sanction does not violate due process.*

Carrier next objects to the Court's penalty structure on grounds that it violates due process. (See Carrier's Motion, ECF No. 601 at PageID 13728–30.) Carrier applies the wrong legal standard to determine whether a contempt sanction violates due process. Carrier's argument relies on State Farm Mutual Automobile Insurance v. Campbell, 538 U.S. 408 (2003), but State Farm set the standard for determining the constitutionality of a jury's award of punitive damages. See id. at 415, 418. The lower court cases cited by Carrier in its Motion address the same issue and are equally inapplicable. (See id. at PageID 13279.)

---

[5] As the Court stated during the Hearing, the Court will modify the Order on Rollout Plan to reflect that the coercive contempt sanction against Carrier will be payable into the Court, not to ECIMOS and held pending final resolution of these proceedings. This makes clear that this coercive penalty is not a compensatory contempt sanction or licensing fee.

The contempt sanction in this case is not an award of punitive damages. It does not compensate ECIMOS for Carrier's theft of its intellectual property, nor does it serve to punish Carrier for its infringing activities. Rather, the penalty is for the sole purpose of coercing Carrier's compliance with the Court's orders, which is necessitated by Carrier's continued failure to meet the established deadlines.

There are limits to the imposition of civil contempt sanctions. If the purpose of the sanction is "to make the defendant comply," the court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." United States v. United Mine Workers of Am., 330 U.S. 258, 304 (1947). Courts are to consider the "amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant" if a court imposes a coercive contempt sanction. Id. Generally, a fine designed to coerce compliance with the court's order is payable to the court rather than to the opposing party. See Blaylock v. Cheker Oil Co., 547 F.2d 962, 965 (6th Cir. 1976); see also United States v. Bayshore Assocs., Inc., 934 F.2d 1391, 1400 (6th Cir. 1991) ("The second kind [of fine for contempt] is payable to the court, but the defendant can avoid paying the contempt 'fine' by performing the act required by the court's order." (quoting Roe v. Operation Rescue, 919 F.2d 857, 868 (3d Cir. 1990))).

The sanction outlined by the Court's Order is designed to coerce Defendant's compliance with the Court's Order on Rollout and the permanent injunction. On balance, Carrier's continued failure to meet deadlines imposed by the Court after representations by Carrier that it could meet these deadlines warrants the imposition of a fine to coerce its compliance. The harm posed by Carrier's continued noncompliance warrants the penalty.

9

Carrier has continued to use ECIMOS's protected intellectual property for almost two years while paying a small licensing fee, and its revenues from the use of ECIMOS's intellectual property have been significant. According to Carrier's own witness, Carrier earns approximately $247,500,000 in gross revenue from its Collierville plant each month during its busy season. (See June 8, 2020 Status Conf. Tr., ECF No. 577 at PageID 13252:15-21.) The record throughout this litigation also makes it incontrovertible that Carrier has known all along that it would be forced to shut down its production lines if it was no longer permitted to use ECIMOS's RES software and database. (See, e.g., Carrier's Supplemental Br., ECF No. 581 at PageID 13493–94.) Moreover, a coercive penalty of $250,000[6] is miniscule in comparison to the value of the run-test software and database to Carrier's continued operation of its Collierville plant. Defendant is an entity with billions of dollars in gross revenue and can bear the burden of the sanction. The sanction is therefore appropriate and meets the standard under United Mine Workers.

> 3. *Coercive civil contempt sanctions that are remedial in nature, like the potential sanctions imposed on Carrier, do not implicate the Excessive Fines Clause of the Eighth Amendment.*

Finally, Carrier asserts that the escalating penalty structure violates the Excessive Fines Clause of the United States Constitution. (See ECF No. 601 at PageID 13730–31.) The Eighth Amendment prevents government actors, including courts, from imposing excessive fines. See U.S. Const. amend. VIII; see also Attar 2018, LLC v. City of Taylor, --- F. Supp. 3d ----, 2020 WL 532174, at *8 (E.D. Mich. 2020) ("The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some

---

[6] The Court will reduce the penalty, as stated above, to $250,000 from $500,000.

offense." (quoting United States v. Bajakajian, 524 U.S. 321, 328 (1998)) (internal quotation marks omitted)). The Excessive Fines Clause applies to fines that are "'directly imposed by, and payable to, the government' and only to fines that are punitive rather than wholly remedial." Id. (quoting Austin v. United States, 509 U.S. 602, 609–10 (1993)).

The Excessive Fines Clause does not apply to this sanction. The sanction in this case is not "punitive" but rather serves a remedial purpose: to ensure Carrier's compliance with the Court's Order and the permanent injunction. "A contempt fine [] is considered civil and remedial if it either 'coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained.'" Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 829 (1994) (quoting Mine Workers, 330 U.S. at 303–04). These potential fines are remedial in nature rather than punitive in nature because Carrier "is able to purge the contempt and obtain [its] release [from the fines] by committing an affirmative act . . . ." Id. at 828 (quoting Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 442 (1911)). As such, like other coercive civil contempt sanctions, the Court's threatened sanction does not implicate the Eighth Amendment.

The cases cited by Carrier in its brief are factually dissimilar from this case. Austin v. United States does not render this penalty punitive. Carrier cites to Austin for the proposition that the "penalty [imposed by the Court] bears no relationship to any compensation ECIMOS could be thought to deserve as a result of a short delay in Carrier's compliance, and as such, the penalty is punitive." (ECF No. 601 at PageID 13731.) Austin does not support this assertion. Austin dealt with criminal forfeiture, which is different in kind from the Court's contempt power designed to coerce compliance with past or future orders. See id. at 610–11. The Court is not imposing the penalty *because of* Carrier's *past* noncompliance or delay; it is

11

imposing the award because the Court's orders have not been enough to ensure Carrier's compliance. Although the Court may rely on evidence that Carrier has not met previous deadlines in deciding whether a sanction is necessary, such evidence serves to demonstrate the necessity of the sanction to ensure Carrier's future compliance with the Court's orders rather than evidence that the Court is punishing Carrier for its continued inability to comply. See United States v. Tennessee, 925 F. Supp. 1292, 1303 (W.D. Tenn. 1995) ("[A] court clearly can consider a contemnor's history of compliance or noncompliance in shaping an appropriate contempt sanction."). Because Carrier has demonstrated a constant delay in developing and testing the new run-test software and database and a past and present failure to exercise diligence and marshal resources to meet Court-imposed deadlines, the sanction is necessary to achieve the ends of this litigation: to ensure Carrier's compliance with the Permanent Injunction entered almost two years ago. (See ECF No. 400.)

Moreover, Carrier's Motion does not address Sixth Circuit case law that differentiates between civil contempt sanctions that serve a punitive purpose and those that serve a remedial purpose. See Bayshore Assocs., 934 F.2d at 1400–01. If the contemnor can avoid paying the penalty by "performing the act required by the court's order," then the civil penalty payable to the court is a civil, not criminal (i.e., punitive) penalty. See id. (quoting Operation Rescue, 919 F.2d at 968) (internal quotation marks omitted); see also Hopper v. Phil Plummer, 887 F.3d 744, 753 (6th Cir. 2018) ("A criminal [contempt sanction], by contrast, 'cannot [be] avoid[ed] or abbreviate[d] . . . through later compliance.'" (quoting Bagwell, 512 U.S. at 828–29)). Given that Carrier can still comply with the Court's Order on Rollout and avoid the sanction by meeting the August 17, 2020 midnight deadline, Carrier can still "avoid paying the fine." Bayshore Assocs., 934 F.2d at 1400. The penalty is thus remedial in nature,

12

rendering the Excessive Fines Clause inapplicable to this sanction. See Austin, 509 U.S. at 609–10 (noting that the "Eighth Amendment cannot apply to a civil proceeding unless that proceeding is so punitive that it must be considered criminal . . ."); see also Attar 2018, 2020 WL 532174, at *8.

In summary, the Court finds that any future penalty would not violate due process, nor would it violate the Excessive Fines Clause of the Eighth Amendment.

The Court, however, will exercise its discretion and reduce the penalty to a $250,000 weekly payment, to be paid each week until Carrier comes into full compliance with the Court's permanent injunction. This fine is necessary to coerce Carrier's compliance with the Court's Order on Rollout and the permanent injunction. A $25,000 penalty, as recommended by Carrier, provides insufficient incentive for Carrier to promptly come into compliance with the Court's orders. A $250,000 weekly penalty is also not so overly burdensome as to violate due process; Carrier earns a "significant" profit at its Collierville plant, and the remaining non-compliant lines in the plant (lines 1, 6, 7 and 8) provide Carrier with significant profits. See United Mine Workers, 330 U.S. at 304. Carrier earns approximately $247,500,000 in gross revenue from its Collierville plant each month during its busy season. (See June 8, 2020 Status Conf. Tr., ECF No. 577 at PageID 13252:15-21.) That equates to roughly $61,875,000 per week in revenue. A $250,000 coercive penalty is a meager portion of that weekly revenue. Such a penalty also reflects the fact that Carrier, as stated above, has shown a demonstrated refusal until the arrival of Lisa Oliver to marshal resources to meet the Court's deadlines for testing, development and (potentially) rollout of the non-infringing run-test software and database. See Tennessee, 925 F. Supp. at 1303; see also Glover v. Johnson, 934

F.2d 703, 715 (6th Cir. 1991) ("a persistent pattern of obfuscation," among other actions, supported significant sanction).

### III.     Conclusion

For the reasons set forth above, Carrier's Motion is **GRANTED IN PART** and **DENIED IN PART**. The Court will modify the Order on Rollout in accordance with the terms of this Order. Impoundment of all ECIMOS software and database except as to lines 1, 6, 7 and 8 shall proceed on schedule. Lines 1, 6, 7 and 8 may continue to run the infringed database and software with final impoundment to be completed on **Monday, August 24, 2020 at midnight**.

**SO ORDERED**, this 17th day of August, 2020.

    /s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE